No. 25-2061

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

HAYDEN GATEWAY LLC AND BLOC DISPENSARY LLC,

*Plaintiffs-Appellees,*

v.

ADVANCED FLOWER CAPITAL INC. AND AFC AGENT LLC;

*Defendants-Appellants.*

*On Appeal From The United States District Court For The District of New Jersey*
*Hon. Zahid Quraishi, Case No. 3:25-02789*

## OPENING BRIEF OF APPELLANTS ADVANCED FLOWER CAPITAL INC. AND AFC AGENT LLC

Jason D. Sternberg
David A. Nabors
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
2601 South Bayshore Dr., Ste. 1550
Miami, FL 33133
(305) 402-4880

Alex H. Loomis
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
111 Huntington Ave., Ste. 520
Boston, MA 02199
(617) 712-7100

Kevin S. Reed
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
295 Fifth Avenue, 9th Fl.
New York, NY 10016
(212) 849-7000

*Counsel for Defendants-Appellants*
*Advanced Flower Capital Inc. and AFC Agent LLC*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendants-Appellants Advanced Flower Capital Inc. and AFC Agent LLC (together, "AFC") have no parent corporation, and no publicly-held corporation owns 10% or more of their stock.  AFC is not aware of any publicly held corporation that is not a party to the proceeding before this Court that has a financial interest in the outcome of this case.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...........................................................................iv

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT ..................................................................5

STATEMENT OF THE ISSUES.......................................................................6

STATEMENT OF RELATED CASES ..............................................................6

STATEMENT OF THE CASE...........................................................................7

    A.    The Credit Agreement .......................................................................7

    B.    The Forbearance Agreement ..............................................................9

    C.    The Borrowers' Defaults On The Forbearance Agreement ...............12

        1.    The Hazleton Property ...........................................................13

        2.    The Borrowers' Defense To Foreclosure..................................15

        3.    Annual Audited Financial Statements ......................................15

        4.    The Ewing Property ...............................................................15

    D.    The Preliminary Injunction ...............................................................17

    E.    The Injunction Bond..........................................................................21

SUMMARY OF ARGUMENT .......................................................................23

ARGUMENT ................................................................................................27

I.    The District Court Should Not Have Issued The Injunction .........................27

    A.    Standard Of Review .........................................................................27

    B.    The District Court Committed Legal Error In Ruling That Plaintiffs Had Established A Likelihood Of Success On The Merits.................................................................................................28

        1.    The Purported Oral Reopening Agreement Is Unenforceable .......................................................................29

        2.    The Purported Oral Waiver Of The Borrowers' Obligation To Provide Audited Financial Statements Is Unenforceable .......................................................................38

3.      This Court Must Vacate The Preliminary Injunction Based On The Borrowers' Defaults ...........................................41

C.      The Borrowers Have Not Clearly Shown Irreparable Harm .............45

1.      The Foreclosure Action Will Not Irreparably Harm The Borrowers.................................................................................46

2.      AFC's Other Bargained-For Remedies Will Not Irreparably Harm The Borrowers' Business Or Goodwill .......49

II.     In Any Case, The District Court Should Have Set An Adequate Bond........51

A.      Standard Of Review ........................................................................51

B.      The District Court Abused Its Discretion By Allowing The Borrowers To Post AFC's Collateral As Bond .................................52

C.      The District Court Abused Its Discretion By Setting The Bond Too Low ..........................................................................................54

CONCLUSION ....................................................................................................56

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................58

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 28.3(d)....................59

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 31.1(c)....................60

CERTIFICATE OF SERVICE ..............................................................................61

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

## Cases

*1890 Adam Clayton Powell LLC v. Penant*,
    37 N.Y.S.3d 166 (N.Y. App. Div., 1st Dep't 2016) ...........................................40

*Acierno v. New Castle Cnty.*,
    40 F.3d 645 (3d Cir. 1994) ..........................................................................49, 50

*ADP, Inc. v. Levin*,
    No. 21-2187, 2022 WL 1184202 (3d Cir. Apr. 21, 2022)..................................51

*United States v. Ali*,
    508 F.3d 136 (3d Cir. 2007) .............................................................................48

*Am. Prescription Plan, Inc. v. Am. Postal Workers Union*,
    565 N.Y.S.2d 830 (N.Y. App. Div., 2d Dep't 1991)........................................33

*Anostario v. Vicinanzo*,
    450 N.E.2d 215 (N.Y. 1983).................................................................24, 30, 34

*Appel v. Kaufman*,
    No. 08-cv-392, 2011 WL 13377541 (E.D. Pa. Jan. 5, 2011) ...........................48

*ARP Films, Inc. v. Marvel Ent. Grp.*,
    952 F.2d 643 (2d Cir. 1991) .............................................................................45

*Artvale v. Rugby Fabrics Corp.*,
    363 F.2d 1002 (2d Cir. 1966) ...........................................................................47

*Caplan v. City of Pittsburgh*,
    100 A.2d 380 (Pa. 1953)...................................................................................48

*Colton v. N.Y. Hosp.*,
    414 N.Y.S.2d 866 (Sup. Ct., N.Y. Cnty. 1979) ...............................................48

*Cordova v. Mike Bloomberg 2020, Inc.*,
    No. 22-1023, 2023 WL 6119448 (2d Cir. Sept. 19, 2023)................................34

*Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety*
  *& Homeland Sec.*,
  108 F.4th 194 (3d Cir. 2024) .............................................................27, 28, 31, 43

*Delaware Strong Fams. v. Att'y Gen. of Delaware*,
  793 F.3d 304 (3d Cir. 2015) .................................................................27

*Deutsche Bank Nat'l Tr. v. Williams*,
  879 N.Y.S.2d 552 (N.Y. App. Div., 2d Dep't 2009).........................................45

*DFW Metro Line Servs. v. Sw. Bell Tel. Co.*,
  901 F.2d 1267 (5th Cir. 1990) .................................................................47

*Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter Co., L.P.A.*,
  Nos. 04-cv-494 & 04-cv-584,
  2009 WL 818997 (S.D. Ohio Mar. 27, 2009).................................................48

*ECRI v. McGraw-Hill, Inc.*,
  809 F.2d 223 (3d Cir. 1987) .................................................................26, 46, 50

*Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC*,
  4 N.E.3d 336 (N.Y. 2013)....................................................................30, 34, 40

*Gaia Gardens, LLC v. Township of Montclair*,
  No. 23-3026, 2024 WL 5199327 (3d Cir. Dec. 23, 2024) .................................28

*Gibson v. State Farm Mut. Auto. Ins.*,
  994 F.3d 182 (3d Cir. 2021) .................................................................52

*Goadby v. Philadelphia Elec. Co.*,
  639 F.2d 117 (3d Cir. 1981) .................................................................47

*Golden Fortune Imp. & Exp. Corp. v. Mei-Xin Limited*,
  Nos. 22-1710 & 22-1885,
  2022 WL 3536494 (3d Cir. Aug. 5, 2022) .................................................49

*Gottwald v. Sebert*,
  148 N.Y.S.3d 37 (N.Y. App. Div., 1st Dep't 2021) .........................................44

*Hoxworth v. Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990) .................................................................52, 54

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
   882 F.2d 797 (3d Cir. 1989) ...................................................49, 52, 53

*John St. Leasehold LLC v. F.D.I.C.*,
   196 F.3d 379 (2d Cir. 1999) ...................................................37

*Joseph P. Day Realty Corp. v. Jeffrey Lawrence Assocs., Inc.*,
   704 N.Y.S.2d 587 (N.Y. App. Div., 1st Dep't 2000) ........................................40

*L & B 57th St., Inc. v. E.M. Blanchard, Inc.*,
   143 F.3d 88 (2d Cir. 1998) ...................................................36, 37

*Lenel Sys. Int'l, Inc. v. Smith*,
   824 N.Y.S.2d 553 (N.Y. App. Div., 4th Dep't 2006)........................................45

*Mallet & Co. v. Lacayo*,
   16 F.4th 364 (3d Cir. 2021) ...................................................54, 55, 56

*Merrill Lynch Interfunding, Inc. v. Argenti*,
   155 F.3d 113 (2d Cir. 1998) ...................................................24, 30, 32, 35, 39

*Nat'l Westminster Bank USA v. Vannier Grp.*,
   554 N.Y.S.2d 482 (N.Y. App. Div., 1st Dep't 1990) ........................................33

*National Land & Inv. Co. v. Specter*,
   428 F.2d 91 (3d Cir. 1970) ...................................................47

*NRDC v. Texaco Refining & Mktg., Inc.*,
   906 F.2d 934 (3d Cir. 1990) ...................................................39

*Parker v. Navarra*,
   958 N.Y.S.2d 754 (N.Y. App. Div., 2d Dep't 2013)........................................41

*Phoenix Corp. v. U.W. Marx, Inc.*,
   881 N.Y.S.2d 714 (N.Y. App. Div., 3d Dep't 2009)........................................30

*Riverside Rsch. Inst. v. KMGA, Inc.*,
   489 N.Y.S.2d 220 (N.Y. App. Div., 1st Dep't 1985) ........................................38

*Rose v. Spa Realty Assocs.*,
   366 N.E.2d 1279 (N.Y. 1977)...................................................29

*S & G Golden Ests., LLC v. New York Golf Enters., Inc.*,
190 N.Y.S.3d 89 (N.Y. App. Div., 2d Dep't 2023)............................................35

*S. Camden Citizens in Action v. N.J. Dep't of Env't Prot.*,
274 F.3d 771 (3d Cir. 2001) ...............................................................28

*Sampson v. Murray*,
415 U.S. 61 (1974)..........................................................................49

*Sinclair v. Soniform, Inc.*,
935 F.2d 599 (3d Cir. 1991) .......................................................37, 38, 40

*Snelling & Snelling, Inc. v. Ryvis, Inc.*,
No. 99-cv-2028-D, 1999 WL 1032799 (N.D. Tex. Nov. 10, 1999)...................47

*Sparacio v. Sparacio*,
724 N.Y.S.2d 204 (N.Y. App. Div., 2d Dep't 2001)...............................47, 48

*Syverson v. Int'l Bus. Machines Corp.*,
472 F.3d 1072 (9th Cir. 2007) ...............................................................48

*Towers Charter & Mar. Corp. v. Cadillac Ins.*,
894 F.2d 516 (2d Cir. 1990) ....................................... 3, 29, 30, 36, 38, 39, 41

*TrueNorth Cap. Partners v. Hitachi Metals, Ltd.*,
723 F. App'x 22 (2d Cir. 2018) ......................................................4, 32, 35

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008).........................................................................45, 46

*Zambelli Fireworks Mfg. Co. v. Wood*,
592 F.3d 412 (3d Cir. 2010) ...........................................................51, 52

## Statutes

28 U.S.C. § 1292(a)(1)........................................................................5

28 U.S.C. § 1332(a)(1).........................................................................5

28 U.S.C. § 2283..............................................................................48

N.Y. U.C.C. Law § 9-609(a)....................................................................8

N.Y. Gen. Oblig. Law § 15-301.....................................................29, 39, 40

N.Y. U.C.C. Law § 9-609(b) ....................................................................8

**Rules**

Fed. R. Civ. P. 65(c)...........................................................26, 52, 53, 54

**Other Authorities**

Alan M. Christenfeld, *Forbearance Agreements in Funded Credit Arrangements*,
   42 UCC L.J. 385 (2011)......................................................................10

**INTRODUCTION**

Defendants-Appellants Advanced Flower Capital Inc. and AFC Agent LLC (collectively, "AFC") are an institutional lender and collateral agent, respectively, specializing in secured financing for licensed cannabis operations. In 2021, AFC entered into a Credit Agreement with Plaintiffs-Appellees Hayden Gateway LLC and Bloc Dispensary LLC (together, the "Borrowers"). JA0275. Under the Credit Agreement, AFC lent the Borrowers approximately $83.5 million to fund their cannabis operations in Pennsylvania and New Jersey. JA0860.

