No. 25-2061

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

_____

HAYDEN GATEWAY LLC and BLOC DISPENSARY LLC,
*Plaintiffs-Appellees,*
v.
ADVANCED FLOWER CAPITAL INC. and AFC AGENT LLC;
*Defendants-Appellants.*

_____

*On Appeal From The United States District Court For The District of New Jersey*
*Hon. Zahid Quraishi, Case No. 3:25-02789*

## RESPONSE BRIEF OF APPELLEES
## HAYDEN GATEWAY LLC AND BLOCK DISPENSARY LLC

Jon Loevy
Loevy & Loevy
311 North Aberdeen Street
Chicago, IL 60607

Jamie Solano
Michael Homer
Dynamis LLP
200 Connell Drive
Berkeley Heights, NJ 07922

*Attorney for Plaintiffs-Appellees*
*Hayden Gateway LLC and Block*
*Dispensary LLC*

# TABLE OF CONTENTS

INTRODUCTION ................................................................. 1

STATEMENT OF RELATED CASES ...................................... 3

STATEMENT OF THE CASE ................................................ 3

I.    Relevant Factual Background ......................................... 3

II.   Procedural History ...................................................... 14

SUMMARY OF ARGUMENT ............................................. 17

ARGUMENT ...................................................................... 19

I.    The District Court Did Not Abuse Its Discretion In Granting The Preliminary Injunction ................................................... 19

    A.    Standard of Review ............................................. 19

    B.    AFC Has Abandoned Most Of Its Purported Bases For Default ........ 19

    C.  The District Court Did Not Err Regarding The Requirement To Produce Audited Financial Statements ...................................... 21

        1.    The District Court Did Not Abuse Its Discretion In Finding Waiver ...................................................... 21

        2.    The Doctrine of Waiver Defeats AFC's Position ..................... 22

    D.    The District Court Did Not Abuse Its Discretion In Concluding That Appellees Established A Likelihood of Success On Count One Based On The Parties' Enforceable Agreement to Reopen, Not Foreclose Upon, The Pennsylvania Cultivation Facility .................... 24

        1.    AFC Reached An Agreement Not To Foreclose On The Pennsylvania Facility .................................. 24

2. AFC Has No Valid Basis To Challenge The District Court's Conclusion That The Parties Reached A Reopening Agreement By Which AFC Agreed Not To Foreclose.................................30

3. The District Court Correctly Concluded That The Reopening Oral Contract Modification Was Enforceable Because, Under Well-Settled Law, Oral Modifications Can Be Enforceable, Even With A "No Oral Modification" Clause..........................32

    a) The Test For An Enforceable Oral Modification Was Easily Met Here.............................................................33

    b) The District Court Properly Concluded That The Parties' Subsequent Conduct Is "Unequivocally Referable" To The Oral Modification....................................................34

E. The Court Did Not Err In Finding That Appellees' Opposition To AFC's PA Lawsuit Was Not A Breach................................39

F. The District Court Did Not Err In Rejecting The (Still-Pending) Pennsylvania Permit Non-Renewal As A Basis For Default.............42

G. The District Court Did Not Err In Rejecting The Belated Email Notice To AFC As A Basis For Default.........................................44

H. AFC Has Not Asserted The Certificate of Occupancy On Appeal.....47

I. Equitable Estoppel Independently Defeats AFC's Appeal.................47

J. The District Court Did Not Abuse Its Discretion In Finding That Appellees Satisfied The Other Factors Supporting Injunctive Relief.....................................................................................49

    1. Irreparable Harm......................................................49

    2. The Other Factors Both Favor Appellees ................................52

II. The District Court Did Not Abuse Its Discretion When It Set Bond At $1 Million......................................................................................53

A. Standard of Review ............................................................53

B.      AFC Has Failed To Identify Any Real Damages Requiring A Higher Bond ...................................................................................54

C.      The District Court Did Not Abuse Its Discretion In Allowing Appellees To Pay For The Bond With Their Own Money .................56

CONCLUSION ......................................................................................... 57

# TABLE OF AUTHORITIES

*AFC Agent LLC v. JG HoldCo, LLC,* No. 652644/2025 (N.Y. Sup. Ct.) .................. 15

*Automated Irr'n Controls, LLC v. Watt Stopper, Inc.,* 407 F. Supp. 3d 274
    (S.D.N.Y. 2019) ............................................................ 37

*Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Com.,*
    265 A.D.2d 513 (1999)...................................................... 40

*Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178
    (N.Y. App. Div., 1st Dep't 2007) ...................................45

*Bethpage Theatre Co., Inc. v. Shekel,* 133 A.D.2d 62
    (N.Y. App. Div., 2d Dep't 1987) .................................. 47

*Blue Ridge Investments, LLC v. Anderson-Tully Co.,* 2005 WL 44382
    (S.D.N.Y. Jan. 10, 2005).................................................. 23

*Brook Shopping Centers, Inc. v. F.W. Woolworth Co.,* 215 A.D.2d 620
    (N.Y. App. Div., 2d Dep't 1995) .................................... 36

*Cantor v. Boston Children's Health Physicians, LLP*, 64 Misc.3d 1233,
    2019 WL 4124728 (N.Y. Super. Ct. Aug. 12, 2019)........................ 33

*CoraMed USA, LLC v. Alexion Pharms., Inc.,* 695 F. Supp. 3d 251
    (E.D.N.Y. 2023)............................................................ 44

*Delaware Strong Farms. v. Attorney Gen. of Del.*, 793 F.3d 304 (3d Cir. 2015) ....... 19

*DiStefano v. Maclay,* 102 F. App'x 188 (2d Cir. 2004) ............................... 33

*Doran v. Salem Inn, Inc.,* 422 U.S. 922 (1975) ......................................... 50

*Echostar Satellite LLC v. ESPN, Inc.,* 79 A.D.3d 614
    (N.Y. App. Div., 1st Dep't 2010)...................................... 23

*Fifty States Mgmt. Corp. v. Pioneer Auto Parks*, 389 N.E.2d 113 (N.Y. 1979).......... 45

*Finch v. Treto,* 606 F. Supp. 3d 811 (N.D. Ill. 2022)................................... 52

*Fisher Scientific Company L.L.C. v. Ortho-Clinical Diagnostics, Inc.*,
    2019 WL 1427564 (S.D.N.Y. Mar. 29, 2019)...................................... 36

*Frank Brunckhorst Co., LLC v. JPKJ Realty, LLC,* 129 A.D.3d 1019
    (N.Y. App. Div., 2d Dep't 2015) ......................................................... 42

*Fundamental Portfolio Advisors, Inc. v. Toqueville Asset Mgmt., L.P.,*
    850 N.E.3d 653 (N.Y. 2006) ............................................................... 23

*In re 53 Stanhope LLC,* 625 B.R. 573 (Bankr. S.D.N.Y. 2021) .................................. 45

*In re 975 Walton Bronx LLC,* 2022 WL 5265041 (Bankr. E.D.N.Y. Oct. 6, 2022).... 46

*Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797 (3d Cir. 1989) ......... 56

*John Street Leasehold LLC v. F.D.I.C.*, 196 F.3d 379 (2d Cir. 1999)....................... 36

*Kamco Supply Corp. v. On the Right Track, LLC,* 149 A.D.3d 275
    (N.Y. App. 2d Dep't 2017) ................................................................ 23

*L & B 57th Street, Inc. v. E.M. Blanchard, Inc.*, 143 F.3d 88
    (2d Cir. 1998)......................................................................................36

*Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105 (3d Cir. 2020).............................. 48

*Lipkis v. Gilmour,* 158 Misc.2d 609 (N.Y. App. Div., 1st Dep't 1993) ...................... 40

*Lowe v. City of Detroit,* 544 F. Supp. 3d 804 (E.D. Mich. 2021).............................. 52

*Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364 (3d Cir. 2021) .......................................53

*Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486 (S.D.N.Y. 2014) .................33

*New Jersey Staffing All. v. Fais,* 749 F. Supp. 3d 511 (D.N.J. 2023)........................ 50

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800 (3d Cir. 1998) ........ 51

*Reilly v. City of Harrisburg,* 858 F.3d 173 (3d Cir. 2017).......................................... 19

*Rose v. Spa Realty Assocs.,* 366 N.E.2d 1279 (N.Y. 1977) ................................... 36, 37

*Rossrock Fund II LP v. Arroyo,* 34 Misc.3d 1211(A), 2012 WL 127444
    (N.Y. Sup. Ct. 2012) ......................................................................... 40

*Sarcona v. DeGiaimo,* 226 A.D.2d 1143 (N.Y. App. Div., 4th Dep't 1996) .............. 36

*Second on Second Cafe, Inc. v. Hing Sing Trading, Inc.,* 66 A.D.3d 255
    (N.Y. App. Div., 1st Dep't 2009)........................................................ 52

*Smith v. Bayer Corp.*, 564 U.S. 299 (2011)................................................. 41

*Sprint Comm'ns Co. L.P. v. CAT Comm'ns Intern., Inc.*, 335 F.3d 235
    (3d Cir. 2003)........................................................................... 53, 56

*Stassa v. Stassa,* 123 A.D.3d 804 (N.Y. App. Div., 2d Dep't 2014)........................... 23

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.*,
    894 F.2d 516, 522 (2d Cir. 1990) ......................................................... 33, 35

*Tri-M Grp., L.L.C. v. Sharp,* 638 F.3d 406 (3d Cir. 2011) ......................................... 41

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008)......................................... 19

## STATUTES AND OTHER AUTHORITIES

28 Pa. Code §1141a.38(c)(1) ............................................................... 43, 44

28 U.S.C. § 2283 .......................................................................... 41

**INTRODUCTION**

Plaintiffs-Appellees Hayden Gateway, LLC ("Hayden") and Bloc Dispensary, LLC ("Bloc") (together, "Appellees") borrowed money from Defendants-Appellants Advanced Flower Capital, Inc. and AFC Agent LLC (together, "AFC") to build medical cannabis businesses in Pennsylvania and New Jersey.

It is undisputed that the loan got off to a shaky start. Although AFC could have foreclosed early on, AFC opted to renegotiate the loan multiple times, but only after extracting a heavy price. All told, Appellees had to inject $21 million in cash for the privilege of taking the loan out of default in order to keep their businesses.

After one final forbearance agreement in March 2024, Appellees' businesses stabilized. The loan is now performing, and not in default. Every month since the March 2024 forbearance, the Appellees make their required minimum monthly payment of at least $250,000 -- always on time, and always in the required amount.

Meanwhile, the loan term expires in May. Appellees intend by then to have in place alternative financing to take out AFC, but if for whatever reason they do not, the lender will undoubtedly press its rights. Until that time, however, Appellees continue to make their loan payments, and have stayed out of default.