The Borrowers defaulted, repeatedly, and now owe in excess of $100 million. But AFC wanted to help the Borrowers make their business work. AFC agreed to a 2024 Forbearance Agreement, under which it would not enforce its remedies against the Borrowers for their prior defaults and reduced the Borrowers' loan payments. In exchange for the Forbearance Agreement, the Borrowers agreed that AFC could foreclose on the Borrowers' Hazleton, Pennsylvania facility, that the Borrowers would not assert defenses to foreclosure, and that the Borrowers would obtain necessary licenses and certificates from New Jersey regulatory authorities. The Borrowers also agreed that they would continue to abide by their obligations under the Credit Agreement, including keeping AFC informed by sending it audited financials, maintaining necessary licenses from Pennsylvania regulatory authorities, and informing AFC right away if the Borrowers lost their applicable licenses.

1

Both contracts were governed by New York law and subject to clauses dictating that modifications "be in writing and signed." If the Borrowers defaulted on either agreement, the parties agreed, AFC could immediately take back its collateral and accelerate the loan. JA0367, JA0370-71, JA0213, JA0231.

The Borrowers breached again, as they had before, but this time, enough was enough: AFC collected $1.8 million in cash collateral and informed the Borrowers that it intended enforce its other remedies. In response, the Borrowers ran to court claiming that AFC's collection of collateral and maintenance of the Hazleton foreclosure action was a breach. They concocted a story that AFC had orally waived its rights to foreclose on the Pennsylvania property and to receive financials and was itself to blame for the Borrowers' failure to obtain a necessary New Jersey permit. Just twenty-two days after they sued, the U.S. District Court for the District of New Jersey (Quraishi, J.) entered a preliminary injunction barring AFC from enforcing any of its rights under the Credit Agreement and the Forbearance Agreement. This Court should reverse, or at minimum vacate and remand.

The Borrowers did not satisfy the elements of injunctive relief. The Credit and Forbearance Agreements authorized AFC (1) to bring the Hazleton foreclosure action unconditionally and (2) to collect cash collateral without judicial process, expedite the loan, and employ other remedies upon the Borrowers' default. The Borrowers defaulted several times. They failed to obtain a necessary license renewal

in Pennsylvania, resulting in the loss of loan collateral, and hid this fact from AFC—which the district court ignored.  They also asserted defenses in the Hazleton foreclosure proceeding, which was also a default of the Forbearance Agreement. And they failed to give AFC audited financial information, another default.

Any one of these defaults on its own authorizes AFC to pursue all its remedies, and thus precludes the Borrowers from establishing that they are likely to succeed on the merits of their claim that AFC's actions were unlawful.

The district court excused the defaults because it believed that the parties had orally modified their contracts to take away AFC's right to foreclose and receive financials (but not any of its other remedies).  AFC vigorously disputes that any such oral agreements existed.  But this Court need not resolve that factual dispute because the alleged oral agreements are unenforceable.  Under New York law, parties cannot orally modify or waive rights under agreements that, like the Credit and Forbearance Agreements, contain no-oral-modifications and no-waiver clauses.   The only exception to this rule is when "the conduct claimed to have resulted from the oral modification … is inconsistent with the agreement as written." *Towers Charter & Mar. Corp. v. Cadillac Ins.*, 894 F.2d 516, 522 (2d Cir. 1990).  Here "nothing in the written agreements precluded" the conduct that the Borrowers attributed to the modifications.  *Id.*  That alone precludes enforcing the purported oral agreement. Well over a dozen appellate cases applying New York law with fact patterns similar

to here hold that the oral modifications are unenforceable.  *See, e.g.*, *TrueNorth Cap. Partners v. Hitachi Metals, Ltd.*, 723 F. App'x 22, 25 (2d Cir. 2018) (summary order).  The district court cited in passing, but failed to apply, this body of law.

The district court also disregarded two of the Borrowers' undisputed defaults—failure to maintain a license for their Hazleton facility, and the Borrowers' hiding this fact from AFC—each of which also entitles AFC to exercise all its remedies.  There is no evidence, let alone a finding by the district court, that any purported oral agreements excuse either of these defaults.

The district court also erred in ruling that the Borrowers would suffer irreparable harm absent relief.  The district court wrongly granted an antisuit injunction against Hazleton foreclosure action, seemingly in violation of the Anti-Injunction Act, even though the Borrowers did not contend, and the district court did not conclude, that litigating this action would irreparably harm the Borrowers.  Wrongful foreclosure on a business is compensable by damages.  Litigating the Borrowers' defenses in Pennsylvania, where the property is based, instead of New Jersey, is not irreparable harm either.

Nor is there evidence that AFC's exercising its remedy to collect its cash collateral would cause irreparable harm.  The district court acknowledged that the only immediate harm the Borrowers would suffer from such "cash sweeps" is monetary, but still granted relief because the Borrowers were at "risk" of "possibly"

suffering irreparable harm later on. This is too speculative to justify an injunction under this Court's precedents.

Finally, the district court set the bond too low. Bonds are supposed to deter plaintiffs from advancing meritless requests for injunctive relief and to compensate enjoined defendants for damages they suffer as a result of a wrongful injunction. But here, the district court turned that rationale on its head. It ordered a $1 million bond—itself an inadequate amount—that it then required to be paid using AFC's own collateral. In other words, AFC is paying for the Borrowers' bond. If the Court reaches the question, it should vacate and remand for the district court to set an appropriate bond.

For these reasons, this Court should reverse or vacate the decision below.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

The district court entered a preliminary injunction on May 9, 2025, and AFC timely appealed on June 2, 2025. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the district court abused its discretion in granting the preliminary injunction.  *See* JA0460-82, JA600-04, JA0613.

2.      Whether the district court abused its discretion when it ordered a $1 million bond to be posted using the enjoined parties' collateral.  *See* JA0482-83, JA1582-84.

## STATEMENT OF RELATED CASES

This case has not previously been before this Court.  AFC is aware of the following cases related to the subject matter of this appeal:

1.      *AFC Agent LLC v. SRG HI Park LLC*, No. 202501520 (Pa. Ct. of Common Pleas).  This is the foreclosure action for the Hazleton, Pennsylvania discussed in this brief, the parties' Forbearance Agreement, and the opinion below. *See* Dist. Ct. Dkt. 48-4.

2.      *Advanced Flower Cap. Inc. et al. v. Kanovitz et al.*, No. 1:25-cv-02996 (S.D.N.Y.).  This is a suit by AFC against Jon Loevy and Michael Kanovitz, the guarantors of the loans at issue in this appeal.  *See* Dist. Ct. Dkt. 48-5.

3.      *AFC Agent LLC v. JG HoldCo, LLC*, No. 652644/2025 (N.Y. Sup. Ct.). This is a suit by AFC against JG HoldCo, LLC, the Borrowers' parent company and a guarantor of the loans at issue in this appeal.  *See* Dist. Ct. Dkt. 48-6.

## STATEMENT OF THE CASE

### A.    The Credit Agreement

AFC is an institutional lender that focuses its business on the legal cannabis industry.  JA0009.

In September 2021, AFC entered into a Second Amended and Restated Credit Agreement with the Borrowers and their parent company, JG HoldCo LLC. JA0008-09.[1]  Under the Credit Agreement, AFC lent the Borrowers $83.5 million, and the Borrowers agreed to pay the full principal plus interest by May 2026, while making regular payments to AFC before maturity.  JA0860, JA0301, JA0290.

Given this large sum and extended payment time, the parties agreed to extensive interim protections for AFC.  The Borrowers agreed to:

- make regular payments to AFC, JA0322, JA0324;

- maintain certain accounting and billing standards, JA0345-46;

- "keep in full force and effect … any Permits or Cannabis Licenses material to [their] businesses," JA0346; and

- provide AFC with any communications or documents they sent to, or received from, "any Governmental authority" within five days. JA0352.

---

[1]    When the parties entered into the Credit Agreement, Plaintiff-Appellee Bloc Dispensary LLC was known as JG New Jersey LLC.  JA0283.

Additionally, the Credit Agreement requires the Borrowers' parent company to provide AFC with "annual audited financial statements" and "regular progress reports" on those audits.  JA0345-46.

The Credit Agreement defines breaches of these obligations, as well as any "fail[ure] to pay when due and payable," as default events.  JA0359.  Upon a default event, AFC is entitled to a range of remedies, including:

- "declar[ing] all or any portion of the principal" and "all accrued and unpaid interest and fees … immediately due and payable," JA0362;

- terminating the Credit Agreement, *id.*; and

- "exercis[ing] all other rights and remedies available … under the Loan Documents, under Applicable Law, or in equity"—including by recovering its collateral under New York's Uniform Commercial Code ("U.C.C."), JA0363.

*See also* N.Y. U.C.C. Law § 9-609(a)-(b) (providing that "a secured party" may, after default, "take possession of the collateral" either "pursuant to judicial process" or "without judicial process, if it proceeds without breach of the peace").

The parties also agreed that the Credit Agreement, "any provision" in it, and "any other Loan Document" could not be amended, waived, or modified "unless" the amendment, modification, or waiver was "in writing and signed."  JA0370. Likewise, the Credit Agreement contains a no-waiver clause, which states "[n]o

8

failure by Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by Agent or any Lender in exercising the same, will operate as a waiver," and that "[n]o waiver … will be effective unless it is in writing, and then only to the extent specifically stated." JA0371.

Finally, New York law governs the Credit Agreement and "the other Loan Documents," as well as "the construction, interpretation, and enforcement" of those documents and all matters arising under or related to them.  JA0367.

### B.    The Forbearance Agreement

The Borrowers failed to make the required payments under the Credit Agreement, and more than $100 million is now due.  JA0009.  The Borrowers' failure to make the required payments under the Credit Agreement placed them in default.  *Id.*

Rather than terminate the Credit Agreement, AFC negotiated with the Borrowers, and in March 2024, the parties entered into a Forbearance Agreement. JA0211.  The Forbearance Agreement significantly lowered the Borrowers' regular payments and their interest rate.  JA0010.