The reason for this appeal is that AFC has run into a desperate financial crisis of its own making. As a predatory lender relying on extremely high-interest loans

(exploiting the unavailability of traditional financing in the cannabis industry), AFC's portfolio is faring poorly and its stock price is cratering.

Unable to pay a scheduled dividend, AFC unilaterally and falsely declared that Appellees were in default and proceeded to raid Appellees' bank accounts, stealing almost $1.75 million. Not only were Appellees left with insufficient funds to run their 200-employee business, but AFC informed Appellees that it planned to keep raiding the accounts, and was going to liquidate and sell Appellees' assets to raise cash.

AFC's actions were lawless. As was demonstrated to the District Court's satisfaction, Appellees are not even arguably in default. Appellees owe AFC nothing other than their $250,000 monthly payments, which they are making without interruption. The reality that AFC is feeling too much financial pressure to wait until May for this loan to expire does not give it the right to destroy Appellees' businesses.

In unilaterally declaring the loan in default, AFC originally cited 23 purported breaches. Because these arguments were so obviously pretextual, AFC is no longer even trying to pretend that most are real. And the few remaining defaults asserted on appeal are just as baseless as those AFC has now abandoned. As the court correctly found after very careful consideration, the loan is not in default. AFC has fallen well short of demonstrating an abuse of discretion. This Court should affirm in full.

**STATEMENT OF RELATED CASES**

Appellants' Statement of Related Cases is correct, with one addition: *Bloc Dispensary LLC v. Bossidy*, Case No. 3:25-CV-01725-ZNQ-JBD (D.N.J.), a related lawsuit filed on March 7, 2025. Following transfer to Central District of California, Bloc filed a notice of voluntary dismissal without prejudice on August 28, 2025.

**STATEMENT OF THE CASE**

## I.     Relevant Factual Background

Beginning about a decade ago, various States began launching licensing programs to legalize cannabis for medical purposes. JA0178 (Feldman Decl.). In many states (including Pennsylvania and New Jersey), these licenses were limited in number, issued based on a competitive scoring process. JA0654 (Transcript); JA0738 (Transcript). Their capped availability makes them valuable. JA60; JA738.

### The Parties

Appellees Bloc and Hayden are part of a group of affiliated cannabis companies founded by two civil rights attorneys, doing business as Justice Cannabis Co. ("Justice"). JA08; JA178 (Feldman Decl.); JA745 (testimony). Hayden applied for and won licenses to operate a cultivation and three retail medical dispensaries in Pennsylvania. JA14. Bloc applied for and won an integrated license that allowed it to

operate a cannabis cultivation and manufacturing facility, as well as three retail cannabis dispensaries, in New Jersey. JA13; JA178.

AFC is a publicly traded company specializing in cannabis lending. JA9; JA57. Taking advantage of cannabis companies' inability to borrow money, AFC saw an opportunity to lend at extremely high interest rates, approaching or exceeding twenty percent after factoring in fees and costs. JA60.

## The Loan

In 2021, AFC lent money to Appellees in Pennsylvania and New Jersey to develop their cannabis businesses. JA9; JA283 (Credit Agreement). The loan, which consists of an original agreement plus at least five amendments and two separate forbearance agreements, contemplated that AFC would lend the Borrowers millions of dollars to build the facilities. JA200 (Papatheofanis Decl.). Of that, AFC charged close to $15 million in PIK/capitalized interest and $10 million in asserted loan fees. JA200 (Papatheofanis Decl.).[1]

## The Loan Modifications

The cannabis industry has proved challenging, and the parties' plans did not proceed smoothly. JA9 (Opinion). The pandemic caused significant construction

---

[1] The amount actually loaned is disputed, and the subject of a declaratory judgment claim. AFC's Brief ("Br.") at 9 claims there is now more than $100MM due. On the stand, AFC's CEO claimed it was $125MM. JA0860. Appellees contend it is less than half that.

delays and supply chain disruptions, increasing costs. *Id.*; JA166 (Feldman Decl.).

Almost as soon as the loan was closed, Appellees struggled to comply with the financial covenants governing EBITDA, free cash flow, and related metrics. JA166 (Feldman Decl.). Within months of closing, Appellees fell into default. JA9.

There is no dispute that AFC could have foreclosed at the time. JA9; JA166 (Feldman Decl.). Instead, the parties began renegotiating the loan obligations. All told, the parties amended, restated, and reconfigured the terms of the loan nine times in four years. JA10 (Opinion); JA0166 (Feldman Decl.); JA736-37 (Brashers-Krug testimony). In each instance, Justice and its owners dug deeper and deeper to purchase another forbearance, put the loan back into compliance, and renegotiate more favorable terms. JA0166-67 (Feldman Decl.); JA0737 (Transcript).

In total, Appellees' owners injected a total of $17.6 million in additional capital. All but about $900,000 went to AFC, along with over $4 million in "amendment fees." JA10 (Opinion); JA165-67 (Feldman Decl.); JA736-38.

Appellees acceded to AFC's monetary demands because their cannabis operations have the potential of becoming extremely valuable. Once fully constructed and operating optimally, each of the Pennsylvania and New Jersey cultivation facilities had the potential to generate more than $5 million per month in revenue. JA674-75 (Transcript). At present cannabis multiples, that performance would make the company worth $150 million, or more. *Id.*

## The March 2024 Forbearance Agreement

In March 2024, the parties renegotiated the parties' obligations one final time in order to relieve Appellees' prior defaults and ensure that the loan would stay out of default. JA10 (Opinion). The resulting agreement ("The 2024 Forbearance"), established, *inter alia,* a cash-sweep mechanism for the Appellees' monthly payments, wherein AFC was entitled to $250,000 per month and seventy-five percent of excess cash. JA10 (Opinion); JA1535-39 (2024 Forbearance). Pursuant to the agreement, AFC controlled Appellees' operating bank accounts and approved every dollar that Appellees spent, enforced by a deposit account control agreement (DACA). JA200-01 (Papatheofanis Decl.); JA1526, 1537 (2024 Forbearance).

Under the 2024 Forbearance, AFC agreed to forgo, among other things, accelerating on the loan, repossessing or disposing of Appellees' collateral, or "exercis[ing] or enforce[ing] any other rights and remedies under the Credit Agreement," absent any new default. JA1528-30; JA10-11 (Opinion).

Every month since the parties entered the 2024 Forbearance, Appellees have timely made the required $250,000 payment, at times even exceeding the minimum required. JA202 (Papatheofanis Decl.).

## AFC Conspires To Manufacture Defaults

The 2024 Forbearance required Justice to hire an outside consultant as its Chief Restructuring Officer ("CRO") to manage the New Jersey operations. JA10

6

(Opinion); JA1535 (Forbearance Agreement). From the outset, AFC insisted that

Bloc hire Timothy Bossidy, someone AFC's CEO, Daniel Neville, had worked with

before. JA620-22, 26 (Transcript); JA168 (Fields Decl.). Appellees asked AFC to

consider their candidates, or at least conduct a search process, but AFC refused any

process other than hiring Bossidy; Neville later informed Justice's CEO, Alexzandra

Fields, that if she interfered with Bossidy's control of the company, AFC would

consider that a default. JA1239 (Emails); JA625, 780 (Transcript).

From the very beginning, Bossidy—who had full operational control in New

Jersey—took his direction from AFC, which managed and controlled his actions, and

directed him on a near-daily basis. JA169 (Fields Decl.); JA629-34 (Transcript);

JA1241-42 (Emails). Bossidy and Neville were in regular communication, and

Bossidy needed AFC's approval for even the most granular decisions, such as

employee raises, expenditure of funds, and payment of contractors. JA633-35

(Transcript); JA1241-42 (Emails).

Despite owing a fiduciary duty only to Appellees under the law, Bossidy began

actively promoting AFC's interests to the detriment of Bloc, his putative employer.

JA35-36 (Opinion). For instance, Appellees discovered that in June 2024, just two

months after AFC installed him, Bossidy forwarded a privileged email from Justice's

in-house counsel to Neville, stating: "I'll manage this - so nothing for you to do - *I

just wanted to flag for you another forbearance breach to add to your list.*" JA926

(emphasis added). Notably, this email was sent *before* any of the alleged "breaches" of the 2024 Forbearance. *Id.*; JA39 (Opinion).

In other words, AFC forced Justice to hire Bossidy as its CRO (a C-suite level employee) to run New Jersey so that Bossidy could use his inside position, including access to attorney-client communications, to assist AFC in manufacturing a case against Justice to revoke the very forbearance agreements for which Justice had paid many millions of dollars—all while serving as Justice's highly-paid fiduciary, earning $700/hour. JA39 (District Court observing: "When asked by the Court what Bossidy's email meant, Neville was unable to provide meaningful answers."); JA635; JA830-38 (Transcript)

### Through Bossidy, AFC Runs The Facility Into The Ground

Almost immediately after Bossidy started in April 2024, he tanked the business. JA12 (Opinion); JA0169-71 (Fields Decl.); JA626-27; JA639-44 (Transcript). Appellees' CEO and other senior management quickly began to express concerns about Bossidy's competence. JA630-31 (Transcript). After several months of disastrous performance, Appellees' CEO implored AFC to fire Bossidy and approve a different CRO. *Id.*; JA1239 (Exhibit); JA171-72 (Fields Decl.). AFC repeatedly refused, insisting that Bossidy remain in place and that Appellees do nothing to interfere with his decisions, even as the damages from his mismanagement piled up. JA34-35 (Opinion); JA172 (Fields Decl.); JA621-39, 777-78 (Transcript).

After almost one year with AFC's agent in charge, Bloc's financial performance plummeted. The inventory backlog increased five-fold, sales declined, and Bloc was unable to pay down any loan principal, which continued to grow as interest got added on. JA12; JA626-31, JA639-43.

Critically, however, Appellees always made the minimum monthly cash payment required under the renegotiated loan. The loan is not in default, and has not been since the 2024 Forbearance agreement. JA202 (Papatheofanis Decl.).

### Bossidy Is Finally Removed

Although AFC, through Neville, had steadfastly refused to fire Bossidy, it could no longer ignore the issue after Appellees analyzed video of Bossidy's somewhat rare visits from California to Bloc's New Jersey facilities. They discovered footage revealing that Bossidy mostly parked himself in a conference room and surfed the internet for scantily clad models and luxury shopping, rather than working. JA13 (Opinion); JA639 (Transcript).

Justice sent the video to AFC's CEO, and AFC finally agreed that Bossidy could be fired. JA638-39 (Transcript); JA172-73 (Fields Decl.).

### The Pretextual Demand for Audited Financials

The day after Bossidy was fired, Neville emailed Appellees on March 15, threatening that if Appellees did not provide audited financial statements by the very next day, AFC would foreclose on Appellees' properties. JA19; JA671-72.