Consistent with commercial practice, the Forbearance Agreement did not extinguish the Borrowers' defaults or terminate or supersede the Credit Agreement. "[F]orbearance agreements merely suspend the exercise of a creditor's remedies

temporarily while neither curing or waiving the borrower's defaults nor impairing the creditor's right to exercise its remedies ultimately." Alan M. Christenfeld, *Forbearance Agreements in Funded Credit Arrangements*, 42 UCC L.J. 385, 388 (2011). The parties expressly agreed—and repeatedly acknowledged—that the Borrowers remained in default. JA0211-13, JA0216, JA0236-37 ("Neither this Agreement, nor any actions … , shall be construed as a waiver of or consent to the Specified Defaults or any other existing or future defaults under the Loan Documents, as to which Agent's and Lenders' rights shall remain reserved."). The Forbearance Agreement also provides that "all terms, conditions, covenants, representations and warranties contained in the Credit Agreement" were to "remain in full force and effect." JA0229.

In sum, under the Forbearance Agreement, AFC agreed only to forbear exercising *some* of its rights upon specified defaults, like the right to accelerate the loan or repossess some of its collateral, until either the May 2026 maturity date or further defaults by the Borrowers. JA0214.

The Forbearance Agreement expressly reserves several of AFC's other rights under the Credit Agreement. As relevant here, AFC reserved its ability to foreclose on real estate in Hazleton, Pennsylvania that the Borrowers used for cultivation at any time after April 30, 2024, even if the Borrowers did not default again. *Id.*

As in the Credit Agreement, the parties agreed that the Forbearance Agreement could "not be waived, modified, altered, or amended except by agreement in writing signed by all the parties."  JA0231.

In exchange, the Borrowers agreed to several additional conditions to reduce the risk of further underpayment to AFC, including:

- to grant AFC exclusive control over their bank accounts and to permit AFC to make regular "cash sweeps" of Borrowers' bank accounts if the funds available in those accounts exceeded certain thresholds, JA0214, JA0217, JA0221-22;

- to obtain a certificate of occupancy for a cultivation facility in Ewing, New Jersey by May 15, 2024, JA0219; and

- to "enter into a consulting … agreement with SierraConstellation Partners LLC," under "which [an] NJ Operations Manager has full control to manage the operations of Borrowers in New Jersey," JA0221.

Like the Credit Agreement, the Forbearance Agreement defines what qualified as "default" under the Forbearance Agreement.  Defaults include:

- any "fail[ure] to abide by … any covenant set forth in <u>Section 5</u>"—one of those covenants being the Borrowers' promise to obtain a certificate of occupancy for the Ewing facility by May 15, 2024, JA0219, JA0227;

11

- any attempt by the Borrowers "to challenge, enjoin, avoid or unwind" AFC's foreclosure of the Hazleton property, JA0228; and

- anything that would qualify as a default under the Credit Agreement, JA0227.

Upon any default, AFC's forbearance obligations would "immediately and automatically" terminate "without notice or further action," at which point AFC would "be entitled to exercise any or all of [its] rights and remedies" under the Credit Agreement and applicable law—including, again, the U.C.C.  JA0228.

The Forbearance Agreement is also governed by New York law.  JA0231.

## C.    The Borrowers' Defaults On The Forbearance Agreement

The Borrowers failed to comply with several of the Forbearance Agreement's terms.  The Borrowers:

(1)    failed to timely notify AFC of the loss of their permit in Pennsylvania and failed to turn over the Department of Health's correspondence,

(2)    asserted affirmative defenses in AFC's foreclosure action on the Hazleton property,

(3)    failed to submit 2023 and 2024 audited financial statements, and

(4)    failed to obtain a certificate of occupancy for the Ewing property by May 15, 2024.

12

(The Ewing default is not relevant to this appeal but is summarized below because the district court addressed it.)

### 1.    The Hazleton Property

As discussed, the Forbearance Agreement authorized AFC to foreclose on the Hazleton property any time after April 30, 2024, regardless of whether the Borrowers committed another default.  JA0214.  But consistent with the parties' agreement that no "failure" or "delay" in pursuing its rights would operate as a waiver, AFC did not immediately foreclose on the Hazleton property.  JA0371.

The Borrowers tried to recruit investors to make the Hazleton property an operational cultivation facility.  JA0014.  They failed.  *Id.*

Things got worse.  On July 25, 2024, the Pennsylvania Department of Health declined to renew the cultivation permit for the Hazleton property because (1) the Borrowers "failed to timely submit [their] 2024-2025 renewal application"; and (2) the property was not operational."  JA1522.  The Borrowers' loss of their permit was a default under Section 5.3 of the Credit Agreement, which required the Borrowers to "keep in full force and effect … any Permits or Cannabis Licenses material to [their] businesses."  JA0346, JA0360.

The Borrowers did not inform AFC of the Department of Health's decision until August 15, 2024.  JA0014.  That delay breached two more provisions of the Credit Agreement: Section 5.1, which required the Borrowers to inform AFC of

known defaults within three business days, JA0345-46, JA0429-30, and Section 5.22, which required the Borrowers to provide AFC with information and documents given to them by "any Governmental authority," like the Department of Health, within five business days, JA0429-30.  In fact, the Borrowers never gave to AFC the Department of Health's letter informing AFC of its decision or why the Borrowers lost their permit.  JA0852.

The Borrowers appealed the Department of Health's non-renewal of the cultivation permit.  JA0014.  AFC did not object to the Borrowers' decision to appeal.  *Id.*  This appeal remains pending.  JA0015.

Around September 2024, the Borrowers began negotiating a potential settlement with the Department of Health.  The Borrowers asked that AFC approve Borrowers' contribution of $500,000 of equity funds toward startup and reopening costs.  JA0015, JA1234.  AFC did so.  *Id.*  In a December 2024 letter to the Department of Health, the Borrowers advised that their owners also "pledged up to $5 million of their personal funds" to pay for completion of the cultivation facility. JA0015, JA1226.  In an exhibit to the same letter, the Borrowers told the Department of Health that AFC "has informed [them] of AFC's agreement to … take no action to foreclose" on the Hazleton property.  JA1226. The Borrowers concede that no such agreement was ever reduced to writing.  JA0668-69.  AFC denies that it ever orally promised not to foreclose (indeed, AFC did not even know why the Borrowers

14

lost their permit). JA0850-57. The Borrowers did not send AFC the exhibit referring to the purported oral agreement until January 2025, four weeks after the Borrowers sent the document to the Department of Health. JA0688-89.

### 2. The Borrowers' Defense To Foreclosure

In February 2025, AFC filed an action to foreclose on the Hazleton property in Pennsylvania state court. JA0015. The Borrowers answered AFC's foreclosure complaint and asserted affirmative defenses. *Id.* Again, this was a default of the Forbearance Agreement, which prohibited the Borrowers from defending against foreclosure. JA0213.

### 3. Annual Audited Financial Statements

The Credit Agreement, as discussed, required the Borrowers' parent company to submit annual audited financial statements to AFC. JA0345-46. The Borrowers admit that their parent did not provide AFC with the Borrowers' 2023 and 2024 audited financial statements. JA0669-70; *see* JA0032-33. Both the Credit and Forbearance Agreements define the failure to submit such statements as a default. JA0359-60, JA0227.

### 4. The Ewing Property

The Forbearance Agreement also required the Borrowers to enter into a consulting agreement granting operational control of their New Jersey business to an "Operations Manager" acceptable to AFC. JA0221. So the next month, AFC approved Tim Bossidy's appointment as the Borrowers' Chief Restructuring

Officer.  JA0620.  Mr. Bossidy was a Managing Director at SierraConstellation Partners LLC.  JA0012.  According to the Borrowers, Mr. Bossidy had a prior professional relationship with AFC's CEO, Daniel Neville.  JA0035-36.

Around the time that Mr. Bossidy was appointed, the Borrowers were under the Forbearance Agreement's soon-approaching May 15, 2024 deadline to obtain a final certificate of occupancy for their Ewing facility.  JA0219.  The Borrowers do not dispute that they failed to meet that deadline.  JA0013.  That failure placed Borrowers in "default of Section 5.3 of the Forbearance Agreement."  *Id.*

The Borrowers attribute that default to Mr. Bossidy and AFC.  They call Mr. Bossidy's leadership "disastrous."  JA0012.  Mr. Bossidy withheld payments to vendors, including Mosaic Construction LLC, the general contractor tasked with building Borrowers' facilities in New Jersey, due to the vendors' faulty work.  JA0856.  The Borrowers also blame AFC for Mr. Bossidy's conduct.  JA0645.

The contract gave the Borrowers the right to terminate Mr. Bossidy's employment without cause on seven days' notice to Mr. Bossidy.  JA0272, JA0623.  Eventually, the Borrowers did terminate Mr. Bossidy's employment.  JA0623, JA0638-39.

\*        \*        \*

After these forbearance defaults, AFC sent the Borrowers several demand letters explaining that the Borrowers were in default and informing them that AFC

was accelerating the loan.   JA0015, JA0940.   AFC demanded payment, but the Borrowers refused.   *Id.*   AFC then undertook a "cash sweep," consistent with the Credit and Forbearance Agreements, withdrawing about $1.8 million from the Borrowers' bank accounts that the Borrowers had posted as collateral.   JA0016. [2]

### D.    The Preliminary Injunction

The Borrowers sued AFC in the District of New Jersey for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the U.C.C.   JA0053.   The Borrowers sought a preliminary injunction barring AFC from enforcing its remedies under the Credit and Forbearance Agreements.   JA0110.

On breach of contract, the Borrowers asserted that they and AFC entered into an enforceable oral modification of the Credit and Forbearance Agreements. JA0028-32.   In that alleged oral modification, said the Borrowers, AFC orally agreed (1) to permit the Borrowers to use their equity funds to make the facility operational and (2) not to foreclose on the Hazleton property.   *Id.*   The Borrowers also argued that their failure to provide annual audited financial statements was not a default because AFC orally waived the Credit Agreement's requirement to provide AFC with the Borrowers' annual audited financial statements.   JA0032-33.   Even though the Borrowers had stipulated in the Forbearance Agreement that they were "in default" of the Credit Agreement and that the Forbearance Agreement did not waive

---

[2]    AFC returned these funds pursuant to the orders on appeal.  JA1580.

those defaults, the Borrowers also insisted that they were not in default.  JA0213, JA0130.

The Borrowers contended that AFC breached the implied covenant of good faith and fair dealing by "actively conspiring with Bossidy to hold Plaintiffs in default of the 2024 Forbearance."  JA0510.  They did not address the merits of their U.C.C. claim.  *See* JA0110, JA0485.

The district court scheduled a one-day evidentiary hearing on the motion. JA0007, JA0016.  At the hearing, five witnesses testified for the Borrowers, and one witness, Mr. Neville, testified for AFC.  *Id.*

Twenty-two days after the Borrowers sued, the district court granted the preliminary injunction.  JA0007.  It found that the Borrowers were likely to succeed on the merits, for three reasons.