While the Credit Agreement contemplated the preparation of audited financial statements, the audit process is expensive, and this was a cash strapped business. Audits also consume company resources, taking a minimum of three months and distracting personnel from other functions. JA209 (Papatheofanis Decl.); JA669. For those reasons, AFC waived the requirement every year of the loan to save money. JA33 (Opinion); JA654 (Transcript); JA669-70 (Transcript).

Before the 2023 audit came due, Fields had a conversation with Tannenbaum, wherein he told her that AFC would waive the requirement once again so Appellees could focus resources on operating. *Id.* Fields and Tannenbaum had similar conversations regarding the 2024 audited financial statements. *Id.*

Thus, when Neville abruptly demanded audited financials by the following day, Appellees reminded Neville in writing that AFC had already waived the requirement. JA185-86 (Kanovitz Decl.). The email added:

> All that said, assuming AFC wants to rescind the waiver and the forbearance on this point, we are prepared to grant it if that is how AFC wants to spend the money. Let me know if you are prepared to release the necessary funds [$120,000 to $150,000] and we will provide you with a reasonable timeline for completing a 2023 audit and a 2024 audit.

Neville never responded to this email, much less authorized the expenditure of funds from the DACA. *See* JA672.

### Bloc's Post-Bossidy Turnaround

As the District Court later concluded, "once Bossidy was fired, there was an immediate improvement in morale, . . . [and] an increase in productivity and sales." JA13; JA645-46 (Transcript). In the first full month after Bossidy left, Bloc's third-party sales from cultivation exceeded sales under Bossidy for the prior two months combined. JA173 (Fields Decl.). The trajectory is moving toward the facility's $5 million/month potential, and is on track to reach it fairly quickly. *Id.*

### AFC Confronts Its Own Financial Emergency

AFC's largest shareholder and Chairman, Leonard Tannenbaum, made his fortune in finance through a company that extracted huge funds from high-yield loans. JA181 (Decl.). Tannenbaum's company was described in *Forbes* features as the "poster child" for a poor-performing management company that "has been mismanaged for the benefit of the external manager," *i.e.,* Tannenbaum-controlled entities. *Id.* After he took the company public, it eventually collapsed, leaving Tannenbaum rich, but his investors holding the bag. *Id.*

Following the very same playbook, Tannenbaum and his entities have extracted tens of millions of dollars from AFC in management fees and other payments. JA181-82. Recently, however, things have turned sharply against them. Very few of the predatory cannabis loans in AFC's portfolio have performed well, and AFC has not generated the cash it modeled. *Id.*

The result was a financial crisis for AFC. JA773-74 (Transcript). At the time AFC tried to put Appellees in default, its stock price had lost about half of its value, hitting a low of roughly $4.35/share, down from a prior peak around $16/share. JA180 (Kanovitz Decl.). As a result, AFC began experiencing extreme financial distress, and by all outward appearances began to fail. JA773-75 (Transcript); JA180 (Kanovitz Decl.).

## AFC Begins Threatening Appellees

On February 19, 2025, the day after Appellees complained about Bossidy's mismanagement and proposed a plan to replace him, AFC sent Appellees a "default notice," claiming falsely that they were in default of the 2024 Forbearance even though Appellees had not missed or been late with a loan payment in a year. JA936-39 (Letter). AFC's letter threatened immediate litigation against the owners personally if they did not agree to provide "the immediate payment" of almost $30 million in cash and additional collateral to AFC. *Id.*; JA15 (Opinion).

Because the loan was not in default, and because Appellees' owners had done nothing that could have even remotely triggered their personal liability for any sum, much less $30 million, they rejected AFC's extortionate demand and continued making payments on the loan. JA182-83 (Kanovitz Decl.).

In April 2025, lacking any legitimate basis to declare Justice in default, but desperately in need of cash, AFC turned up the pressure. During the week of April 7,

AFC threatened that unless Appellees' owners paid AFC the sum of $10 million cash, AFC would bring a "RICO" lawsuit naming the owners personally, thereby causing them personal and professional embarrassment, even though Appellees' owners were not personally liable for the loan. JA182 (Kanovitz Decl.).

When Appellees and their owners refused to be shaken down, AFC carried through with its threat: the day after its deadline expired, AFC filed a salacious RICO lawsuit against Appellees' two owners, accusing them of looting the company of $19 million and engaging in criminal racketeering. *Advanced Flower Capital Inc. et al. v. Kanovitz et al.*, 1:250-cv-2996 (S.D.N.Y.), ECF 1.[2]

### AFC Loots Appellees' Cash

Just after close of business on April 9, the same day AFC filed the bogus RICO complaint, AFC sent a letter to Appellees alleging additional pretextual defaults, purporting to terminate the 2024 Forbearance, and providing notice that AFC was accelerating the loan ("The April Termination"). JA940-44 (Letter). The April Termination demanded full and immediate payment of an amount AFC calculated now somehow exceeded $120 million. JA943.

---

[2] Months later, Appellees wrote a pre-motion letter demanding that AFC dismiss the RICO allegations because they were frivolous. *Id.,* ECF 15. Rather than try to defend them, AFC voluntarily dismissed them before any motion to dismiss even had to be filed. *Id.,* ECF 24.

The next morning, April 10, 2025, less than 24 hours later, and without notice to Hayden, AFC abused its DACA-access to withdraw $1.75 million from Appellees' bank accounts without permission. JA16 (Opinion). That left Bloc's operating account below the $300,000 minimum balance to run the company as required by the 2024 Forbearance. JA1539. AFC, through Neville, also informed Appellees that it was going to sell all of their assets. JA197 (Brashers-Krug Decl.).

Facing the unjustified destruction of their company, Appellees filed this action seeking injunctive relief.

## II.  Procedural History

Shortly after the case was filed, the court convened a case management conference, during which AFC asked the Court for the right to file legal actions and seek remedies during the pendency of the injunction briefing. JA439 (Letter to Court). The Court rejected the request, informing AFC that it would instead accommodate AFC's desire to have a hearing as rapidly as it desired. *Id.; JA543.*

### The TRO

On April 28, 2025, following the initial case management call, the District Court entered an agreed temporary restraining order (TRO) in the form of a stipulated status quo order. JA8; JA437-38 (TRO). The order barred AFC from initiating foreclosure proceedings. *Id.* It also included an agreed-upon schedule, setting the preliminary injunction hearing for May 2, 2025. JA437 (TRO).

## AFC's Subsequent Actions

On the same day AFC voluntarily stipulated to the TRO, and just four days before the preliminary injunction hearing, AFC's parent company filed a lawsuit in New York state court seeking to enforce the shareholder guaranty against Appellees' corporate parent, based on the exact same alleged default that the District Court had just enjoined AFC from enforcing. JA439 (Letter to Court); *AFC Agent LLC v. JG HoldCo, LLC,* No. 652644/2025 (N.Y. Sup. Ct.).

At the subsequent hearing, the Judge Quraishi demanded an explanation. JA543. The court expressed profound dissatisfaction with AFC's counsel's attempt to equivocate about whether she had disclosed AFC's intention to proceed during the off-the-record case management call a week earlier. As the court pointed out, the "crux of that entire discussion was keeping and maintaining the status quo until [he] decided the PI issue," and the court made clear that: "[J]ust so we're not mincing words, you absolutely did not disclose the intent to file that litigation, or anything about that litigation to the court. Absolutely not." JA543,546-47.

The court added that: "[t]here will be no communications with the Court unless on the record. I've never had to say that to counsel before. This will be the first time in my career…" *Id.* The court *sua sponte* issued an order to show cause, later dissolved, and directed AFC's counsel to disclose to the New York court the stipulated TRO order, and a copy of the transcript. *Id.* JA56-18 (order to show cause).

## The Evidentiary Hearing

In advance of the hearing, the parties submitted approximately 120 collective pages of briefing, attaching hundreds of pages of exhibits. *See* JA Vol. 2-4. At the all-day hearing on May 2, 2025, the parties called five witnesses, and submitted more than thirty exhibits. *See generally* JA Vol. 5-7.

The District Court thereafter issued a 39-page opinion, making credibility findings plus conclusions of fact and law. JA7-45. The court expressly found Appellees' witnesses more credible than AFC's sole witness, Neville. *See* JA16-22, 44-45. After considering all of the evidence, documents, testimony, and witness credibility, the District Court considered and rejected each of the purported bases for default proffered by AFC. JA28-39.

The Court concluded that Appellees had established a likelihood of success on the merits on Count 1 (breach of the parties' contracts) and Count II (implied covenant of good faith and fair dealing). JA28-39 (Opinion). Judge Quraishi further found that Appellees established irreparable harm because AFC's actions (indeed, its stated intentions) went beyond economic harm, threatening both the existence of the business, and its ability to retain its license in a unique and competitive industry. JA40-41. The court also found that the balance of the remaining factors favored injunctive relief. JA41-43.

The court thus "declare[d] that, as of the date of this Order, Appellees are not in breach or default," and that AFC was enjoined from seizing Appellees' cash and/or "seeking any remedy for default that is inconsistent with the parties' oral Reopening Agreement with respect to Appellees' Pennsylvania facility." JA4-5 (Order).

When Appellees tried to post the $1 million bond set by the court, AFC (which had DACA control over Appellees' accounts) refused to authorize the wire. JA1580-81 (Letter Motion to Compel). On Appellees' motion, Judge Quraishi ordered AFC to permit the payment. JA6.

This appeal followed.

## SUMMARY OF ARGUMENT

After considering all the relevant agreements and testimony from five witnesses, the District Court concluded that Appellees are not in default and thus had a high likelihood of success on their claims. That conclusion, and the factual findings supporting it, were hardly clear error.

In arguing otherwise, AFC has now abandoned all but three of its original 23 purported bases for default. AFC's few remaining arguments are plainly pretextual.

On the requirement to prepare audited financials, Appellees' CEO testified *without contradiction* that AFC instructed them not to prepare them to save money, thereby waiving the requirement. Fields also testified that AFC entered into an agreement not to foreclose on the Pennsylvania facility while the parties worked

17

together to reopen it (the "Reopening Agreement"), an agreement upon which Appellees heavily relied and partially performed. Given the contemporaneous supporting documentation, the court believed Fields' account over that of AFC's CEO (Neville), and rightly deemed the parties' conduct "unequivocally referable" to the new agreement under the partial performance doctrine.

AFC cannot show error. These are exactly the kinds of well-supported factual and credibility determination to which appellate courts afford deference.

That leaves AFC down to its last complaint that more than a year ago, AFC received an email notice of a permit non-renewal a few weeks late. That brief delay, according to AFC, entitles it to call this massive loan, drain Appellees' bank accounts, and liquidate Appellees' business. This argument ignores, among other things, the cure period built into the loan. That AFC feels obliged to press this alleged breach on appeal (even while abandoning its very public allegations that Appellees supposedly stole millions of dollars and committed fraud and criminal racketeering) says all the Court needs to know about the weakness of AFC's position.