*First*, the district court determined that the Borrowers were likely to succeed on their claim that they and AFC entered into an oral "Reopening Agreement," under which AFC orally promised not to foreclose on the Hazleton property and then breached that oral promise by filing the foreclosure action.  JA0028-32.  The district court recognized that the parties had agreed that any modifications to the Credit and Forbearance Agreements had to be "in writing [and] signed."  JA0370, JA0231; *see* JA0032.  But it credited the Borrowers' testimony that there was an oral agreement, and ruled that this agreement was enforceable because "there has been partial

performance attributable to the Reopening Agreement." JA0032. The district court did not find that, as part of the Reopening Agreement, the parties agreed to waive the Borrowers' failures to keep the Hazleton permit and to timely inform AFC of the permit loss under Section 5 of the Credit Agreement. JA0030-32 & n.12.

*Second*, the district court concluded that the Borrowers were likely to prevail on their argument that AFC orally waived the Credit Agreement's requirement that the Borrowers submit annual audited financial statements. JA0033. The district court did not acknowledge the Credit and Forbearance Agreements' no-waiver clause stating that waivers must be in writing and signed, or explain why the purported oral waiver overcame those written agreements. *Id.*

*Third*, the district court concluded that the Borrowers were likely to prevail on their claim that AFC breached the implied covenant of good faith and fair dealing because Mr. Bossidy was responsible for the Borrowers' failure to obtain the Ewing certificate of occupancy and "was working as an agent for [AFC], or at the least, in concert with [Mr.] Neville." JA0035.

The district court also ruled that the Borrowers would suffer irreparable harm absent an injunction. "[N]ormally economic harm does not constitute irreparable harm," but the district court found that the Borrowers' business operations would possibly shut down if AFC were to collect on the cash collateral. JA0040. The district court relied on testimony from the Borrowers' CEO, Alexzandra Fields, that

cash sweeps have "a negative effect on [Borrowers'] ability to operate" and "impacts [the Borrowers'] employees' lives and wellbeings [sic] as well as the surrounding areas."   JA0672.   It also suggested that "unauthorized cash sweeps" could "jeopardize" the Borrowers' negotiations with the state and their ability to make payroll, "which in turn could be a violation" of employment regulations, and increase the "risk" that the Borrowers default on their obligations to business partners and "could impact [the Borrowers'] brand reputation and goodwill." JA0040-41.  The district court did not conclude—and the Borrowers did not argue— that AFC's prosecution of the foreclosure action would cause them irreparable harm. *Id.*; JA0158-59, JA0510.

The preliminary injunction prohibits AFC from:

- "seizing any of Plaintiffs' assets or cash (beyond the permitted scheduled cash sweeps) or seeking any remedy for default that is inconsistent with the parties' oral Reopening Agreement," JA0004;

- "seizing any of Plaintiffs' assets or cash (beyond the permitted scheduled cash sweeps) or seeking any remedy for default that is inconsistent with the parties' oral agreement waiving the requirement that Plaintiffs submit audited financial statements to Defendants in 2023 or 2024," JA0005; and

- "seizing any of Plaintiffs' assets or cash  (beyond the permitted scheduled cash sweeps) or seeking any remedy for default on the basis that Plaintiffs failed to obtain a final certificate of occupancy" for the Ewing facility "by May 15, 2024," *id.*

Even though the Borrowers stipulated that they defaulted on the Credit Agreement, JA0213, and even though the district court, in its opinion, noted that the Borrowers defaulted on both the Credit and Forbearance Agreements, JA009, JA0013, the district court's injunction order includes a declaration that "Plaintiffs are not in breach or default of the parties' Credit Agreement and 2024 Forbearance Agreement." JA0004.

### E.    The Injunction Bond

In its original injunction order, the district court set the terms of the injunction bond in two orders.  *First*, it set the amount of bond at $1 million in its order following the preliminary injunction hearing. JA0004.  *Second*, it later ordered AFC, over objection, to permit the Borrowers to use AFC's own collateral to cover the bond. JA0006.

The Borrowers argued that an injunction would benefit AFC, and therefore the bond should be only minimal in amount. JA0043-44. Mr. Neville, by contrast, testified that AFC would suffer $7.3 million in damages if it were enjoined, explaining the rate of return on capital AFC would receive if it could obtain its

collateral, his valuation of several collateral assets, and other inputs he used to arrive at that calculation. JA0858-67. Most of those damages, Mr. Neville explained, stemmed from the opportunity cost of being unable to accept a nationally recognized cannabis operator's letter of intent to buy the Borrowers' New Jersey operations for $45 million. JA0861, JA1575. A sale of the New Jersey operations for that price would have allowed AFC to deploy the full amount to loans with interest rates of 11-14%. JA0860. Forgoing the sale would cost AFC $5.3 million in lost opportunity. JA0861.

The district court rejected both parties' proposals, set bond at $1 million, and deemed Mr. Neville's testimony "unpersuasive." JA0045. The district court stated that Mr. Neville's 11-14% rate-of-return assumption "lacked any foundation" and did not account for risk. JA0044. The district court also questioned Mr. Neville's valuation of the *Pennsylvania* facilities. JA0044-45. But the court did not question or even mention the letter of intent to buy the *New Jersey* business. *Id.* Nor did the court identify an alternative, reasonable rate of capital underlying its bond determination. *Id.* Instead, it gestured in broad terms at "the parties' projections, a more realistic rate of return, and the timing at issue" in setting bond at $1 million. JA0045.

After the district court granted the injunction, the Borrowers unilaterally sought to post bond using funds from a Deposit Account Control Agreement bank

account that the Borrowers had agreed to submit to AFC's control as collateral for their loan. JA1580-81. When AFC did not immediately approve release of those funds, the Borrowers sought emergency relief from the district court, requesting an order compelling AFC to release the funds. *Id.* AFC opposed, arguing that allowing the Borrowers to post AFC's own collateral for the bond "would provide AFC with no meaningful protection" if the injunction were vacated, because it would compensate AFC with funds that AFC would be entitled to if the Borrowers are in default. JA1583.

In a docket entry order, the district court granted the Borrowers' request and ordered AFC to permit the Borrowers to post bond using its collateral. JA0006. The district court reasoned that AFC "knew or should have known that the nature of the parties' business would make securing a bond problematic." *Id.* The district court offered no other explanation for its decision. *See id.*

AFC complied with the district court's order. The Borrowers then withdrew the $1 million and deposited the funds in the district court's registry. JA1585.

## SUMMARY OF ARGUMENT

I.     The district court's preliminary injunction should be reversed because the Borrowers failed to clearly show either likelihood of success or irreparable harm.

The Borrowers cannot establish a likelihood of success on the merits. The district court committed reversible legal error by enforcing oral modifications to

23

contracts that contain express no-oral-modification clauses governed by New York law. Oral modifications are unenforceable unless the alleged partial performance is "unequivocally referable" to the oral agreement—meaning it must be "unintelligible or at least extraordinary" absent the modification. *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998) (quoting *Anostario v. Vicinanzo*, 450 N.E.2d 215, 216 (N.Y. 1983)). None of the conduct here meets this stringent standard. AFC's agreement to release the Borrowers' equity funds, the owners' pledge of capital, and AFC's delay in foreclosing were all consistent with the written agreements. This conduct can be explained by a desire to give the Borrowers another chance to succeed in their business and improve the quality of AFC's collateral, rather than by a desire to modify the Forbearance Agreement. That alone precludes the enforcement of any purported oral agreement. The district court's contrary ruling disregards over a dozen state and federal appellate decisions applying this body of law.

The parties' alleged oral waiver of financial reporting requirements is also unenforceable. Under the Credit and Forbearance Agreements, AFC's past non-enforcement of its contract rights does not waive those rights. The parties cannot be deemed to have orally modified this requirement for the same reasons explained above. AFC's non-enforcement of the audit requirement is not incompatible with the Credit and Forbearance Agreements, and so any oral modification of this no-

waiver clause is unenforceable.  The district court here simply failed to apply governing New York law.

Thus, this Court must reverse the injunction.  If the oral Reopening Agreement is not enforceable, the Borrowers' assertion of defenses in the foreclosure action is a default under the Forbearance Agreement.  Likewise, if there is no enforceable oral waiver of the financial reporting requirements, the Borrowers' failure to provide AFC with their 2023 and 2024 audited financial statements violates the Forbearance Agreement and the Credit Agreement.  Finally, two undisputed defaults that the district court disregarded—the Borrowers' loss of the Pennsylvania permit and their failure to timely notify AFC—likewise entitle AFC to exercise its contractual remedies.  The Forbearance Agreement provides that upon any default, AFC's forbearance obligations terminate "immediately and automatically," at which point AFC may "exercise any or all of [its] rights and remedies."  JA0214, JA0228.  If there is just one default, the Borrowers cannot show that AFC's collection of collateral is a breach of contract, and an injunction should not issue that bars AFC from exercising its rights upon a default.

This Court need not reach the district court's implied covenant ruling.  Even if Mr. Bossidy's mismanagement were attributable to AFC and responsible for the Borrowers' failure to obtain their Ewing certificate of occupancy—and AFC sharply contests the district court's ruling on the subject—that would, at best, excuse just

25

that one default.  Mr. Bossidy had nothing to do with the Borrowers' Pennsylvania or financial auditing defaults.  The district court could not enjoin AFC from exercising its remedies upon those defaults.

The district court's erroneous irreparable harm analysis likewise demands reversal.  The district court did not find, nor did the Borrowers even argue, that the Hazleton foreclosure action would irreparably harm the Borrowers.  Yet the district court nonetheless enjoined AFC from prosecuting the foreclosure action.  That unexplained antisuit injunction was error; at minimum, the injunction should be narrowed to permit the foreclosure.  The district court's ruling that AFC's collection of the Borrowers' cash collateral would cause irreparable harm is also indefensible and an independent ground for reversal.  The Borrowers testified only that cash sweeps—but no other remedies, like acceleration of the loan or collection against any other assets—"could" impact operations or "possibly" cause their business to shut down.  This Court's precedent demands a "clear showing of immediate irreparable injury," not speculation about future risks.  *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).

II.    The district court abused its discretion in setting an inadequate bond funded by AFC's own collateral.  This violates Rule 65(c) by forcing AFC to indemnify itself for a wrongful injunction.  The $1 million amount—set without meaningful analysis—also ignores undisputed evidence that the injunction will

cause AFC at least $7.3 million in damages, including the opportunity cost of a pending $45 million sale.

## ARGUMENT

## I.    The District Court Should Not Have Issued The Injunction

The preliminary injunction should be reversed or vacated and remanded.  The district court's likelihood-of-success rulings misapplied New York law and its irreparable harm ruling is contrary to Third Circuit precedent.  Both likelihood-of-success and irreparable harm are necessary showings for a preliminary injunction. Thus, if this Court reverses on either issue, it must reverse the injunction below.

### A.    Standard Of Review

On an appeal from a preliminary injunction, "findings of fact are reviewed for clear error, legal conclusions are reviewed de novo, and the decision to grant or deny an injunction is reviewed for abuse of discretion."  *Delaware Strong Fams. v. Att'y Gen. of Delaware*, 793 F.3d 304, 308 (3d Cir. 2015) (citation omitted).