Equally sound was the District Court's conclusion that the complete destruction of Appellees' businesses and loss of their unique cannabis licenses would cause irreparable harm. After engaging in the required case-specific analysis, the District Court also correctly exercised its discretion when it granted AFC's request for a $1 million bond.

# ARGUMENT

## I.     The District Court Did Not Abuse Its Discretion In Granting The Preliminary Injunction.

### A.     Standard of Review

Preliminary injunctions are subject to a "tripartite standard of review": findings of fact are reviewed for clear error, legal conclusions are reviewed *de novo,* and the decision to grant or deny for abuse of discretion. *Delaware Strong Farms. v. Attorney Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015).

To justify injunctive relief, Appellees must establish (a) likelihood of success on the merits, (b) likelihood of irreparable harm, (c) the balance of equities tipping in their favor, and (d) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). The first two factors are the "most critical." *Reilly v. City of Harrisburg,* 858 F.3d 173, 179 (3d Cir. 2017).

In this Circuit, likelihood of success requires a prospect more than "negligible," but something short of "more likely than not." *Id.*

### B.     AFC Has Abandoned Most Of Its Purported Bases For Default

AFC appeals less than half of the seven purported defaults it asserted during the injunction proceedings, to say nothing of the 23 it originally claimed when it raided Appellees' accounts and started selling their assets. The unavoidable truth is that AFC made lots of baseless arguments about defaults that were not really defaults.

Most notably, AFC had very publicly accused Appellees' owners of stealing $19 million in loan proceeds, characterizing the theft as criminal racketeering and fraud. Appellees disproved that accusation with unrebutted evidence establishing that they had done no such thing. JA205-07 (Papatheofanis Decl.). Suffice it to say that theft and fraud violate the Loan Agreement. If AFC had any evidence whatsoever that Appellees' owners had truly diverted $19 million, or even $19,000 -- or really any amount, for that matter -- then AFC obviously would have offered it at the hearing as a basis for default. Instead, AFC effectively said: "never mind."

Unwilling to defend its theft and fraud allegations, AFC raised other alleged non-monetary defaults, such as supposedly missing inventory records, purported interference with the CRO, and the allegedly fraudulent perfection certificate. JA188-92,194-96,168-73,182-84,831,940-42. At the hearing and now on appeal, AFC abandons each of these other purported defaults too. That is not surprising. All were frivolous and contrived. Appellees offered evidence showing why each had no merit, *see, e.g.*, JA188-92 (perfection certificate); JA194-96 (inventory discrepancy); JA168-73, 182-84 (Bossidy interference)*, and AFC no longer even attempts to defend them.

Instead, AFC contends that the last three remaining of the original 23 bases for default really were real. According to AFC, these last three, unlike all the others, supposedly do have merit even though the court found otherwise. They do not.

## C. The District Court Did Not Err Regarding The Requirement To Produce Audited Financial Statements

AFC argues that Justice did not deliver the required audited financial statements for 2023 and 2024. The District Court did not err in finding that AFC expressly waived any default.

### 1. The District Court Did Not Abuse Its Discretion In Finding Waiver

As set forth *supra* at 10, there were two parties to the conversation where AFC allegedly waived the audit requirement: Fields and Tannenbaum. In the District Court's estimation, Fields "credibly testified" that the parties mutually deemed the cost of audited financial statements as too costly ("upwards of $150,000") and that "AFC did not deem them necessary." JA33. Fields' testimony was corroborated by the fact that notwithstanding the requirements of the contract, Appellees never submitted audits in past years, and AFC had never suggested this was a problem. *Id.*

Not only was Fields credible, *but AFC did not call Tannenbaum to rebut her account of their understandings.* Instead, the totality of AFC's rebuttal consisted of the following answers from Neville, where he uttered only three words:

Q:    Has Justice Grown provided an annual audited financial statement for the parent for fiscal year 2024?

A:    No.

Q:    Has it done it for fiscal year 2023?

A:    No.

Q:    Has AFC ever waived the requirement that it do so?

A:    No.

JA845.

The District Court did not abuse its discretion in choosing to believe Fields. Based upon both demeanor and substance, the court found Neville to be not fully credible on the key issues. JA21-22. Appellate courts defer to district courts on credibility determinations like that. *E.g.*, *Grider v. Keystone Health Plan Central, Inc.*, 580 F.3d 119, 137 (3d Cir. 2009).

Moreover, the court's conclusion was well-supported by the evidentiary record. JA33. As the District Court explained: "Such a waiver makes practical sense because Defendants wanted Appellees to focus on making their cannabis facilities operational, which in turn would have benefitted Defendants." *Id.* Also, given AFC's control of the bank account, AFC would have been well aware that the expense required to prepare audited statements had never been approved or deducted, yet it never suggested this was a problem.

### 2.    The Doctrine of Waiver Defeats AFC's Position

The "law is abundantly clear in New York that, even where a contract specifically contains a nonwaiver clause and a provision stating that it cannot be modified except by a writing, it can nevertheless be effectively modified by actual performance

and the parties' course of conduct." *Aiello v. Burns Int'l. Sec. Corp.*, 110 A.D. 3d 234, 245 (N.Y. App. 1st Dep't 2013). Waiver "may be accomplished by affirmative conduct or failure to act so as to evince an intent not to claim the purported advantage." *Stassa v. Stassa,* 123 A.D.3d 804, 806 (N.Y. App., 2d Dep't 2014).

"[T]he roots of waiver lie firmly in equity, and are designed to prevent the waiving party from lulling the other party into a belief that strict compliance with a contractual duty will not be required and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction." *Kamco Supply Corp. v. On the Right Track, LLC,* 149 A.D.3d 275, 281 (N.Y. App. 2d Dep't 2017). Waiver through "affirmative conduct" is a question of fact. *Fundamental Portfolio Advisors, Inc. v. Toqueville Asset Mgmt.*, *L.P.,* 850 N.E.3d 653, 658 (N.Y. 2006).

Here, Tannenbaum's instruction went beyond "mere silence or inaction." *Echostar Satellite LLC v. ESPN, Inc.,* 79 A.D.3d 614, 618 (N.Y. App. Div., 1st Dep't 2010). It evidenced "'a clear manifestation of intent' to relinquish [the] contractual protection" of requiring audited financials for 2023 and 2024. *Fundamental Portfolio Advisors*, 850 N.E.2d at 658. The court did not err in finding waiver.[3]

---

[3] Moreover, to the extent Neville's later request could be construed as an attempt to retract AFC's waiver, he provided an unreasonable amount of time (one business day) to turn around a task he knew takes months to complete. *Blue Ridge Investments, LLC v. Anderson-Tully Co.,* 2005 WL 44382, at *7 (S.D.N.Y. Jan. 10, 2005) (waiver cannot be expunged or recalled, but can "be withdrawn, provided the party whose performance has been waived is given notice of the withdrawal and *a reasonable time after notice within which to perform.*") (emphasis added). What is

**D.** **The District Court Did Not Abuse Its Discretion In Concluding That Appellees Established A Likelihood of Success On Count One Based On The Parties' Enforceable Agreement to Reopen, Not Foreclose Upon, The Pennsylvania Cultivation Facility**

Also lacking merit are the alleged defaults identified by AFC relating to Appellees' cultivation facility in Pennsylvania (the "Pennsylvania Cultivation"). The District Court did not err here either.

**1.** **AFC Reached An Agreement Not To Foreclose On The Pennsylvania Facility**

Virtually none of the following evidence offered by Appellees at the hearing was contested by AFC, whose Brief likewise ignores it.

**AFC Shuts Down The Pennsylvania Cultivation**

In early 2023, Appellees' Pennsylvania Cultivation facility began experiencing challenges. Before the facility's construction was complete, a dispute with the general contractor caused a work stoppage. Cultivating cannabis in the partially-built facility became increasingly difficult and decreasingly profitable. JA174 (Fields Decl.).

Fields and Tannenbaum had multiple conversations during the Summer of 2023, wherein Tannenbaum told her to focus Appellees' resources on getting New Jersey ramped up. JA653-54 (Transcript); JA174 (Fields Decl.). After examining the

---

more, when Appellees wrote back to confirm that AFC had previously waived the requirement, and asking whether AFC really wanted Appellees to spend $150,000 on procuring audits, JA0185-86 (Kanovitz Decl.), Neville never authorized the funds required to prepare the statements, or even responded at all. *Id.*

numbers, Tannenbaum told Fields that AFC wanted the Pennsylvania cultivation facility shut down completely. JA654-55 (Transcript).

Appellees preferred to run a skeleton crew that would keep the facility operational and maintain the permit, but AFC disagreed. JA174-75. Because AFC by then had control over Appellees' bank accounts through the DACA, AFC was able to enforce its will by refusing to approve bills necessary to keep the Pennsylvania facility operational, including utilities, insurance, water, pest control, plant nutrients, suppliers, etc. JA655-56 (Transcript); JA175 (Fields Decl.). Without utility service, the building also developed a mold problem. JA657.

By October 2023, AFC's refusal to release money to pay bills caused the facility to become inoperable. JA647, 655-56 (Transcript); JA175 (Fields Decl.). AFC understood and discussed with Appellees that if it was not operational, the Pennsylvania Department of Health ("DOH") probably would not renew the facility's cannabis license when it came due in July 2024. JA0174-75 (Fields Decl.).

### The 2024 Forbearance

The 2024 Forbearance reflected the parties' original agreement that AFC could foreclose on the Pennsylvania facility if the parties could not find an investor by the end of April to pay for completing the construction. JA175 (Fields Decl.).

April passed. AFC did not initiate foreclosure. *Id.*

As the parties predicted, when it came time to renew the facility's cannabis license in July, the DOH denied the application to renew, primarily because the facility was not operational and had not timely submitted a renewal application (because it had been shut down). JA175 (Fields Decl.); JA0653-54; 0753-59 (Transcript). That denial is on appeal. JA176 (Fields Decl.).

**The Reopening Agreement And Promise Not To Foreclose**

Absence of any Pennsylvania cultivation revenue was not good for either side. In September 2024, Appellees approached AFC to discuss a new path forward for the facility, with Justice's owners stepping in and injecting the capital needed to finish the construction, capital that Appellees had been unable to raise from outside investors. JA176 (Fields Decl.); JA659-63 (Transcript). The proposal, to which AFC agreed, was that AFC would forego foreclosure if, instead of an outside investor, Appellees' owners contributed $5 million of their own money to complete construction, plus a buffer for unforeseen costs and operating expenses JA176 (Fields Decl.); JA659-69 (Transcript).