"The decision to issue a preliminary injunction is governed by a four-factor test.  The plaintiff must show: 1) likelihood of success on the merits; 2) that he is likely to suffer irreparable harm; 3) that denying relief would injure the plaintiff more than an injunction would harm the defendant; and 4) that granting relief would serve the public interest."  *Id.* (internal citation omitted).  "Because 'a preliminary injunction is an extraordinary and drastic remedy,' the movant bears the burden of making 'a clear showing.'"  *Delaware State Sportsmen's Ass'n, Inc. v. Delaware*

27

*Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024) (citation omitted), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (2025).

"The first two factors are the 'most critical.'" *Id.* (citation omitted). "If both are present, a court then balances all four factors." *Id.* By contrast, "a failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." *Gaia Gardens, LLC v. Township of Montclair*, No. 23-3026, 2024 WL 5199327 (3d Cir. Dec. 23, 2024) (quoting *S. Camden Citizens in Action v. N.J. Dep't of Env't Prot.*, 274 F.3d 771, 777 (3d Cir. 2001)).

In weighing these factors, the court must keep in mind that the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Delaware State Sportsmen's Ass'n*, 108 F.4th at 200 (citation omitted). A preliminary injunction should also "be granted only in limited circumstances.'" *Id.* (citation omitted). "Preliminary injunctions raise [special] problems" because "[t]ime pressures limit adversarial testing," evidence is often limited, "[a]ffidavits drafted by lawyers are poor substitutes for discovery," and a "hasty process" can often make a "district court jump to conclusions." *Id.*

## B. The District Court Committed Legal Error In Ruling That Plaintiffs Had Established A Likelihood Of Success On The Merits

The decision below should be reversed, first, because the Borrowers are not likely to succeed on the merits. To justify the preliminary injunction, the Borrowers

must clearly show either that they never defaulted or that every forbearance default they committed was extinguished or excused. The Borrowers did not and cannot make this showing.

### 1. The Purported Oral Reopening Agreement Is Unenforceable

The district court erred in ruling that the parties formed an enforceable oral Reopening Agreement that barred AFC from exercising its right under the Forbearance Agreement to foreclose on the Hazleton property. AFC denies that it ever made any such oral agreement. But this Court need not resolve that factual dispute. Even if there were such an oral agreement, it would not be enforceable.

In Section 12.5 of the Forbearance Agreement, the Borrowers agreed that the Forbearance Agreement's terms could "not be waived, modified, altered, or amended except by agreement in writing signed by all the parties hereto." JA0231. New York law enforces no-oral-modifications clauses like this one. *See* N.Y. Gen. Oblig. Law § 15-301(1) ("A written agreement … which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought …."). There are just "two exceptions" to this rule. *Towers Charter*, 894 F.2d at 522. *First*, "an oral modification may be enforced when there has been partial performance of the [oral] agreement." *Id.* (citing *Rose v. Spa Realty Assocs.*, 366 N.E.2d 1279, 1283 (N.Y. 1977)). *Second*, an oral

modification can be enforced based on equitable estoppel "when one party has induced the other party to rely on an oral modification." *Id.*

The standard for invoking either exception is high. For both, "the conduct claimed to have resulted from the oral modification must be conduct that is inconsistent with the agreement as written." *Id.* "Inconsistent with the agreement as written," *id.*, means "unintelligible or at least extraordinary, explainable only [by] reference to the oral agreement"—not just odd. *Merrill Lynch Interfunding, Inc.*, 155 F.3d at 122 (quoting *Anostario*, 450 N.E.2d at 216). So long as "nothing in the written agreement[] precluded" the purported partial performance or reliance, an oral modification lacks legal effect. *Tower Charter*, 894 F.2d at 522. "[I]t is not sufficient that the conduct of the parties indisputably evidences a mutual departure from the written agreement if such conduct does not satisfy these rules." *Phoenix Corp. v. U.W. Marx, Inc.*, 881 N.Y.S.2d 714, 716 (N.Y. App. Div., 3d Dep't 2009).

New York has good reason to impose these sharp limits on oral modifications to contracts containing no-oral-modifications clauses. No-oral-modifications clauses ensure that claimed amendments to agreements are "authentic," avoiding the risk that the parties' bargain will be undermined by a credibility contest in court. *Eujoy Realty Corp. v. Van Wagner Commc'ns, LLC*, 4 N.E.3d 336, 344 (N.Y. 2013) (citation omitted). That risk is especially acute when a district court is asked to make credibility findings on a preliminary injunction. "Time pressures limit adversarial

testing," evidence is often limited, discovery is lacking, and a "hasty process" can often make a "district court jump to conclusions." *Delaware State Sportsmen's Ass'n*, 108 F.4th at 200. Sophisticated commercial players, like AFC and the Borrowers, select New York law and agree to no-oral-modifications clauses to guarantee that their contracts will be enforced as written.

The district court's preliminary injunction thwarts the parties' expectations and this important aspect of New York public policy. It ruled that the (purported) oral Reopening Agreement was an enforceable modification based only on the partial performance exception. JA0032. The "partial performance," according to the district court, consisted of AFC's agreement to release $500,000 of the Borrowers' equity funds to fund the Hazleton facility, the Borrowers' owners' "pledge" to contribute $5 million to the effort, and AFC's delay in filing the foreclosure action. JA0030-31. Based on this partial performance, the district court found that the oral Reopening Agreement was an enforceable "novation" of the Forbearance Agreement, and that the Borrowers were likely to prevail on the merits of their claim that the Hazleton foreclosure action breached the oral Reopening Agreement. JA0030.

This ruling was legal error. None of the district court's findings could establish an enforceable oral modification. The parties' conduct can be explained by a desire to give the Borrowers another chance to succeed in their business and

31

improve the quality of AFC's collateral, rather than by a desire to modify the Forbearance Agreement.

Consider, first, the district court's suggestion that AFC's agreement to release $500,000 of the Borrowers' equity funds was attributable only to the alleged oral Reopening Agreement. No part of the Credit or Forbearance Agreements barred AFC from releasing these funds, let alone agreeing to release them (they are still sitting in escrow). The district court did not disagree. *See* JA0030-32. Because "nothing in the written agreements precluded such expenditures," those potential expenditures were not "unequivocally referable to the oral modification." *Towers Charter*, 894 F.2d at 522 (citation omitted).

The Borrowers' owners' "pledge" to commit—not an actual commitment—$5 million to the facility is also consistent with the Forbearance Agreement, and certainly is not "incompatible with the original agreement"—the relevant legal test. *TrueNorth Cap. Partners*, 723 F. App'x at 25 (brackets omitted) (citation omitted). That pledge could not amount to partial performance but was, at best, a (likely unenforceable) promise to perform. *See Merrill Lynch*, 155 F.3d at 123 (partial performance that is "at least reasonably explainable as preparatory conduct" cannot overcome clause prohibiting oral modifications).

Even if the Borrowers' owners had paid the $5 million, that would not suffice either. The Forbearance Agreement and Credit Agreement did not bar the owners

from using their own funds to improve the Borrowers' business. Nor did these written agreements prevent the owners from using outside funds to persuade AFC not to exercise its express right to foreclose on the Hazleton property. *See, e.g.*, *Nat'l Westminster Bank USA v. Vannier Grp.*, 554 N.Y.S.2d 482, 483-84 (N.Y. App. Div., 1st Dep't 1990) (defendants' decision "to stay in business rather than sell off their assets" did not establish a legally effective oral agreement to stay in business in exchange for forbearance because "there are possible explanations for defendants' decision ... , including, perhaps, a belief that plaintiff would be disinclined to call the notes if defendants showed progress in turning their business around").

Indeed, the Borrowers' owners had previously made multi-million-dollar capital injections long before the purported oral Reopening Agreement was ever made. JA0010, JA0737; *see, e.g.*, *Am. Prescription Plan, Inc. v. Am. Postal Workers Union*, 565 N.Y.S.2d 830, 832 (N.Y. App. Div., 2d Dep't 1991) (a plaintiff's detrimental "reliance" cannot overcome a no-oral-modifications clause if the reliance is "compatible with its performance under prior written agreements"). This is unsurprising, as Section 5 of the Credit Agreement requires the Borrowers to maintain their property and relevant permits and licenses to do business. *See* JA0346-47. Cash infusions from the Borrowers' owners, made in connection with the Borrowers' efforts to reobtain their Pennsylvania license, can thus be explained by a desire to comply with those terms, not an alleged oral Reopening Agreement.

33

Whatever the reason for the future "pledge," the parties' written contracts did not forbid it, and it is "explainable" either "by the possibility of other expectations" or "as [a] preparatory step[] taken with a view toward consummation of an agreement in the future"—not "*only* [by] reference to the oral agreement." *Anostario*, 450 N.E.2d at 216 (emphasis added) (a plaintiff's assignment of his interest in a building contract is not "unequivocally referable" to an oral agreement to exchange that interest for "a one-half interest in defendant's corporation," because the assignment could be explained by "the receipt of compensation other than in the form of an equity interest in the corporation" or as inducement for a future contract); *Cordova v. Mike Bloomberg 2020, Inc.*, No. 22-1023, 2023 WL 6119448, at *3 (2d Cir. Sept. 19, 2023) (summary order) (plaintiffs' leaving their jobs and moving "to a new city" does not establish an oral agreement guaranteeing employment through November 2020 because the plaintiffs "could have undertaken the same conduct due to their offer of at-will employment with the Campaign"). Besides, "'no sensible businessperson' would neglect to reduce a [] modification [of a major contract involving real property] to writing." *Eujoy*, 4 N.E.3d at 345.

Nor is AFC's decision not to "immediately foreclose" on the Hazleton property "when [it was] entitled to do so" explainable only by the oral Reopening Agreement. JA0032. The parties' written agreements did not require or incentivize AFC to foreclose immediately on the Hazleton property. To the contrary, the Credit

34

Agreement provided that "[n]o failure" or "delay" by AFC in exercising its rights under the Credit Agreement "or any other Loan Document … will operate as a waiver thereof." JA0371. The Forbearance Agreement also stated that "actions taken in accordance with" the Forbearance Agreement should not "be construed as a waiver of or consent to" future defaults, and expressly permitted AFC to foreclose on the Hazleton property—with or without a forbearance default—at any time after April 30, 2024. JA0213-14.

Because AFC's decision to wait before foreclosing was consistent with the parties' written agreements, it is not "unequivocally referable" to an alleged oral agreement. *Merrill Lynch*, 155 F.3d at 122 (citation omitted); *see, e.g.*, *TrueNorth Cap. Partners*, 723 F. App'x at 25-26 ("apparent acquiescence" to oral modification that would otherwise constitute a breach does not suffice); *S & G Golden Ests., LLC v. New York Golf Enters., Inc.*, 190 N.Y.S.3d 89, 82 (N.Y. App. Div., 2d Dep't 2023) (acceptance of "two checks totaling $50,000" does not evidence an oral agreement to make periodic $25,000 payments instead of "$250,000").

These facts do not establish an oral modification when considered collectively, either. Courts applying New York law have repeatedly held that similar facts do not overcome a no-oral-modifications clause. Consider just three examples.