The agreement was finalized at a breakfast in Chicago during the Benzinga conference in October 2023. The parties' two CEOs, Fields and Neville, agreed that instead of AFC foreclosing, Appellees' owners would pledge $5 million in outside money to reopen Pennsylvania and restart the cultivation operations, an agreement which AFC was excited about. *Id.* To help fund the plan, Fields asked Neville to

release $1 million from Justice escrowed equity account to put towards operating expenses until they could start selling the harvests. Instead of the full million, AFC agreed to contribute $500,000. JA661 (Transcript).

The plan was attractive not only because once the facility was operational, re-permitted, and growing cannabis, it would generate revenue, but also because changes in Pennsylvania law (awarding cultivators three more dispensaries) could dramatically increase the value of the assets. JA179 (Kanovitz Decl.). AFC very much liked the deal because its collateral would be substantially improved, and the facility would generate funds to pay down the loan. JA176 (Fields Decl.). At the hearing, Neville admitted: "It would have been more valuable as an operating cannabis cultivation facility than as a facility on an alternative use basis. So it was good for our loan, generally. It was good for Justice Grown. It was something that we all wanted. We wanted the cultivation facility to be operational and active." JA0850.

A key part of the Reopening Agreement was that in consideration for $5 million in additional capital and work toward reopening, AFC agreed not to exercise its right (in the 2024 Forbearance) to foreclose -- just as would have been the case if the parties had successfully found an outside investor to inject the same funds. JA176 (Fields Decl.); JA659-69 (Transcript). Appellees' owners were obviously not willing to invest $5 million of outside money to prepare the facility to grow cannabis if AFC retained the option to turn around and sell the building as a warehouse. *Id.*

## Written Confirmation of the Reopening Agreement

As a part of, and in reliance on, the agreement, Appellees began negotiating a resolution of the appeal with the Pennsylvania Department of Health ("DOH") to restore the permit. JA176 (Fields Decl.); JA734-35 (Transcript). DOH wanted a specific and credible path to bring the facility back online, and by December 2024, it supported Appellees and AFC's plan. JA176.

Pursuant thereto, Appellees submitted their application to DOH, documenting in writing that "our lender, AFC, has agreed to make available $500,000 toward start-up costs to complete and operate Pier Cove until its cash flow is sufficient to be self-supporting." JA1226 (Email). Crucially, the DOH application memorialized the parties' agreement, that AFC, through Neville, had agreed to "*take no action to foreclose on the mortgage or otherwise impair the facility*" pending the DOH approval. *Id.* (emphasis added); JA659-63 (Transcript).

Emails confirm that Neville received this document, and Neville admitted reading these representations to DOH that AFC had agreed not to foreclose. JA851; JA867-68. Although Neville tried to claim on the stand that he disagreed that AFC had promised to "take no action to foreclose," JA851, Neville admitted that after

reading this representation, he took no steps to inform DOH that it was inaccurate, nor even raised any concerns with Appellees, JA868.[4]

## Appellees' Reliance

Relying on its Reopening Agreement with AFC not to foreclose, Justice proceeded to pursue the settlement with DOH. Justice paid a law firm (Ice Miller) to do the legal work, and invested executive time in drafting the documents. JA176 (Fields Decl.); JA666, 755 (Transcript). Appellees also started spending the pledged funds, including significant payments to the general contractor. JA665-67 (Transcript). They retained architects, engineers, and contractors to get the plans redrafted, scaling back the floor plan and kitchens. *Id.* Appellees also cleaned up the liens on the property and developing a construction plan. JA0666-68.

Appellees would have done none of this without Neville's agreement that AFC would not foreclose. JA665, JA668. They had plenty of other markets where they could have deployed this capital. *Id.*

_____

[4] There were other contemporaneous communications confirming Neville's agreement with the plan. For example, on December 12, 2024, with settlement moving forward and DOH wanting confirmation of AFC's financial undertakings, Justice's CEO emailed Neville, stating that as part of the reopening plan, the DOH needed a letter from AFC confirming "that we [Justice] can use up to $500K from our equity account for initial restart fees (utilities, cleaning, initial staffing, etc)," Neville's email replied: "Happy to do[.]" JA1234 (email). Referring to Justice's outside law firm, Ice Miller, Neville added: "Ok. Can you guys or Ice draft." *Id.*

DOH liked the plan. JA176 (Fields Decl.); JA760-61 (Transcript). It indicated that it wanted to settle, and agreed to postpone the license renewal appeal hearing dates to allow the Commonwealth time to complete the settlement. JA193-94 (Brashers-Krug Decl.).

## AFC Breaches The Reopening Agreement By Foreclosing

In early February 2025, AFC (which had run into the cash squeeze described above) unilaterally and abruptly breached the Reopening Agreement. JA194 (Brashers-Krug Decl.); JA669 (Transcript). Without notice or explanation, and directly threatening the progress Justice made with DOH, AFC filed a lawsuit in Pennsylvania state court on February 6, 2025, seeking relief that included foreclosing on the Pennsylvania Cultivation (the "PA Lawsuit") to sell it for cash. JA41 (Opinion); JA738-39 (Transcript).

The PA Lawsuit was in direct breach of the Reopening Agreement. JA30-31 (Opinion). Appellees emailed AFC's CEO and its General Counsel, urging AFC to respect the agreement not to foreclose, to no avail. JA194 (Brashers-Krug Decl.).

2. **AFC Has No Valid Basis To Challenge The District Court's Conclusion That The Parties Reached A Reopening Agreement By Which AFC Agreed Not To Foreclose**

Based on the foregoing record, the District Court correctly found as a factual matter that the parties' CEOs (Fields and Neville) entered into the Reopening Agreement by which Appellees would invest time and money in exchange for AFC's

promise to continue not to foreclose. JA30-32. As the court summarized: "It is therefore apparent to the Court based on the evidence presented at the hearing … that there was an offer, acceptance, and consideration for the Reopening Agreement," the consideration being that "Neville agreed not to foreclose on the Hazle property." *Id.*

AFC tries to suggest that while the parties may have agreed to reopen the facility, AFC did not necessarily promise to continue to hold off on foreclosure. Br. 14-15. That is contradicted by the record and the court's factual findings, which are not clear error. Fields testified unequivocally and with detail that Neville agreed that AFC would not foreclose on the facility while AFC and Appellees worked together to reopen it. JA660-68.  The District Court correctly concluded that the material premise of the Reopening Agreement was that if Appellees spent the time and money to get the facility back open (which was in everyone's interest), then AFC would not exercise its contractual right. JA30-31 ("Fields testified credibly that by entering into the Reopening Agreement, . . . Defendants would not foreclose on the property."). That is particularly so where, as the court found, the documents and the parties' subsequent conduct corroborates the existence of the agreement not to foreclose. See JA31 ("Additionally, the documentary evidence memorializes the terms of the Reopening Agreement, implicitly and explicitly stating that Defendants would not foreclose.").

Much turned on whether the court decided to believe Appellees' witnesses that there was such an agreement, or Neville that there was not. The court found the testimony of Appellees' witnesses, including their CEO (Fields) and their owner, to be credible, and assigned both "substantial weight." JA17-22. The court described Neville, by contrast, as less credible, characterizing his testimony as evasive, often implausible, contradicted by the documents, inconsistent and self-contradictory. *Id.*

Where, as here, the District Court has made factual findings based on credibility, this Court's role on appeal is narrower. Clear error is always a steep hill to climb, and, here, AFC fails even to approach the hill.

3.      **The District Court Correctly Concluded That The Reopening Oral Contract Modification Was Enforceable Because, Under Well-Settled Law, Oral Modifications Can Be Enforceable, Even With A "No Oral Modification" Clause**

The law permits enforcement of oral contract modifications even where, as here, the contract provides that modifications must be in writing. AFC does not dispute the District Court's summary of the correct legal test: oral modifications can be enforced despite no-waiver clauses, where (1) "there has been partial performance of an agreement to modify, so long as the partial performance is unequivocally referable to the oral modification; or (2) one party has induced the other party to rely on an oral modification such that the first party may be equitably estopped from invoking the requirement that any modification be in writing." JA29-30, citing

*DiStefano v. Maclay,* 102 F. App'x 188, 189 (2d Cir. 2004); *Towers Charter &*

*Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990) (for both

exceptions, "the conduct claimed to have resulted form the oral modification must be

conduct that is inconsistent with the agreement as written.").

### a) The Test For An Enforceable Oral Modification Was Easily Met Here

The totality of the evidence, according to the District Court, "illustrates that

Neville worked closely with Appellees to reopen the Pennsylvania facility." JA31-32.

The court continued: "Appellees performed under the Reopening Agreement by

working to reopen the facility and pledging the money they promised," which was

sufficient to satisfy the partial performance test. *Id.*

There was no error here either. As described above, Appellees expended (and

continue to expend) substantial time and money in reliance on the no-foreclosure

Reopening Agreement, and its owners obligated themselves for millions more.

JA660-68. That reliance suffices. *Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d

486, 504-05 (S.D.N.Y. 2014) (no oral modifications clause did not defeat parties'

oral agreement that defendants would "credit" plaintiff for years of service when

paying vested commissions); *Cantor v. Boston Children's Health Physicians, LLP*,

64 Misc.3d 1233, 2019 WL 4124728, at *1-*5 (N.Y. Super. Ct. Aug. 12, 2019).

### b) The District Court Properly Concluded That The Parties' Subsequent Conduct Is "Unequivocally Referable" To The Oral Modification

As it did below, AFC contends that the no oral modification rule must be enforced because the parties' subsequent actions are supposedly not "unequivocally referable" to the agreement not to foreclose. The District Court did not err here either. Far from it, the District Court's conclusion is the only one that makes any sense.

Neville testified unambiguously to AFC's plan for selling this building to a buyer in an entirely different industry for $6 million, which he explained was the going rate for this 72,000 sq. ft. warehouse-shaped structure in an industrial park. JA866. Neville testified that he pulled regional comps from CoStar for the past 15 years, and estimated the non-cannabis value to be $6 million. JA865-66.

At the end of the day, AFC cannot answer the key question. Why would Appellees invest $5MM in new capital, plus so much of their limited time and people-resources, to reopen as a cannabis-producing facility if they understood that AFC could at any time turn around and sell it for $6MM as a warehouse? No sane outside investor would ever do that, and neither would Appellees, who were stepping into outside investor's shoes. But for AFC's promise not to foreclose, Appellees' owners would not spend $5 million to finish outfitting the facility to grow cannabis.