*Towers Charter* rejected a purported oral modification of a loan agreement as legally ineffective on facts similar to those here. The plaintiff spent "more than $1

million [in 1980s dollars] to refurbish" a yacht allegedly "in reliance on its understanding that [the defendant] would not strictly enforce the [loan's] written requirements." 894 F.2d at 522. The Second Circuit held that those expenditures were not unequivocally referable to the alleged oral modification because "nothing in the written agreements precluded such expenditures." *Id.* Nor did it matter that the defendant had granted the plaintiff a $225,000 advance on the agreed loan— similar to AFC's agreement to a future release of $500,000 of equity funds for the property here. An advance was irrelevant because it was not "inconsistent with [the defendant's] rights under the agreements as written." *Id.*

*L & B 57th Street, Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88 (2d Cir. 1998), held that a purported oral agreement was unenforceable for similar reasons. A landlord and its tenant disagreed whether they had formed an oral agreement to reduce rent upon the tenant's vacating one floor of the premises. *See id.* at 93. The tenant had vacated "the second floor (and turn[ed] over the keys)," consistent with this purported oral agreement, but that did not meet New York's "stringent standard." *Id.* Although the tenant argued "that the rent deal [was] the only possible reason for vacating a portion of the premises, it [was] just as likely that [the tenant] unilaterally vacated the floor to reduce its insurance and maintenance costs, or in the hope that [the landlord] would re-rent it and abate the rent." *Id.* The mere "existence

of a competing inference" as to the parties' motivations established as a matter of law that the oral agreement was not enforceable. *Id.*

*John Street Leasehold LLC v. F.D.I.C.*, 196 F.3d 379 (2d Cir. 1999) (per curiam), also parallels this case. John Street mortgaged its property for $20 million, but agreed that a consortium of bankers could, before the loan was due, exercise a call option requiring "repayment of the entire loan" on six months' notice. *Id.* at 380. John Street defaulted, but the banks did not foreclose, and John Street maintained that he had formed an oral agreement to waive the call option. *See id.* at 381. This oral agreement was invalid because the mortgage contained a no-oral-modifications clause. *See id.* at 382. It did not matter that John Street had partially performed by investing "substantial sums in maintaining and improving the building, as well as keeping up with the mortgage payments." *Id.* "John Street was already obligated to maintain the premises and to make its mortgage payments, so it can hardly claim to have taken those actions because of the alleged waiver of the call provision." *Id.* So too here because Section 5 of the Credit Agreement required the Borrowers to maintain the properties in good order and keep appropriate licenses.

The alleged oral Reopening Agreement is thus not enforceable.[3]

---

[3] The district court did not address whether the second exception to the enforceability of prohibitions on oral modifications—equitable estoppel—applies. JA0028-30. This Court could not sustain the district court's injunction on this ground, as a result, because a preliminary injunction is reviewed for abuse of discretion, and this Court "cannot exercise discretion on behalf of the district court."

### 2. The Purported Oral Waiver Of The Borrowers' Obligation To Provide Audited Financial Statements Is Unenforceable

Even if this Court found the oral Reopening Agreement to be legally effective, it still should vacate the preliminary injunction below. The Borrowers admit that they did not submit their 2024 audited financial statements after entering into the Forbearance Agreement, and this constitutes a default under both the Credit Agreement and the Forbearance Agreement. JA0341-46, JA0669-70, JA0359-61, JA0032-33.

The district court ruled that this was not a default because AFC orally waived this audit requirement. JA0033. This was legal error. Both the Credit Agreement and the Forbearance Agreement forbid oral waivers. Section 15.2 of the Credit Agreement provides that "[n]o waiver by Agent or any Lender will be effective unless it is in writing, and then only to the extent specifically stated." JA0371. And again, Section 12.5 of the Forbearance Agreement states that the Forbearance Agreement's terms may "not be waived, modified, altered, or amended except by agreement in writing signed by all the parties." JA0231.

---

*Sinclair v. Soniform, Inc.*, 935 F.2d 599, 603-04 (3d Cir. 1991). In any case, this exception does not apply for the same reasons the partial performance exception does not. The equitable estoppel exception also does not apply unless "the conduct claimed to have resulted from the oral modification" was "inconsistent" with the written agreement. *Towers Charter*, 894 F.2d at 522; *see, e.g.*, *Riverside Rsch. Inst. v. KMGA, Inc.*, 489 N.Y.S.2d 220, 222 (N.Y. App. Div., 1st Dep't 1985) ("[T]he actions of the parties are consistent with [the written agreement], and so we do not have to reach the question of [] estoppe[l].""), *aff'd*, 497 N.E.2d 669 (N.Y. 1986).

Because the parties' written agreements barred oral modifications, the same principles that generally govern "provision[s] to the effect that [a written agreement] cannot be changed orally" apply.  N.Y. Gen. Oblig. Law § 15-301(1); *see Towers Charter*, 894 F.2d at 521-22 (treating "oral modifications and waivers" indistinguishably).  The Credit and Forbearance Agreements' prohibitions on oral modifications are enforceable unless there has been partial performance or reliance "explainable only [by] reference to the oral agreement."  *Merrill Lynch*, 155 F.3d at 122 (citation omitted); *see supra*, Part I.B.1.

The district court did not even purport to apply this test.  It did not consider whether the parties had partially performed their alleged oral agreement to waive the requirement to furnish audited financial statements.  JA0032-33.  Nor did it conclude that any such performance was explainable only by reference to the alleged oral modification.  *Id.*  The district court merely credited the testimony of the Borrowers' witnesses over that of AFC's witness, ignoring the Borrowers' burden of showing that the alleged oral modification is enforceable.

The district court's application of the incorrect standard is by itself reason enough to vacate the injunction below, at minimum.  *See NRDC v. Texaco Refining & Mktg., Inc.*, 906 F.2d 934, 937-41 (3d Cir. 1990) (vacating preliminary injunction and remanding because the district court "erred by applying the wrong standard").

This Court "cannot exercise discretion on behalf of the district court" and cure its legal errors on appeal. *Sinclair*, 935 F.2d at 603-04.

Nor could that alleged oral waiver overcome the Credit Agreement's no-implied-oral-waiver clause under the governing legal test. The Credit Agreement provides that "[n]o failure" or "delay" by AFC to "exercise any right, remedy or option under this Agreement … will operate as a waiver thereof," JA0371, so any purported decision by AFC not to enforce its rights cannot be construed as a waiver. *See* JA0033 (oral waiver occurred because AFC had "relieved" the Borrowers of submitting financials in earlier years); *1890 Adam Clayton Powell LLC v. Penant*, 37 N.Y.S.3d 166, 167 (N.Y. App. Div., 1st Dep't 2016) (rejecting argument that alleged past waiver by acquiescence precludes present enforcement of same restrictions based on a similar provision).  Noncompliance with a contract is "just as demonstrative of [a] breach of contract as of completion of the purported oral modification," and "General Obligations Law § 15-301 becomes meaningless" if noncompliance "is sufficient to prove an oral modification." *Eujoy*, 4 N.E.3d at 345; *see, e.g.*, *Joseph P. Day Realty Corp. v. Jeffrey Lawrence Assocs., Inc.*, 704 N.Y.S.2d 587, 588-89 (N.Y. App. Div., 1st Dep't 2000) ("tenant's departure from the premises prior to the expiration of the lease term cannot be deemed to be unequivocally referable to the claimed oral modification" to waive liability in exchange for early departure, because "departure is equally or even more consistent

with a breach of the lease").  And even the Borrowers agreed in the Forbearance Agreement that their failure to submit 2022 audited financials was a default under the Credit Agreement.  JA0237.

AFC's decision to assert its right to audited financials is thus "entirely consistent with [the Credit Agreement] as written."  *Towers Charter*, 894 F.2d at 522 (citation omitted); *see, e.g.*, *Parker v. Navarra*, 958 N.Y.S.2d 754, 756 (N.Y. App. Div., 2d Dep't 2013) (plaintiff's failure to enforce a separation agreement did not establish an oral modification because the parties had a no-oral-waivers clause). The district court was thus wrong to conclude that the alleged oral waiver is effective.

### 3. This Court Must Vacate The Preliminary Injunction Based On The Borrowers' Defaults

If this Court rules for AFC on either of the above points, it must vacate the preliminary injunction.  If either oral agreement is unenforceable, then the Borrowers necessarily defaulted at least once.  And upon a single default by the Borrowers, forbearance would "immediately and automatically" terminate "without notice or further action," at which point AFC would "be entitled to exercise any or all of [its] rights and remedies" under the Credit Agreement and applicable law— including the U.C.C.  JA0228.  Indeed, even if this Court affirms *both* district court rulings, there still would be undisputed defaults that entitle AFC to exercise all its remedies and require vacatur of the preliminary injunction below.

*First*, the Forbearance Agreement specified that any attempt by the Borrowers "to challenge, enjoin, avoid or unwind" AFC's foreclosure of the Hazleton property was a default. JA0228. The Borrowers challenged the foreclosure by seeking the injunction below, JA0162-63 and asserting affirmative defenses in the foreclosure action. Dist. Ct. Dkt. 41-2. That default would be mooted if there were an enforceable oral Reopening Agreement. But because there was no such enforceable agreement, the Borrowers could not seek to enjoin or defend against the foreclosure action, and their doing so constitutes a default that terminated AFC's forbearance obligations and permitted AFC to exercise its contractual remedies.

*Second*, the Borrowers admit that they did not provide AFC with their 2023 and 2024 audited financial statements. JA0345-46, JA0669-70, JA0359, JA0227. Absent an enforceable waiver (*supra*, Part I.B.2), this constitutes a default under both the Credit Agreement and the Forbearance Agreement, which entitles AFC to exercise its remedies. JA0345-46, JA0669-70, JA0359-61, JA0227, JA0032-33.

*Finally*, even setting aside the two purported oral agreements, the Borrowers are on the hook for two other defaults. The Pennsylvania Department of Health informed the Borrowers of its decision not to renew the Hazleton permit. JA0014. That alone is a default under the Credit Agreement. JA0346, JA0359-60. The Borrowers also failed to timely inform AFC of the permit loss or provide AFC with the Department of Health's letter—another default. JA0345-46, JA0429, JA0352;

42

JA0014.  Either default entitles AFC to exercise all its remedies under the Credit and Forbearance Agreements.  JA0214.

The district court disregarded the import of these undisputed defaults.  It acknowledged that "Plaintiffs failed to meet any of the[] deadlines" for informing AFC of their loss of the Hazleton permit.  JA0014 n.7.  It declined to address these defaults based on its view that, in light of the oral Reopening Agreement, there was no "forbearance default related to Pennsylvania."  JA0032 & n.12.  It gave no explanation for this ruling.  Nor did it find that the oral Reopening Agreement barred AFC from exercising its bargained-for remedies under the Credit and Forbearance Agreements.  *See* JA0028-32.  Even if the oral Reopening Agreement were intended to preclude, as the district court assumed, foreclosure on the Hazleton facility notwithstanding these defaults, AFC should, at minimum, still be entitled to exercise all its other remedies, including loan acceleration, cash sweeps, and collection of any other liened collateral.