Crucially, any new buyer could not use the facility for any cannabis-related purpose. That is because Appellees' cannabis permit for that facility is specific to the

recipient: Appellees. JA738 (Transcript). No buyer could use the factory for cannabis purposes. *Id.* All of the actions and money being spent to renew the permit thus only improve the value of the collateral *if Appellees remains the owner. Id.*

That means all prospective buyers would be limited to using this modern, high-tech, cannabis-producing facility as an old-fashioned warehouse. JA865-66 (Neville conceding that the facility would be sold for "alternative-use basis," which is "not the highest and best use"). It thus makes no sense that Appellees would be willing to put in another $5 million to restart and reopen a cannabis factory, while also allowing AFC the option to sell the building as a warehouse for the $6 million that *it is already worth.*

That reality distinguishes the cases on which AFC relies. The owner of the yacht who paid $1M to refurbish it, for example, captured the upside from the improvements upon any foreclosure sale, and thus cannot be said to have been "unequivocally" acting with an understanding that there was an oral no-sale agreement. *Towers Charter,* 894 F.2d at 521-22 (all evidence of "partial performance" could have fit the original written agreements without inconsistency).

That is not this case. Absent an agreement not to foreclose here, Appellees would have been literally lighting the money on fire. Without a cannabis cultivation permit, which is specific to Appellees, no buyer would ever pay for cannabis-cultivating features. So there is no point in spending $5 million to get a warehouse

prepared to grow and process cannabis if AFC was just going to find a new buyer

who could not grow and process cannabis. The "unequivocally referable" condition is

met. *E.g.*, *Sarcona v. DeGiaimo,* 226 A.D.2d 1143, 1144 (N.Y. App. Div., 4th Dep't

1996); *Brook Shopping Centers, Inc. v. F.W. Woolworth Co.,* 215 A.D.2d 620, 621-22

(N.Y. App. Div., 2d Dep't 1995).[5]

For the same reasons, AFC's rationale for supporting Appellees' license appeal

only makes sense if AFC had agreed not to foreclose on the property. Fields'

December 12 email to Neville and the renewal submission summary to DOH

(expressly stating that AFC agreed not to foreclose) "unequivocally refer[] to the oral

modification," *Rose v. Spa Realty Assocs.,* 366 N.E.2d 1279, 1283 (N.Y. 1977).

Viewing these writings in combination with both parties' other actions, "the only

inference possible . . . is that an oral agreement had been concluded between the

parties." *L & B 57th Street*, 143 F.3d at 93; *Fisher Scientific Company L.L.C. v.*

*Ortho-Clinical Diagnostics, Inc.*, 2019 WL 1427564, at *5 (S.D.N.Y. Mar. 29, 2019)

---

[5] For similar reasons, AFC's other cases are likewise distinguishable. *L & B 57th Street, Inc. v. E.M. Blanchard, Inc.*, concerned a landlord-tenant dispute with no writings/correspondence between the parties memorializing the oral agreement or its terms. 143 F.3d 88, 90-91, 93 (2d Cir. 1998). In *John Street Leasehold LLC v. F.D.I.C.*, 196 F.3d 379 (2d Cir. 1999) (per curiam), appellant did produce written evidence memorializing an agreement, but could not point to a single action that was not already required by the underlying contract (plus the agent who entered the alleged modification had no authority to bind the lender anyway). *Id.* at 381-82. If anything, AFC's ability to cite cases reaching the opposite conclusion only serves to highlight the fact-specific nature of the inquiry.

(parties' "partial performance, such as executing a precondition seven months after the deadline and attempts to expand the scope of the validation protocol" was "unequivocally referable" to oral modification extending deadline to perform).[6]

*Rose,* the foundational case on partial performance, is instructive. A written contract to purchase land for a development obligated neither side to proceed without regulatory approval for at least 150 units. 366 N.E.2d at 1281-82. After sewage problems made regulatory approval unlikely, plaintiff alleged (and the factfinder agreed) the parties had orally agreed approval would be sought for just 96. *Id.*

Even though the underlying written agreement was never modified, and even though it contained a "no oral modifications" clause, the New York Court of Appeals found that the partial performance doctrine justified enforcement of the oral modification when the buyer refused to pay. *Id.* at 1284. The court explained that the parties' actions evinced a subsequent agreement: even after it became clear that 150 units would not be approved, the parties continued their work, and a letter from the seller informed the purchasers that approval was sought for 96 units rather than 150.

---

[6] AFC points to at least one court that phrased the test in as whether the written contract "precludes" a given action, and its Brief then starts using the verb "bar." But the actual test is whether the actions and the oral modification are "unequivocally referable." *Automated Irr'n Controls, LLC v. Watt Stopper, Inc.,* 407 F. Supp. 3d 274, 284 (S.D.N.Y. 2019). This makes sense. If Appellees gave AFC $25 million in reliance upon an oral promise to do something, it would not suffice to point out that the written contract does not explicitly "preclude" or "bar" $25 million gifts.

*Id.* at 1283-84. The letter, in combination with the parties' performance, referred unequivocally to the oral agreement, such that the agreement was enforceable. *Id.*

AFC argues in passing that surely sophisticated entities would have papered up a modification. While admittedly a point in AFC's favor, the District Court was not required to deem it dispositive. At the hearing, Appellees argued that the best way to view this agreement is as the type that CEOs reach with one another without bringing in lawyers, which is sometimes the way business operates, particularly in non-traditional industries like cannabis. Attorneys may not prefer those kinds of agreements, but the law respects an oral agreement (provided there really is one) just as much as 100-page documents created by corporate attorneys. Appellees further argued that the parties had lawyer-fatigue; every time the lawyers got involved during earlier rounds of renegotiation, another six-figure legal bill would arrive. JA587.

More to the point, Appellees had every reason to believe AFC would honor the Reopening Agreement, and no reason to suspect it would renege. Appellees are injecting millions of dollars of their own capital (from outside the collateral package) to accomplish a goal that will significantly improve AFC's collateral. Unrebutted hearing testimony established that a finished and reopened cannabis facility in Pennsylvania could generate $2.5 to $7 million in revenues every month at a high profit margin -- which is almost as much in one month as AFC is trying to get by selling the whole building in its desperate cash grab. JA674.

Once ramped up, the completed Pennsylvania enterprise will be worth as much as $75 million, JA674-75, many times the value of the alternative-use $6 million sale, JA866. Though Neville estimated the reopened value to be less than that, even he conceded it would be worth at least $20 million as a cannabis factory. JA865.[7]

In summary, AFC is the one in breach, not Justice. The District Court properly concluded that AFC is bound by the deal it made not to foreclose, and cannot validly claim the agreement contained some sort of one-way option, allowing AFC to change its mind after Appellees relied and partially performed.

### E. The Court Did Not Err In Finding That Appellees' Opposition To AFC's PA Lawsuit Was Not A Breach

AFC's argument that Appellees' Opposition to the PA Lawsuit was a default fails out of the gate. AFC concedes, as it must, that the PA Lawsuit default "would be mooted if there were an enforceable oral Reopening Agreement." Br. 42. As the District Court properly found, after Appellees relied on this Reopening Agreement and partially performed, AFC abruptly breached, filing a PA Lawsuit seeking relief that included foreclosure that AFC had agreed not to seek. Under those circumstances, Appellees were perfectly entitled to defend against the PA Lawsuit without being found in breach of the 2024 Forbearance, which had been modified by

---

[7] Neville tried to net out $5 million in cash to get it operational, JA866, but that capital was coming from Appellees' owners, outside the collateral package.

the Reopening Agreement. *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Com.,* 265 A.D.2d 513, 513-14 (N.Y. 1999) (defendant cannot act "to prevent performance of [the] contract or to withhold its benefits from plaintiff.").

While that is sufficient, AFC's foreclosure-defense argument also fails for three other independent reasons.

*First*, the contract provision at issue is unenforceable. AFC relies on terms purporting to prevent Appellees from "assert[ing] any defense" in any "enforcement" action, and require Appellees to "fully cooperate" in AFC's "exercise of all rights and remedies," "in connection with" the facility. JA1531; 1536. Under New York law, such overbroad provisions are unconscionable and contrary to public policy, and thus unenforceable. *Rossrock Fund II LP v. Arroyo,* 34 Misc.3d 1211(A), 2012 WL 127444, at *3 (N.Y. Sup. Ct. 2012) (rescinding similar term as "unconscionable"); *Lipkis v. Gilmour,* 158 Misc.2d 609, 610 (N.Y. App. Div., 1st Dep't 1993) (similar term "unenforceable as contrary to public policy"); *see also, e.g.*, JA11 n.5 (District Court noting that this provision may "violate public policy").

*Second*, AFC neglects to acknowledge that the District Court rejected as untimely its proffer of the PA Lawsuit. JA15 n.9. AFC had failed to put this evidence into the record at the hearing, and the District Court thought it prejudicial to allow it belatedly. *Id.* The basis for AFC's foreclosure argument is not even properly part of the record, and thus waived.

*Third*, Appellees' actions did not violate the 2024 Forbearance, which provides only for a consensual judicial foreclosure and sale of the real property with the proceeds being allocated to the Appellees' debt. JA1528-29 (defining "PA Foreclosure Proceeding"). Assuming there had been no Reopening Agreement, what Appellees were obligated to do under the 2024 Forbearance was enter into a consent judgment for such a foreclosure and sale. JA1536. Appellees were *not* required to stipulate to a money judgment, let alone a $12 million judgment plus $1,324,793.75 in attorneys' fees, an astronomically outrageous sum for simply filing a foreclosure case. Likewise, nothing required Appellees to admit to untrue allegations of default by itself and its affiliates, admissions which AFC could later use as evidence in collateral litigation such as this one. JA0767-70 (Transcript).[8]

---

[8] Without citing cases or making arguments, AFC suggests in a single paragraph that the Anti-Injunction Act somehow prevents the District Court's order. Br. 48. As AFC acknowledges, however, AFC never mentioned that statute in the proceedings below *(id.)* and has thus forfeited the issue. *Tri-M Grp., L.L.C. v. Sharp,* 638 F.3d 406, 416 (3d Cir. 2011). AFC independently forfeits any appellate argument by raising the issue in a single paragraph and declining to cite any cases or even explain how it might apply. It does not. *Smith v. Bayer Corp.*, 564 U.S. 299, 306 (2011) (the Anti-Injunction Act contains an exception permitting federal courts to stay proceedings in State court "to protect or effectuate its judgments") (citing 28 U.S.C. § 2283).

### F. The District Court Did Not Err In Rejecting The (Still-Pending) Pennsylvania Permit Non-Renewal As A Basis For Default

The Pennsylvania permit status cannot be a basis for default for each of the following reasons.

*First*, the District Court correctly concluded that its Reopening Agreement finding defeats this argument, as the whole point of that Reopening Agreement was to restore the permit by reopening the facility. JA11 & n.5; JA33. Had AFC not breached (and violated its implied covenant of good faith), the permit would be intact; it is thus AFC's own actions in reneging that caused the problem. *E.g., Frank Brunckhorst Co., LLC v. JPKJ Realty, LLC,* 129 A.D.3d 1019, 1020 (N.Y. App. Div., 2d Dep't 2015) ("[W]hen a party to a contract causes the failure of the performance of the obligation due, it cannot in any way take advantage of that failure.").