The district court's implied covenant ruling—even if sustainable—cannot salvage the preliminary injunction, as it addresses only one of multiple independent defaults.  Although AFC sharply contests the district court's ruling—which serves as an example of the risks posed by "hasty" preliminary injunction proceedings, *Delaware State Sportsmen's Ass'n*, 108 F.4th at 200—that ruling would not, on its own, entitle the Borrowers to a preliminary injunction.  Mr. Bossidy undisputedly

had nothing to do with the above defaults, and so his purported mismanagement in New Jersey cannot excuse them. At best, Mr. Bossidy's alleged mismanagement entails that AFC cannot treat as a default the Borrowers' failure to obtain the requisite certificate of occupancy for the Ewing, New Jersey facility, based on the district court's ruling "that the final certificate of occupancy would likely have been obtained but for [Mr.] Bossidy's mismanagement of the New Jersey operations." JA0038. But that would still leave the Borrowers' other defaults, each of which would entitle AFC to exercise all its remedies. *See supra*, pp.41-43.

The district court did not find, and the Borrowers did not argue below, that Mr. Bossidy's actions could excuse the Borrowers' other defaults. Nor could they. The implied covenant of good faith and fair dealing "cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." *Gottwald v. Sebert*, 148 N.Y.S.3d 37, 47 (N.Y. App. Div., 1st Dep't 2021) (citation omitted). AFC negotiated for, and the Borrowers agreed to, AFC's forbearance from exercising its default remedies in exchange for several promises, and agreed that any one default would entitle AFC to exercise all its contractual remedies.[4]

---

[4] The Borrowers did not purport to show, and the district court did not find, that the Borrowers were likely to prevail in *rescinding* the Forbearance Agreement and Credit Agreement. That would have required (1) a showing (which they cannot make) that AFC's purported breaches were "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties

Finally, the district court's inexplicable "**DECLAR[ATION]**" in its preliminary injunction order "that, as of the date of this Order, Plaintiffs are not in breach or default of the parties'" Credit and Forbearance Agreements does not justify affirmance either, because it is plainly wrong.  JA0004 (emphasis in original).  In addition to the above defaults, the Borrowers undisputedly are in default under the Credit Agreement because they failed to make payments in 2023 and early 2024, and they agreed in the Forbearance Agreement that these and their other defaults had not been excused.  *E.g.*, JA0213.  The district court seems to have misunderstood that forbearance agreements are not a "settlement" of prior defaults, but agreements not to "immediately exercis[e] the remedies [the lender] may have."  *Deutsche Bank Nat'l Tr. v. Williams*, 879 N.Y.S.2d 552, 553 (N.Y. App. Div., 2d Dep't 2009).

The preliminary injunction must be reversed because the Borrowers have not clearly shown a likelihood of success on the merits.

## C.    The Borrowers Have Not Clearly Shown Irreparable Harm

The court below also incorrectly ruled that the Borrowers had clearly shown that they would suffer immediate and irreparable injury without an injunction.  The "possibility of irreparable harm" does not suffice.  *Winter v. Natural Res. Def.*

---

in making the contract," thus justifying rescission, *Lenel Sys. Int'l, Inc. v. Smith*, 824 N.Y.S.2d 553, 554 (N.Y. App. Div., 4th Dep't 2006); and (2) the Borrowers to have repudiated the contracts by "stop[ping] performance and su[ing] for total breach," *ARP Films, Inc. v. Marvel Ent. Grp.*, 952 F.2d 643, 649 (2d Cir. 1991), which did not happen.

*Council, Inc.*, 555 U.S. 7, 22 (2008). The Borrowers must instead "prov[e] a 'clear showing of immediate irreparable injury.'" *ECRI*, 809 F.2d at 226 (citation omitted). The injury "must be irreparable—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." *Id.* (citation and quotation marks omitted). The Borrowers made no such clear showing here.

### 1. The Foreclosure Action Will Not Irreparably Harm The Borrowers

The court below erred by extending its preliminary injunction to cover the Hazleton foreclosure action. Below, the Borrowers never even argued that the foreclosure would irreparably harm them, JA0158-59, JA0510, and the district court's irreparable harm analysis addressed only the effects of unscheduled cash sweeps—not foreclosure, JA0040-41. Yet the district court barred AFC from pursuing a foreclosure that no one asserted would cause irreparable harm. JA0004. That unsupported antisuit injunction cries out for correction. Neither foreclosure nor defending against foreclosure in Pennsylvania constitutes irreparable harm.

The Pennsylvania facility generates no revenue and serves no customers. JA0753-54. Foreclosure on the non-operational Hazleton cultivation property could readily be compensated with money; it is just a bundle of assets that serves no customers. Just as a business that operates even "over a short period of time" can recover for any alleged lost good will "in monetary damages," a non-operational business that has never served a customer can be compensated with money too.

*DFW Metro Line Servs. v. Sw. Bell Tel. Co.*, 901 F.2d 1267, 1269 (5th Cir. 1990); *see* No. 99-cv-2028-D, *Snelling & Snelling, Inc. v. Ryvis, Inc.*, 1999 WL 1032799, at *2-3 (N.D. Tex. Nov. 10, 1999) (goodwill could not be harmed by violation of non-compete in markets where company was not even competing).

Nor would defending the foreclosure action irreparably harm the Borrowers. "[I]f an adequate remedy at law exists, equitable relief will not be granted." *Goadby v. Philadelphia Elec. Co.*, 639 F.2d 117, 122 (3d Cir. 1981). If the oral Reopening Agreement were valid, the Borrowers would have an adequate remedy at law. Litigating defenses in a fair forum is not irreparable harm. *See id.* at 123 (district court erred by granting preliminary injunction "because of the existence of the various remedies at law available in the state system"); *National Land & Inv. Co. v. Specter*, 428 F.2d 91, 98 (3d Cir. 1970) (plaintiff suffered no irreparable harm from defending in state court because the court had "no cause to believe that the state courts of Pennsylvania will refuse to accord appellants the full complement of constitutional rights").

It does not matter that the purported oral Reopening Agreement allegedly bars the foreclosure action. A party with a covenant not to sue can raise the covenant "as a defense" to suit—as the Borrowers have here, Dist. Ct. Dkt. 41-2—or, in cases of "bad faith" breach, seek damages. *Artvale v. Rugby Fabrics Corp.*, 363 F.2d 1002, 1008 (2d Cir. 1966) (Friendly, J.); *see, e.g.*, *Sparacio v. Sparacio*, 724 N.Y.S.2d 204,

206 (N.Y. App. Div., 2d Dep't 2001) (breach of a covenant not to sue is grounds for dismissal).[5]  Thus "equity would not permit specific performance of a covenant not to sue." *Syverson v. Int'l Bus. Machines Corp.*, 472 F.3d 1072, 1084 (9th Cir. 2007) (quoting *Colton v. N.Y. Hosp.*, 414 N.Y.S.2d 866, 873 (Sup. Ct., N.Y. Cnty. 1979)); *see Divine Tower Int'l Corp. v. Kegler, Brown, Hill & Ritter Co., L.P.A.*, Nos. 04-cv-494 & 04-cv-584, 2009 WL 818997, at *8 (S.D. Ohio Mar. 27, 2009) (injunction enforcing a covenant not-to-sue is improper because damages are available).

At minimum, specific performance of a covenant-not-to-sue that enjoins litigation of a state court proceeding is barred, because the Anti-Injunction Act prohibits federal courts from enjoining "proceedings in State court except as [1] expressly authorized by Act of Congress, or [2] where necessary in aid of its jurisdiction, or [3] to protect or effectuate its judgments."  28 U.S.C. § 2283.  None of these exceptions applied here, and so no antisuit injunction should have issued.[6]

---

[5]    The same would be true even if the alleged Reopening Agreement were governed by Pennsylvania law.  *See, e.g., Caplan v. City of Pittsburgh*, 100 A.2d 380, 384-85 (Pa. 1953) (enforceable covenant not-to-sue was ground for dismissal); *Appel v. Kaufman*, No. 08-cv-392, 2011 WL 13377541, at *1 (E.D. Pa. Jan. 5, 2011) (a "breach of a covenant not to sue may be grounds for an action for damages").

[6]    Although AFC did not expressly invoke the Anti-Injunction Act in the expedited proceedings below, "there can be no waiver here of the [district court's] duty to apply the correct legal standard." *United States v. Ali*, 508 F.3d 136, 144 n.9 (3d Cir. 2007).

### 2.  AFC's Other Bargained-For Remedies Will Not Irreparably Harm The Borrowers' Business Or Goodwill

The district court also erred when it concluded that the Borrowers made a sufficiently clear showing that permitting AFC to exercise its other remedies for forbearance defaults would cause immediate and irreparable harm.  The district court premised that conclusion on two findings—first, that AFC's enforcement of its rights on default could "possibly" cause the Borrowers' business to shut down, and second, that such enforcement "could impact" the Borrowers' goodwill.  JA0040-41.  This was error.  Any immediate harm the Borrowers might suffer from AFC's pursuit of its remedies is purely economic and could be redressed with damages.

Economic losses can serve as the basis for irreparable harm only in the rare circumstance that a business would be "forced to shut down" as a result of the loss. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 802 (3d Cir. 1989). "[T]his threshold is a significant one." *Golden Fortune Imp. & Exp. Corp. v. Mei-Xin Limited*, Nos. 22-1710 & 22-1885, 2022 WL 3536494, at *6 (3d Cir. Aug. 5, 2022); *see, e.g.*, *Instant Air*, 882 F.2d at 802 (no irreparable harm where a company stood to lose 80% of its business).  Otherwise, economic loss, "however substantial," does not constitute irreparable harm. *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

The Borrowers did not meet this bar.  Their CEO, Alexzandra Fields, testified only that unscheduled cash sweeps by AFC have "a negative effect on our ability to

49

operate, [and] impacts our employees' lives and wellbeings as well as the surrounding areas." JA0672. Their Chief Compliance Officer, Gail Braschers-Krug, testified that "if we are not able to make payroll, that puts us in violation of all kinds of regulations, and we could lose our cannabis license," and that further cash sweeps would be "disastrous." JA0739-40. This speculative testimony falls far short of the clear showing of immediate irreparable injury that binding precedent demands. It is also sharply called into question by the fact that the Borrowers were able to post a $1 million bond—more than half the cash AFC collected in its "cash sweeps," JA0016—with no apparent harm to their business.

The district court exaggerated this testimony and in any case applied the wrong legal test. The district court claimed that the Borrowers' witnesses testified that exercise of cash sweeps would cause the Borrowers to "suffer greatly, *possibly* shut down." JA0040-41 (emphasis added). Even if they had said that (they did not), "a risk of irreparable harm is not enough," *ECRI*, 809 F.2d at 226. Only a "clear showing of *immediate* irreparable injury" suffices. *Id.* (emphasis added) (citation omitted). The district court's listing of various risks the Borrowers might face (loss of license, missing payroll, regulatory noncompliance, etc.) is just the sort of "domino" theory of irreparable harm that this Court rejects. *Acierno*, 40 F.3d at 655.