*Second*, Appellees have not actually lost their Pennsylvania permit, at least not yet. The DOH has not yet renewed it, but Appellees have not had to surrender and still possess the permit, subject to an administrative appeal. JA733-34. That appeal is pending, and will soon be resolved by favorable settlement once the facility is reopened. JA733-34; *see also* JA753 ("We declined to surrender the permit. And what happens in Pennsylvania is, if you don't surrender the permit and appeal, it's not surrendered until the appeal process is over and there's a final appealable

decision"). The Commonwealth has indicated it is willing to renew the permit with a reopening plan, which has been submitted. JA760-61 (Transcript).[9]

*Third*, the contractual provision on which AFC relies (§ 5.3) was drafted very poorly by AFC, and does not actually say that the loss of the permit constitutes a breach. Instead, it obligates *the entity* to remain in good standing, not *the permit*. JA346.

*Fourth*, as described above, *supra* at 24-25, the license was not renewed for circumstances that AFC imposed on Appellees. Fields testified without contradiction that Tannenbaum told her to shut down Pennsylvania to devote limited resources to the more profitable New Jersey opportunity. JA654-55. Appellees preferred to maintain the license by operating a skeleton crew, but AFC refused to approve Appellees' requests to use their own money to pay the expenses necessary to keep the facility open, fully aware that closure would cause exactly this result. JA174-75 (Fields Decl.); JA655-58 (Transcript). Non-operational facilities cannot renew their licenses. JA175 (Fields Decl.); JA753-59 (Transcript); 28 Pa. Code §1141a.38(c)(1).

None of this evidence was disputed by AFC at the hearing. Having itself effectively decided to shut down the facility, AFC cannot use the resulting

---

[9] AFC tried to argue that the application was submitted late, but Appellees' Compliance Officer testified in response that the DOH is ready and willing to renew if the facility can be reopened. JA760-61.

consequence as a basis for a breach. *E.g., CoraMed USA, LLC v. Alexion Pharms., Inc.,* 695 F. Supp. 3d 251, 265 (E.D.N.Y. 2023) (covenant of good faith and fair dealing prohibits parties from "do[ing] anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract").

### G. The District Court Did Not Err In Rejecting The Belated Email Notice To AFC As A Basis For Default

The final claimed default relied upon by AFC to justify foreclosure on this multi-million loan relates to the email Appellees sent to communicate the non-renewal of the Pennsylvania permit, which AFC claims was a few weeks late. This argument, too, lacks merit.

There is no dispute that Appellees provided notice. When Appellees' Comptroller made AFC aware on August 15 that the license was not renewed, JA1352 (Email), AFC did not respond to his email, despite follow up. JA0818-19. Admittedly, Appellees sent AFC this information about two weeks after they received it, JA14 (Opinion), whereas the Credit Agreement provided for five days, JA352 (Credit Agreement). AFC characterizes the slight delay as "hiding" the non-renewal, Br. 4, but there is no dispute that AFC had knowledge that the denial was a foregone conclusion: AFC knew the date for the renewal, JA658, and knew that it had forced Appellees to shut down the facility, *id.*, meaning there was no way the license could be renewed under 28 Pa. Code §1141a.38(c)(1).

In any event, the District Court correctly found that AFC thereafter agreed not to enforce the potential default (like the others) in favor of pursuing the Reopening Agreement. JA14. New York law is clear that, "[w]hen a party materially breaches a contract, the nonbreaching party must choose between two remedies: it can elect to terminate the contract or continue it." *Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 188 (N.Y. App. Div., 1st Dep't 2007). "If it chooses the latter course, it loses its right to terminate the contract because of the default, but given the no-waiver clause, it retains the option of terminating the contract for subsequent breaches." *Id.* AFC's Brief concedes that it elected to continue the performance of the contracts without seeking a remedy when the email was late. Br. 24,34-35; JA849-50 (Transcript). Under New York law, it thus lost its right to terminate the contract (although the existence of the no-waiver clause ensures that it could do so for future breaches). *Id.*

Independently, even assuming a breach, not every conceivable violation of a loan contract, no matter how immaterial, gives a lender permission to unilaterally declare a loan void and liquidate all assets. *In re 53 Stanhope LLC,* 625 B.R. 573, 584 (Bankr. S.D.N.Y. 2021) (collecting cases); *see also Fifty States Mgmt. Corp. v. Pioneer Auto Parks*, 389 N.E.2d 113, 115-16 (N.Y. 1979) ("It is true that equity will often intervene to prevent a substantial forfeiture occasioned by a trivial or technical breach. Similarly, equity may relieve against the effect of a good faith mistake,

promptly cured by the party in default with no prejudice to the creditor to prevent unconscionable overreaching.").

New York law is well-settled that technical or non-monetary defaults only justify acceleration and foreclosure when "(1) the lender has suffered actual damages as a result of the default; (2) the default has impaired the lender's security, such as the collateral securing the debt; and (3) the default makes the future payment of principal and interest less likely." *In re 975 Walton Bronx LLC*, 2022 WL 5265041, at *6 (Bankr. E.D.N.Y. Oct. 6, 2022). "Courts also consider whether the default was inadvertent." *Id.*

Here, AFC cannot satisfy any of those three factors, much less all of them, and has not even tried. That is really the end of the story.

Independently, AFC also loses because any notice problem has long since been cured. To protect against precipitous default, Section 8.1 ("Events of Default") provides that a violation does not become a default until 10 days after the borrower has notice. JA1099 (Credit Agreement). This creates a cure period, because to qualify as a condition of default that would entitle AFC to seize assets, the violation needs to be *continuing. Id.* Section 9.1 ("Rights and Remedies") makes this condition precedent clear: "Upon the occurrence *and during the continuation of* an Event of Default . . . Agent may . . . do any one or more of the following," including exercising the remedies it now seeks. JA1102 (Credit Agreement) (emphasis added).

Because AFC has no right liquidate Appellees' company except "during the continuation" of an Event of Default, the lack of notice about the non-renewal cannot qualify. It no longer continues. In what should be no surprise to anyone, therefore, AFC has no right to sell all of Appellees' assets just because it got this email a few weeks late. The fact that AFC defends this argument on appeal only betrays the overall weakness of its position.

### H.      AFC Has Not Asserted The Certificate of Occupancy On Appeal

Unwilling to defend the Bossidy fiasco, AFC does not challenge in any way the court's well-supported findings that: (a) Bossidy was working as an agent for AFC., JA35 at 29; (b) "evidence presented at the hearing showed that Bossidy was loyal to Defendants rather than Appellees," *id.*; (c) "acting in concert," Neville and Bossidy "interfered with Appellees' rights under the 2024 Forbearance Agreement," JA39 at 33; (d) Bossidy was the reason the certificate was late, JA35; and (e) AFC violated the implied covenant of good faith by conspiring with Bossidy to drum up purported defaults, JA39. Having not asserted this issues as a basis for default, AFC cannot do so in reply.

### I.      Equitable Estoppel Independently Defeats AFC's Appeal

Independently, even assuming *arguendo* that the parties' oral agreements were not enforceable, the injunction should still be affirmed on grounds of equitable estoppel. *Bethpage Theatre Co., Inc. v. Shekel,* 133 A.D.2d 62, 63 (N.Y. App. Div., 2d

Dep't 1987) (although oral modification was unenforceable, triable issue of fact existed on equitable estoppel). Equitable estoppel is "analytically distinct" from partial performance, and is "designed to prevent a party from inducing full or partial performance from another and then claiming the sanctuary of the statute of frauds or section 15-301 when suit is brought." *Eujoy Realty Corp. v. Van Wagner Communications, LLC*, 4 N.E.3d 336, 344 (N.Y. 2013).

The doctrine of equitable estoppel exists precisely for situations like this. AFC originally induced Appellees to shut down the Pennsylvania facility, then later to take steps to appeal the permit renewal to the Pennsylvania DOH by promising not to foreclose on the Pennsylvania property if Appellees successfully appealed. AFC, through Tannenbaum, also told Justice Grown that it should not produce audited financial statements because the process would be lengthy and time-consuming, and the money was better spent on Appellees' operations. That is a classic case for equitable estoppel.[10]

---

[10] AFC argues that because the district court focused on partial performance, this Court cannot sustain on grounds of equitable estoppel. That is plainly wrong. This Court can affirm on "any ground supported by the record," *Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 116 (3d Cir. 2020), and equitable estoppel is a question of law that appellate courts are well-positioned to address. *E.g.*, *Eujoy*, 4 N.E.3d at 344-45. This Court need not remand for additional factfinding where the record is clear that the movant "ha[s] made all necessary showings on the undisputed facts of record." *Kos Pharms.*, 369 F.3d at 712.

**J.  The District Court Did Not Abuse Its Discretion In Finding That Appellees Satisfied The Other Factors Supporting Injunctive Relief**

**1.  Irreparable Harm**

Out of cash and unable to make an impending shareholder dividend, AFC withdrew almost $1.75 million from Appellees' bank accounts. While the DACA accompanying the 2024 Forbearance effectively maintained AFC's control over expenditures, nothing in that (or any other) agreement gave AFC permission to just help itself to Appellees' cash, much less without notice. JA1525-77.

AFC took all of Appellees' tax reserves and operational funds. JA203 (Papatheosanis Decl.). But for the fortuity of a recent large receivable deposit, AFC would have left the company unable to cover payroll and make its vendor check run. *Id.* Appellees' 200-employee companies require at least $300,000 cash on hand to maintain operations; had the court not ordered AFC to return Appellees' money, the enterprise would have gone out of business. JA176-77 (Fields Decl.); JA672 (Transcript).

AFC euphemistically refers its actions as "unauthorized cash sweeps." More accurately, this was theft. AFC took money that belonged to the Appellees without authorization.

On appeal, AFC asks this Court to overturn not only the District Court's injunction against continuing to drain Appellees' account in the future, but it also

seeks the ability to sell Appellees' assets. Br. 46-48. In support, AFC argues that Appellees have not established irreparable harm. In disagreeing, the District Court hardly abused its discretion. There was ample record evidence establishing irreparable harm.

First, further thefts of Appellees' funds below the minimum cash sweep threshold would put Appellees out of business, leaving unpaid New Jersey employees and vendors in the lurch. JA203-04 (Papatheofanis Decl.); JA672,740 (Transcript). Most of the Appellees' employees earn less than $50,000 per year, and cannot afford to miss paychecks. *Id.* Disruption of business and failure to pay union workers would also breach Appellees' Collective Bargaining Agreement, which could interfere with ongoing contract renegotiations. JA195 (Brashers-Krug Decl.).