The district court also raised concerns about harm to the Borrowers' goodwill, but this does not establish irreparable harm either. The district court found only that

50

"the issues in this case *could* impact the brand reputation and goodwill" of the Borrowers.    JA0041 (emphasis added).    But again, the possibility of future irreparable harm to goodwill is insufficient. *See, e.g.*, *ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *3 (3d Cir. Apr. 21, 2022) (deeming inadequate "conclusory allegations that [a party] may lose clients, goodwill, or [] business").

Finally, the district court did not consider whether any remedies beyond what it termed unscheduled cash sweeps would cause irreparable harm. JA0040-41. This Court should also vacate the injunction below for the district court to address the issue. Alternatively, this Court should at minimum limit the injunction to not exclude AFC from exercising other remedies apart from cash sweeps, including the pursuing the foreclosure action, accelerating the loan, and recovering any other liened assets.

## II.    In Any Case, The District Court Should Have Set An Adequate Bond

If this Court finds the injunction and its scope proper, it should still reverse and remand with instructions for the district court to set an adequate bond, for two reasons. *First*, the district court erred in ordering that the bond be posted using AFC's own collateral. *Second*, it set the total bond amount far too low.

### A.    Standard Of Review

This Court reviews determinations about the amount of an injunction bond for abuse of discretion. *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 425-

26 (3d Cir. 2010).  A legal error is always an abuse of discretion.  *See, e.g.*, *Gibson v. State Farm Mut. Auto. Ins.*, 994 F.3d 182, 186 (3d Cir. 2021).

## B.    The District Court Abused Its Discretion By Allowing The Borrowers To Post AFC's Collateral As Bond

The district court erred as a matter of law when it required the bond to be paid entirely using AFC's collateral.  JA0006.

A court may issue a preliminary injunction "only if" the "movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  This rule is, outside certain public interest cases, "mandatory."  *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210-11 (3d Cir. 1990).  This Court has "never excused a District Court from requiring a bond where an injunction prevents commercial" conduct, *Zamebelli*, 592 F.3d at 426; in such cases, "the failure of a district court to require a successful applicant to post a bond constitutes reversible error," *Hoxworth*, 903 F.2d at 210 (citation omitted); *see, e.g.*, *Instant Air*, 882 F.2d at 803.

The bond here violates that rule because it consists only of AFC's collateral for nonpayment of the loan at issue.  JA1582-83.  This arrangement eviscerates the bond's protective function by compelling AFC to indemnify itself for the harm of being wrongfully enjoined.  The bond cannot compensate AFC for the distinct "costs

and damages"—including opportunity costs and declining collateral asset values—
it will suffer from being "wrongfully enjoined."  Fed. R. Civ. P. 65(c).

This Court intervened to correct a similar error in *Instant Air Freight*.  There,
the district court declined to impose a bond based on the plaintiff's counsel's
representation that the plaintiff would have trouble posting the bond.  882 F.2d at
804.  Instead of a bond, the district court ordered that the defendant could "maintain
its possession" of $220,000 in liquidated damages that the defendant acknowledged
it owed the plaintiff—effectively, allowing it to keep funds it already possessed.  *Id.*
On review, this Court explained that such arrangements violate Rule 65(c)'s
mandatory bond requirement.  *Id.*  So too here:  A bond consisting only of funds that
AFC already possesses or is entitled to possess will not compensate it for the distinct
harms caused by an unlawful injunction.

The only reason the district court offered for its order was that AFC "knew or
should have known that the nature of the parties' business would make securing a
bond problematic."  JA0006.  This is doubtful:  The Borrowers provided no evidence
that they tried but failed to secure a bond from a surety, JA1580-81; and their owners
purportedly promised to pay $5 million to support the Hazleton facility.  *See* JA0015,
JA1208.  If that pledge is real, they could have raised a $1 million bond too.  In any
case, a plaintiff's purported inability to pay a bond is no reason to excuse the bond
requirement.  *See, e.g.*, *Instant Air*, 882 F.2d at 804.  A bond is meant to deter

requests for preliminary injunctions by "creat[ing] a barrier" and "causing plaintiff to think carefully beforehand." *Hoxworth*, 903 F.2d at 211 (alteration adopted) (citation omitted). Permitting businesses, including those backed by wealthy investors, to evade this requirement by pleading poverty would undermine the Rule.

## C.    The District Court Abused Its Discretion By Setting The Bond Too Low

The district court also abused its discretion in setting bond at only $1 million. JA0005, JA0043-45. In arriving at that sum, the district court ignored undisputed facts about the extent of AFC's damages and otherwise failed to engage in the case-specific analysis required by Rule 65(c) and this Court's past decisions.

When setting bond, "[d]istrict courts should engage in a case-specific analysis that accounts for the factual circumstances of the parties, the nature of the case and competing harms, and the scope and potential impact of the injunction." *Mallet & Co. v. Lacayo*, 16 F.4th 364, 392 (3d Cir. 2021). They must also "place on the record their reasons for setting a bond amount, so as to provide a meaningful basis for appellate review." *Id.* A district court's "'decision cannot stand' when 'it fails to consider and evaluate the full range of factors that would be relevant under the proper standard.'" *Id.* (citation omitted).

The district court neglected to conduct a case-specific analysis, and the result is a "bond [amount that] is not adequately supported by the Court's explanation." *Id.* at 390. It explained why it rejected AFC's $7.3 million proposal and the

Borrowers' effectively $0 counter.  JA0045.  But it picked the ultimate $1 million

sum seemingly at random.  All it said of that amount, in a single sentence, was that

"a $1 million bond is appropriate given the parties' projections, a more realistic rate

of return [than 11 to 14%], and the timing at issue."  *Id.*  It did not explain what rate

of return it assumed, what "timing" for lifting the injunction it referred to, or what

part of the parties' projections it was relying on.

That one-sentence explanation is not enough.  In *Mallet*, the district court

asserted that a $500,000 bond was "reasonable, proper, and sufficient" because it

was "toward the high-end" of bonds it said courts had imposed in similar cases, and

the defendant's proposal of $21.5 million was "astronomical by comparison."  16

F.4th at 392.  This Court rejected that explanation as inadequate because it offered

no "analysis of the particular facts at hand" to support its determination that a

$500,000 bond was warranted.  *Id.*  The district court's lack of explanation here is

similarly deficient:  It is unsupported by any "analysis of the particular facts"—only

by the district court's say-so.  *Id.*

The district court compounded that lack of explanation with a glaring

"fail[ure] to consider and evaluate the full range" of factors relevant to AFC's

damages.  *Id.*  It overlooked the largest component of the damages an injunction

would cause AFC: the opportunity cost of not being able to immediately move

forward on the recent letter of intent to buy Justice Grown's New Jersey business

for $45 million.  JA0861, JA1575.  That cost accounted for most—$5.3 million of the $7.3 million—of AFC's estimated damages.  JA0861.  Neither the Borrowers nor the district court expressed doubt that AFC would soon begin negotiations to sell the New Jersey operations to the prospective buyer.  But the district court did not even mention the letter of intent when setting bond.  *Id.*  It made no attempt to explain how an influx of $45 million into AFC's coffers could yield a total damages figure of just $1 million—a return of just 2.2%, assuming the injunction remained in place for a year.  *Id.*  The district court thus failed to "engage in a case-specific analysis that accounts for the factual circumstances of the parties."  *Mallet*, 16 F.4th at 392.

## CONCLUSION

The Court should reverse the district court's injunction or, alternatively, vacate the injunction and remand with instructions to narrow its scope and set an adequate bond.

Dated: July 1, 2025

Jason D. Sternberg
David A. Nabors
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
2601 South Bayshore Dr., Ste. 1550
Miami, FL 33133
(305) 402-4880
jasonsternberg@quinnemanuel.com
davidnabors@quinnemanuel.com

Respectfully submitted,

*/s/ Alex H. Loomis*

Alex H. Loomis (Mass. BBO #699129)
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
111 Huntington Ave., Ste. 520
Boston, MA 02199
(617) 712-7100
alexloomis@quinnemanuel.com

Kevin S. Reed
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
295 Fifth Avenue, 9th Fl.
New York, NY 10016
(212) 849-7000
kevinreed@quinnemanuel.com

*Counsel for Defendants-Appellants*
*Advanced Flower Capital Inc. and AFC Agent LLC*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure ("FRAP") because this brief contains 12,934 words, excluding the parts of the brief exempt by FRAP 32(f).

This brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: July 1, 2025                      Respectfully submitted,

                                         */s/ Alex H. Loomis*
                                         Alex H. Loomis (Mass. BBO #699129)
                                         QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP
                                         111 Huntington Ave., Ste. 520
                                         Boston, MA 02199
                                         (617) 712-7100
                                         alexloomis@quinnemanuel.com

                                         *Counsel for Defendants-Appellants*
                                         *Advanced Flower Capital Inc. and AFC*
                                         *Agent LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 28.3(d)

Pursuant to Local Appellate Rule 28.3(d), Alex H. Loomis, attorney for Defendants-Appellants, states that he is a member of the bar of this Court.

Dated: July 1, 2025                     Respectfully submitted,

*/s/ Alex H. Loomis*
Alex H. Loomis (Mass. BBO #699129)
QUINN EMANUEL URQUHART &
    SULLIVAN, LLP
111 Huntington Ave., Ste. 520
Boston, MA 02199
(617) 712-7100
alexloomis@quinnemanuel.com

*Counsel for Defendants-Appellants*
*Advanced Flower Capital Inc. and AFC*
*Agent LLC*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 31.1(c)

Pursuant to Local Appellate Rule 31.1(c), Alex H. Loomis, attorney for Defendants-Appellants, certifies that the text of the electronic brief is identical to the text in the paper copies, and further certifies that a virus detection program, Avast Premium Security, Version 16.2.0a, has been run on the file and no virus was detected.


Dated: July 1, 2025                      Respectfully submitted,

                                         */s/ Alex H. Loomis*
                                         Alex H. Loomis (Mass. BBO #699129)
                                         QUINN EMANUEL URQUHART &
                                           SULLIVAN, LLP
                                         111 Huntington Ave., Ste. 520
                                         Boston, MA 02199
                                         (617) 712-7100
                                         alexloomis@quinnemanuel.com

                                         *Counsel for Defendants-Appellants
                                         Advanced Flower Capital Inc. and AFC
                                         Agent LLC*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief for Defendants-Appellants and Volume I of the Appendix with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 1, 2025                    Respectfully submitted,

                                       */s/ Alex H. Loomis*
                                       Alex H. Loomis (Mass. BBO #699129)
                                       QUINN EMANUEL URQUHART &
                                         SULLIVAN, LLP
                                       111 Huntington Ave., Ste. 520
                                       Boston, MA 02199
                                       (617) 712-7100
                                       alexloomis@quinnemanuel.com

                                       *Counsel for Defendants-Appellants
                                       Advanced Flower Capital Inc. and AFC
                                       Agent LLC*