AFC quibbles with the wording of Appellees' showing that raiding its bank accounts would put Appellees out of business, but the debate is academic: AFC's intended sale of all Appellees' cannabis cultivation factories (and dispensaries) would necessarily mean the end of the business anyway. That is sufficient. *Minard Run Oil Co. v. U.S. Forest Service*, 670 F.3d 236, 255 (3d Cir. 2011); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932 (1975) (irreparable injury where respondent "would suffer a substantial loss of business and perhaps even bankruptcy"); *New Jersey Staffing All. v. Fais,* 749 F. Supp. 3d 511, 521 (D.N.J. 2023), *aff'd*, 110 F.4th 201 (3d Cir. 2024) (while economic harm does not typically constitute irreparable injury, "an exception

exists where the potential economic loss is so great as to threaten the existence of the movant's business").

The District Court also credited testimony about the myriad ways foreclosure and inability to operate would harm Bloc's reputation, both locally and nationally. JA741-42 (Transcript); JA41 (Opinion). That too can suffice. *See Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.").

Additionally, the testimony was clear that if AFC noticed its intent to sell the equity, that would "upend Appellants' negotiations with [DOH] to reopen the cultivation" in Pennsylvania. JA41 (Opinion); JA0738-39 (Transcript).

Perhaps the most important source of irreparable harm is the loss of Appellees' cannabis licenses that would accompany foreclosure and/or sale of their facilities. Like sports franchises, there are a limited number of cannabis license, JA738 (Transcript), and no guarantees Appellees could ever buy back another in the future even at any price, assuming DOH would ever again approve Appellees after having been liquidated. JA738-39 (Brashers-Krug explaining that cannabis licenses are "incredibly hard to get" where Justice operates); JA177 (Fields Decl. explaining that in the "extremely competitive cannabis markets in New Jersey and Pennsylvania," Appellees likely could not recover from losing their facilities); JA196-97 (Brashers-

Krug Decl. explaining that "if AFC's raids on Appellees' bank accounts are not enjoined," Appellees will likely lose their cannabis licenses). Loss of this sort of license qualifies as irreparable harm. *E.g.*, *Lowe v. City of Detroit,* 544 F. Supp. 3d 804, 816 (E.D. Mich. 2021) (irreparable harm based on potential loss of "recreational marijuana retail license"); *Finch v. Treto,* 606 F. Supp. 3d 811, 835 (N.D. Ill. 2022), *aff'd in part, dismissed in part,* 82 F.4th 572 (7th Cir. 2023) (irreparable harm based on loss of cannabis license because "dispensary licenses are scarce and granted only occasionally"); *Second on Second Cafe, Inc. v. Hing Sing Trading, Inc.,* 66 A.D.3d 255, 272 (N.Y. App. Div., 1st Dep't 2009); (finding irreparable harm where "Cafe's inability to operate a restaurant in its establishment potentially jeopardized its liquor license").

### 2. The Other Factors Both Favor Appellees

AFC ignores, and thereby concedes, the other factors, both of which favor Appellees.

First, AFC does not dispute the public's interest in maintaining an uninterrupted supply of medical cannabis. Many of Bloc's New Jersey customers are medical patients, who would lose access without Bloc. JA175 (Fields Decl.). The public interest is served by continuing to allow patient access to prescribed medicine. *See* 35 Penn. Stat. 10231.102 (legislative declaration that access to medicinal

marijuana is in the public interest); N.J. Rev. Stat. 24:6I-2 (2024) (same). Cutting off access to prescription drugs is a weighty public harm. *Kos Pharms*, 369 F.3d at 731.

Second, the balance of the equities clearly favors maintaining the status quo. Every month, AFC gets paid everything owed under the 2024 Forbearance. The loan expires in less than a year anyway, at which time AFC can assert whatever rights it believes are appropriate. Meanwhile, under the DACA already in place, AFC already has full control over all of Appellees' bank accounts, and must approve every payment before it leaves the account. With AFC fully in control, Appellees could not squander or divert a penny even were they inclined to try, which they are not. The status quo injunction for another half-year does not unduly impose on AFC.

## II. The District Court Did Not Abuse Its Discretion When It Set Bond At $1 Million

### A. Standard of Review

This Court reviews a District Court's grant of an injunction bond for abuse of discretion. *Sprint Commc'ns Co. L.P. v. CAT Comm'ns Intern., Inc.*, 335 F.3d 235, 239 (3d Cir. 2003). Determining the bond amount is the type of task particularly subject to the District Court's discretion, as it requires "a case-specific analysis that accounts for the factual circumstances of the parties, the nature of the case and competing harms, and the scope and potential impact of the injunction." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 392 (3d Cir. 2021).

## B.     AFC Has Failed To Identify Any Real Damages Requiring A Higher Bond

The actual need for a bond here is vanishingly small. The injunction maintains the status quo. Appellees have been making their required loan payments every month for more than a year. Defendants already hold a security interest in the collateral, control every penny in Appellees' bank account, and are entitled to most (75%) of the profits to boot. If they eventually win, they already have maximum security.

In arguing the District Court should have set the bond at $7.3 millions, AFC's Brief relies exclusively on Neville's testimony and calculations. Br. 54. That is a weak foundation on appeal. The court not only "assign[ed] little weight" to Neville's testimony generally due to credibility problems, JA21, but the court went out of its way to express particular skepticism concerning Neville's damage calculation, which "lacked any foundation" or recognition of risks. JA44-45 (describing his valuation testimony as "dubious at best").

Appellants cannot even begin to establish that these determinations were clearly erroneous. By any fair analysis, Neville's conclusory explanation of AFC's purported damages made no sense. Neville assumed he could sell everything immediately (good luck with that), and then instantly redeploy the money. JA861. He skips past the problem that his purported $45MM New Jersey LOI consists of only $10 million in cash, JA861 -- leaving aside that an LOI is nothing but a letter,

and thus hardly a done deal. Neville nevertheless claims AFC could use the cash from a New Jersey sale, plus $6 million for selling the Pennsylvania facility as a non-cannabis warehouse, plus about $20 million more for selling Appellees' Pennsylvania dispensaries, and quickly conclude deals to loan out that cash at 11-14% interest. JA860. Even if the District Court believed Neville (which it did not), his analysis fails to account for the fact that AFC is already charging 12.5% interest on far more than that, secured by the same collateral, and thus is not harmed at all.

AFC also continues to ignore the elephant in the room, which is that Appellees' assets are hardly diminishing in value. As the record established, if AFC stays enjoined from interfering with the Pennsylvania reopening, and if AFC is not permitted to liquidate the company at its present lowest possible valuation point to solve its desperate cash crunch, Appellees' assets will soon be worth many times their present value. JA646-47. Comparable facilities in New Jersey earn between $5-$7MM/month, and there is no reason (with Bossidy now gone) Appellees cannot soon do likewise. JA674.

In Pennsylvania, AFC (desperate for cash) proposes to foreclosure on the factory and sell it for scraps, even with a deal in place with DOH to reopen, restore the license, and add three more valuable dispensaries to boot. Reopened, the Pennsylvania facility could be earning up to $7MM/month. *See supra* at 38-39.

From a damages-bonding perspective, more time for the collateral to reach its potential value is good for AFC, not bad.

### C. The District Court Did Not Abuse Its Discretion In Allowing Appellees To Pay For The Bond With Their Own Money

Finally, AFC's contention that the District Court supposedly allowed Appellees to post the bond with AFC's collateral, Br. 52, is simply wrong. In fact, AFC tried to claim for itself the very money at issue, but the District Court ordered AFC to return it, concluding that it belonged to Appellees, not AFC.

AFC nonetheless argues that Appellees have effectively posted no bond at all. AFC cites no law for this proposition, because it cannot—the money belongs to Appellees, and was generated by their business. The District Court did not abuse its discretion in allowing Appellees to use their own money to post the bond.[11]

If nothing else, AFC cannot now complain that the District Court did not impose additional restrictions that AFC did not originally request. Such a change is tantamount to a "retroactive increase," which is prohibited in the Third Circuit. *Sprint Commc'ns*, 335 F.3d at 241.

---

[11] AFC's reliance on *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, is inapposite. That court permitted the *enjoined* party to remain in possession of money it owed to the *bonded* party in lieu of the bonded party posting an additional bond. 882 F.2d 797, 804-05 (3d Cir. 1989). That is the opposite of what was ordered here.

56

**CONCLUSION**

The Court should affirm the District Court's decision.

Respectfully submitted,

*/s/   Jon Loevy*

Jonathan Loevy
Loevy & Loevy
311 North Aberdeen Street
3rd Floor
Chicago, IL 60607

Jamie Solano
Michael Homer
Dynamis LLP
200 Connell Drive
Berkeley Heights, NJ 07922

*Counsel for Appellees-*
*Appellees*

Dated: September 11, 2025

# CERTIFICATE OF COMPLIANCE

I, Jon Loevy, Esq., hereby certify that:

(1) this brief contains 12,990 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), and thus does not exceed the 13,000-word limit prescribed in Federal Rule of Appellate Procedure 32(a)(7);

(2) this brief complies with the typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared using a proportionally spaced typeface, Times New Roman, with 14-point font, using Microsoft Word;

(3) the text of the electronic PDF brief is identical to the text of the paper copies; and

(4) the electronic PDF brief has been prepared on a computer that is automatically protected with a virus detection program, namely Sentinel Scanner Software, and no virus was detected.

Dated: September 11, 2025   Respectfully submitted,

          s/ Jon Loevy
          Jon Loevy
          Loevy & Loevy
          311 N. Aberdeen, 3rd Floor
          Chicago, IL 60607
          (312) 243-5900
          jon@loevy.com

Jamie Solano
Michael Homer
Dynamis LLP
200 Connell Drive
Berkeley Heights, NJ 07922

*Attorney for Plaintiffs-Appellees*
*Hayden Gateway LLC and Block*
*Dispensary LLC*

## CERTIFICATE OF BAR MEMBERSHIP

I, Jon Loevy, am a member in good standing of the Bar of the United States

Court of Appeals for the Third Circuit.

Dated: September 11, 2025

s/ Jon Loevy

Jon Loevy
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900
jon@loevy.com

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on September 11, 2025, I caused the foregoing Brief and the Joint Appendix to be electronically filed with the Clerk of the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system, and thereby to be served upon all counsel appearing in this case, and to have seven paper copies of the Brief delivered to the Court.

Dated:  September 11, 2025

                                        s/ Jon Loevy

                                        Jon Loevy
                                        Loevy & Loevy
                                        311 N. Aberdeen, 3rd Floor
                                        Chicago, IL 60607
                                        (312) 243-5900
                                        jon@loevy.com