# United States Court of Appeals

## FOR THE THIRD CIRCUIT
_____

HAYDEN GATEWAY LLC AND BLOC DISPENSARY LLC,
*Plaintiffs-Appellees,*
v.
ADVANCED FLOWER CAPITAL INC. AND AFC AGENT LLC;
*Defendants-Appellants*.

_____

*On Appeal From The United States District Court For The District of New Jersey*
*Hon. Zahid Quraishi, Case No. 3:25-02789*

---

### PLAINTIFFS-APPELLEES HAYDEN GATEWAY LLC AND BLOC DISPENSARY LLC'S OPPOSITION TO APPELLANT'S MOTION TO DISMISS APPEAL AS MOOT

---

LOEVY & LOEVY

Jon Loevy
311 North Aberdeen Street, 3rd Floor
Chicago, IL 60607
Tel: (312) 243-5900
jon@loevy.com

DYNAMIS LLP

Jamie Hoxie Solano
200 Connell Drive
Berkeley Heights, NJ 07922
Tel: (973) 295-5495
JSolano@dynamisllp.com

Michael B. Homer
175 Federal Street, Suite 1200
Boston, MA 02110
Tel: (617) 693-9732

*Attorneys for Plaintiffs-Appellees*

# **TABLE OF CONTENTS**

INTRODUCTION………………………………………………………………………1

BACKGROUND………………………………………………………………………...4

RELEVANT PROCEDURAL HISTORY………………………………………………5

ARGUMENT……………………………………………………………………………7

      I.      Legal Standard……………………………………………………..7

      II.     AFC's Motion To Dismiss This Appeal Should Be Denied………….8

           A.     AFC's Motion Is Rooted In Improper Gamesmanship………...8

           B.     The May 1 Maturation Date Does Not Terminate The Parties' Reopening Agreement, And Thus Does Not Moot The Injunction That Is Based Thereon……………………………………………………10

           C.     Independently, This Appeal Is Not Moot Given The Illegality Of AFC's Underlying Loan Contracts, Which Fundamentally Affects The Parties' Rights and Remedies…………………………………..12

CONCLUSION………………………………………………………………..24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albers v. Eli Lilly & Co.*,
354 F.3d 644 (7th Cir. 2004)................................................................................ 9

*Americana Art China Co., Inc. v. Foxfire Printing and Packaging, Inc.*,
743 F.3d 243 (7th Cir. 2014)............................................................................. 23

*Bartch v. Barch*,
111 F.4th 1043 (10th Cir. 2024) ....................................................................... 18

*CCH Acquisitions, LLC v. J&J&D Holdings, LLC*,
No. 2:23-cv-2983, 2025 WL 601249 (S.D. Ohio Feb. 25, 2025)............ 16, 17, 18

*Cnty. of Butler v. Governor of Pa.*,
8 F.4th 226 (3d Cir. 2021)................................................................................. 10

*Conn. Fair Housing Ctr. v. CoreLogic Rental Property Sols., LLC*,
167 F.4th 605 (2d Cir. 2026)............................................................................... 7

*Constand v. Cosby*,
833 F.3d 405 (3d Cir. 2016)................................................................... 10, 11, 12

*Fitzsimons v. Eagle Brewing Co.*,
107 F.2d 712 (3d Cir. 1939)............................................................................. 15

*Gonzales v. Raich*,
545 U.S. 1 (2005) ........................................................................................ 22, 23

*Hammer v. Today's Health Care II*,
No. CV2011-051310, 2012 WL 12874349 (Ariz. Super. Apr. 17, 2012) ......... 16

*In re Continental Airlines*,
91 F.3d 553 (3d Cir. 1996)................................................................................ 12

*In re Nexium Antitrust Litig.*,
778 F.3d 1 (1st Cir. 2015) ................................................................................... 8

*Jackson Purchase Rural Elec. Coop. Ass'n v. Local Union 816, Int'l Broth. of Elec. Workers*,
646 F.2d 264 (6th Cir. 1981)..................................................................... 16

*Kornea v. Miller*,
797 F. Supp. 3d 295 (S.D.N.Y. 2025)...................................................... 16

*Next Step Advisors LLC v. True Harvest Holdings Inc.*,
641 F. Supp. 3d 655 (D. Ariz. 2022)........................................................ 16

*Romsted v. Rutgers*,
566 F. App'x 189 (3d Cir. 2014) ........................................................... 8, 23

*Sensoria, LLC v. Kaweske*,
20-cv-00942-MEH, 2021 WL 103020 (D. Colo. Jan. 12, 2021)........................ 16

*Suntharalinkam v. Keisler*,
506 F.3d 822 (9th Cir. 2007)..................................................................... 8

*Thompson v. Advanced Armament Corp., LLC*,
614 F. App'x 523 (2d Cir. 2015) ............................................................ 10

*United States v. Hammer*,
226 F.3d 229 (3d Cir. 2000)...................................................................... 7

*United States v. Lunnin*,
608 F. App'x 649 (10th Cir. 2015) ......................................................... 14

*United States v. Rush*,
666 F.2d 10 (2d Cir. 1981)....................................................................... 14

**Statutes**

18 U.S.C. § 1956............................................................................................. 2

21 U.S.C. § 841(a)(1)................................................................................... 14

21 U.S.C. § 846............................................................................................. 14

iv

**Rules**

Fed. R. App. P. 42(b) ................................................................................ 7

**Other Authorities**

Restatement (Second) of Contracts § 178.................................................. 17

Restatement (Second) of Contracts § 179.................................................. 4

Williston on Contracts § 19:8 (4th ed.).................................................... 23

# INTRODUCTION

Following full briefing, oral argument, and supplemental submissions, Appellant AFC apparently now has misgivings about whether continued pursuit of this appeal advances its strategic interests. The source of AFC's concern is almost certainly the questioning at oral argument regarding the legality of its business model to profit from (predatory) loans by enabling cannabis enterprises to produce and sell drugs in violation of the Controlled Substances Act ("CSA").

Fundamentally, AFC's request to voluntarily dismiss is based upon a pretext: that the injunction is supposedly now moot because the May 1 maturity date allegedly provides AFC an independent basis to enforce remedies for default. Although AFC is intentionally vague about the remedies to which it refers, they are exactly the same ones that Judge Qurashi enjoined, and which this Court called into question for possibly violating federal law: seizing cash generated by the sale of cannabis (which AFC restarted last week), conducting a UCC sale to transfer equity in the cannabis operator LLCs (which AFC also restarted last week), and foreclosing mortgages on the cannabis licenses, dispensaries, production facilities, and cannabis inventory itself (which AFC no doubt intends to do next).

The legality of these loans and liens is a predicate question that determines whether there is a potentially-mooting basis for AFC to take the enjoined actions. AFC thus cannot sidestep this Court's adjudication of illegality.

Stripped of its patina of Wall Street legitimacy, AFC's business model is illegal. AFC specializes in profiting off cannabis producers by enabling them to violate the CSA and 18 U.S.C. § 1956 with financing unavailable from legitimate banks. That same sort of financing has long subjected others to federal prosecution for conspiring to violate the CSA.

AFC's latest attempt to avoid a federal court adjudication of its illegal business model must be denied. For starters, AFC is clearly playing games. Voluntary cessation can sometimes moot an injunction, but it does not here. Though its brief seems to abandon some contract remedies for prior alleged defaults the district court rejected, AFC speaks only in vagaries, has not accepted the Reopening Agreement, and still intends to pursue the same foreclosure activities the injunction prohibits. Further, AFC previously alleged many other pre-maturity defaults which it chose not to press at the injunction hearing, and which are therefore outside the loose scope of its motion. In short, AFC's changing positions are too equivocal and too limited to manufacture mootness through voluntary withdrawal.

AFC also fails to prove the necessary predicate supposedly driving its motion, i.e., that it has new *legally available* remedies. Trying to justify its changing positions on the alleged post-maturity default, AFC improperly sidesteps its illegality problem, never explaining what cannabis- and cannabis-adjacent remedies are triggered, nor establishing that its cannabis debt is even legally enforceable at all. The omission is

2

glaring because, as AFC is aware, the Court already indicated well-founded doubts about the enforceability of the debt and the liens. If AFC cannot enforce these supposed remedies legally, then there are no new grounds to moot the injunction because nothing operative changed. AFC ignores this.

The issues under consideration are not moot for other reasons too. Shortly before filing this motion, AFC essentially asked the district court to declare the dispute moot, *i.e.,* by moving to "clarify" that the injunction -- and the Reopening Agreement underlying it -- does not bar AFC from seeking remedies once the loan matures on May 1. The district court not only *denied* AFC's request and interpretation, but went a step further, indicating that it needed to consider this Court's forthcoming opinion before addressing the issues. That is the opposite of mootness.

Moreover, allowing AFC to dismiss this appeal would deprive the district court (and other courts) of valuable guidance from this Court on the illegality issue that was central to oral argument, and which remains a live controversy. If AFC is instead allowed to pull the plug anytime it dislikes the tenor of judicial questioning, it will eventually be able to cherry-pick its way to forums where it can trick a decision-maker into violating federal law. This Court should deny AFC's application to withdraw its appeal and decide the issues before it.

## BACKGROUND

AFC's Motion begins by describing itself as an institutional lender specializing in "lower middle market companies." Dkt. 61 at 6. That characterization omits much of the context.

Founded by a financial fraudster with a history of abusive lending, Dkt. 37 at 11, AFC was created to exploit a specific opportunity: lending to companies in need of capital to produce and distribute drugs that are illegal under federal law and who therefore have no access to reasonably priced credit. *Id.* at 4. Because no legitimate lending institutions were able to figure out how to legally make and/or secure enforceable loans in the federally illegal cannabis space, AFC was one of very few big players in an industry starved for financing. *Id.* For that reason, AFC was able to extract extremely high fees and interest income -- much of which AFC front-loaded, knowing that these predatory loans were designed to fail. *Id.* at 4, 11-12.

In essence, AFC has been reaping windfall profits as an outlier lender willing to finance illegal activity. Its business model is functionally indistinguishable from lenders who fund production and distribution of other scheduled drugs, such as cocaine or heroin, albeit under a veneer of BigLaw suit-and-tie credibility.[1]

---

[1] While things are still being sorted out, it is undisputed that President Trump's recent rescheduling order does not apply to states with recreational cannabis where the Borrowers operate, such as New Jersey. Dkt. 59-2 at 1-2. Nor does it apply retroactively to debts that were illegal when incurred. *See* Dkt. 59 at 1.

## RELEVANT PROCEDURAL HISTORY

AFC filed this appeal on June 2, 2025. On June 13, AFC moved to expedite consideration, citing as exigency that the appellate process was unlikely to conclude before the loan expired on May 1, 2026. Dkt. 11.

AFC's motion to jump the line was denied on July 3, 2026. Dkt. 27.

AFC nonetheless elected to continue to pursue the appeal. Oral argument proceeded on March 3. To be clear, AFC elected to continue despite knowing there was basically zero chance the appeal could be decided sufficiently in advance of the May 1 maturity date to make any material difference in AFC's foreclosure strategy.

Approximately two weeks ago, and nearly two months after oral argument, AFC abruptly filed a motion on short notice in the district court to modify the injunction (styled as a motion to "clarify") to permit AFC to pursue the previously enjoined remedies on the grounds that as of May 1, the loan matured. Dist. Ct. Dkt. 135. In so moving, AFC made the very same argument on which it presently relies: that the injunction only prohibited interim remedies and was no longer applicable post-maturity. Dist. Ct. Dkt. 135, at 1, 5.

Critically, the district court *denied* AFC's motion to clarify or modify its injunction, instead reaffirming its intention that the injunction "specifically enjoined [AFC] from seizing any of Plaintiffs' assets or cash or seeking any remedy for default that is inconsistent with several oral agreements made between the parties"

5

(*i.e.,* the Reopening Agreement). Dist. Ct. Dkt. 139 at 1-2. The court expressly declined AFC's request to hold that its injunction expired upon loan maturity. *Id.* at 2 ("Defendants' Motion to Clarify is tantamount to a motion to amend an Order.").

Having just been informed that it remains bound by the preliminary injunction even after May 1, AFC immediately filed a motion in this Court arguing that the entire case is now "moot" because, as of May 1, AFC is now supposedly entitled to foreclose notwithstanding the injunction. Dkt. 61 at 8-9.

## ARGUMENT

### I.     Legal Standard

There is no automatic right to dismiss this appeal. Rule 42(b) of the Federal Rules of Appellate Procedure vests discretion in this Court. *United States v. Hammer,* 226 F.3d 229, 234 (3d Cir. 2000).

Under the law, parties "should not be able to manipulate the formation of precedent by dismissing an appeal, especially when the motion was filed after full briefing, extended oral argument, and several months of deliberation." *Conn. Fair Housing Ctr. v. CoreLogic Rental Property Sols., LLC*, 167 F.4th 605, 619 (2d Cir. 2026) (denying motion to dismiss appeal filed five months after oral argument where movant appeared to be acting strategically and "dismissal of the claim after briefing and argument would not save resources or avoid delay") (citing *In re Nexium Antitrust Litig.,* 778 F.3d 1, 2 (1st Cir. 2015)).

## II. AFC's Motion To Dismiss This Appeal Should Be Denied

There are multiple independent reasons to deny this motion, beginning with AFC's impermissible attempt to manipulate the judicial process.

### A. AFC's Motion Is Rooted In Improper Gamesmanship

Under any fair reading, AFC's reasons for seeking dismissal of this appeal are the disfavored strategic kind. *Romsted v. Rutgers*, 566 F. App'x 189, 191 (3d Cir. 2014) ("Other courts of appeals have refused to dismiss appeals where the dismissal would 'abet[] strategic behavior,' such as in a case where an institutional litigant whose interest in success in pending litigation is outweighed by its interest in future litigation.'") (citations omitted).

AFC's stated explanation for trying to abandon this appeal is unquestionably pretext. AFC made the decision to continue this appeal even after its request to expedite was denied. That means AFC pursued an adjudication regarding the Reopening Agreement notwithstanding its awareness that there was no realistic prospect the case could be decided before the May 1 maturity (or sufficiently before May 1 to really change anything). The May 1 deadline, in other words, was not a mootness-causing event back when AFC still thought it had a chance to win.

The only thing that changed is that AFC apparently does not like how this Court received its arguments. AFC got zero traction with its factual challenges, and the Court required AFC to defend how its illegality position regarding the Reopening

Agreement would not also apply to its own business model. AFC is thus asking for a "never mind" because it no longer sees a path to victory, and would prefer to shop for a different court less concerned about federal criminal law. As a basis for seeking to dismiss, that is plainly unacceptable. *Albers v. Eli Lilly & Co.*, 354 F.3d 644, 646 (7th Cir. 2004) (collecting cases and explaining that "[o]ne good reason to exercise discretion against dismissal is to curtail strategic behavior").

Further evidence of pretext is that even putting aside the illegality issue, AFC knows its new and purportedly independent basis to foreclose as of May 1 is illusory. Even after May 1, the Borrowers are not actually in breach -- and certainly have not been judicially declared to be -- where they have pending and as-yet unresolved meritorious claims that AFC's own breaches of the loan agreement waived strict compliance with the maturity date, estopped AFC, and excused any further performance by the Borrowers. These fact- and maturity-specific arguments center around issues partially adjudicated in the court's injunction ruling, including the destructive control AFC exercised on the Borrowers' finances when AFC took over the cannabis operations, and on AFC's repeated breaches of the loan contracts that sabotaged the Borrowers' ability to refinance the debt. Dkt. 37 at 2; *Thompson v. Advanced Armament Corp., LLC,* 614 F. Appx. 523, 525 (2d Cir. 2015) ("[A] defendant violates the implied covenant when it purposefully sabotages a plaintiff's ability to benefit under the contract.") (citations omitted).

**B. The May 1 Maturation Date Does Not Terminate The Parties'
Reopening Agreement, And Thus Does Not Moot The Injunction That
Is Based Thereon**

"An appeal is moot in the constitutional sense only if events have taken place during the pendency of the appeal that make it impossible for the court to grant any effectual relief whatsoever." *Cnty. of Butler v. Governor of Pa.*, 8 F.4th 226, 230 (3d Cir. 2021) (citations omitted). The "prospect of partial relief is sufficient to defeat mootness." *Constand v. Cosby*, 833 F.3d 405, 409 (3d Cir. 2016). This analysis "is ordinarily a low bar," *id.,* and AFC has fallen well short here.

Even if AFC had unequivocally abandoned all pre-maturity defaults, which it has not, AFC clearly still refuses to abide the Reopening Agreement. When it granted the injunction, the district court found that the parties had reached an oral agreement to re-open the Pennsylvania cultivation facility, a valuable component of AFC's collateral package. In reliance on AFC's "agree[ment] not to foreclose," Plaintiffs' owners committed $5 million in new money to get the facility operational again. JA0030. The court found that this Reopening Agreement "acted as a novation of the provisions in the 2024 Forbearance Agreement pertaining to the Hazle cultivation facility," *id.*, and enjoined AFC from seeking any remedy for default inconsistent with that Reopening Agreement.

Appellees contend the Reopening Agreement survives the maturity date in the Credit Agreement. AFC disagrees. AFC thus asked the district court to adopt its

9

position that its injunction does not bar post-maturity foreclosure. Dist. Ct. Dkt. 135-1, at 5-6. The district court, however, *rejected* AFC's request. Dist. Ct. Dkt. 139, at 2.

The court, moreover, made clear that it does not intend to further address the continuing impact of the Reopening Agreement nor the Credit Agreement before first receiving guidance from this Court. *Id.* at 2 & n.1. Citing the oral argument, it stated that it was "unsure why [AFC] would request this Court modify its PI Order while at the same time arguing that it enables illegal activity." *Id.* The court concluded that "proceeding with this case without guidance from the Third Circuit as to the legality of the Credit Agreement 'potentially wastes judicial resources [and] interferes with the Third Circuit's jurisdiction.'" *Id.* at 2 (citations omitted).

From the district court's perspective, in other words, the appeal is the opposite of moot, notwithstanding the maturation of the loan. And the district court is awaiting further direction from this Court before doing anything. *Id.* at 2.

Indeed, there remain multiple ways this Court could rule. It could agree with Plaintiffs that the Reopening Agreement constitutes an enforceable novation of the loan contract, barring post-maturity foreclosure. Or this Court could disagree with the district court that a binding Reopening Agreement was formed, or find that even if one was, that Agreement does not preclude foreclosure after loan maturity. The Court could also agree with AFC that the Reopening Agreement is illegal, or agree with Borrowers that the underlying loan contract is illegal. Or find that both are.

The point is, there is nothing moot about this appeal. *In re Continental Airlines,* 91 F.3d 553, 558 (3d Cir. 1996) ("[W]hen a court can fashion *some* form of meaningful relief, even if it only partially redresses the grievances of the prevailing party, the appeal is not moot.") (emphasis in original).

**C. Independently, This Appeal Is Not Moot Given The Illegality Of AFC's Underlying Loan Contracts, Which Fundamentally Affects The Parties' Rights and Remedies**

Given the centrality of the CSA issues raised at oral argument to the enforceability of AFC's claimed new remedies, it is telling that AFC's motion fails to address them. The injunction is not mooted by the alleged subsequent default because AFC's very contracts are illegal and unenforceable.

First, the debt is unenforceable because it was made in violation of the CSA. AFC extended the loan *expressly* to enable the Borrowers (who could not get conventional funding for federally illegal conduct) to violate the CSA. AFC previously pled the following in a complaint AFC filed against the Borrowers' shareholders:

> AFC entered into a credit agreement with certain Justice Grown affiliates through which AFC agreed to fund up to $46,150,000 to finance the construction of … cultivation and processing sites and dispensaries in New Jersey. . . In September 2021, in connection with Justice Grown's restructuring, AFC entered into the Second Amended and Restated Credit Agreement with several Justice Grown-affiliated entities (the "JG Borrowers") to finance the NJ Project and the construction of cultivation and processing sites and dispensaries in Pennsylvania.

*Advanced Flower Capital Inc. et al. v. Kanovitz et al.*, Dkt. 1 ¶¶ 8-10 (cleaned up).

AFC's admissions that it extended the loan to facilitate cultivation and distribution of federally illegal cannabis is also corroborated by the loan terms. In fact, the loan contract expressly prohibits the Borrowers from using the proceeds for any purpose *other than* to build and operate cannabis production and dispensing facilities. JA0355. AFC also made failure to maintain their cannabis licenses a material default. JA0364. And while the contract recites that the Borrowers must comply with the law, it expressly carves out federal CSA and money laundering prohibitions. JA0285 ("'Applicable Law' shall not mean any United States federal laws, rules, or regulations as they relate to cannabis."); JA0348 (requiring compliance with terms of cannabis licenses and all laws except federal cannabis laws).

Not only did AFC intend to facilitate CSA violations, it went so far as to require the Borrowers to violate the CSA by contract, *prohibiting them from changing their business so they could earn money legally.* If they pivoted to growing any crop other than cannabis, they would breach AFC's contract. JA0353; JA0435. Thus, AFC not only intended that the Borrowers would use the loan proceeds to violate the CSA, but made it such that the only revenues they could earn to pay back the debt must come from federally illegal cannabis sales.

At bottom, despite 1,000+ page contracts bearing all the trappings of financial-world documents prepared by sophisticated counsel, AFC's cannabis loans are legally indistinguishable from drug cartels or mafia loan sharks conspiring to finance

12

illegal drug operations. *See* 21 U.S.C. § 841(a)(1) (prohibiting cultivating or distributing marijuana) and 21 U.S.C. § 846 (conspiracy). Indeed, the mafia and drug cartels are attracted to those kinds of illegal loans for the very same reason AFC is: the opportunity to make out-sized profits by being more willing than other lenders to ignore the law. *See United States v. Rush*, 666 F.2d 10, 12 (2d Cir. 1981) ("[A]ppellant knew the borrowers' 'intended illegal use' and that by making the loans he 'intend(ed) to further, promote and cooperate in' their scheme. This intent, when given effect by an overt act, is the gist of conspiracy.") (citations omitted); *United States v. Lunnin*, 608 F. App'x 649, 656 (10th Cir. 2015).

Moreover, AFC did all this with its eyes wide open. For example, AFC's public 10-K report informs its shareholders that the "the currently capital constrained cannabis market which does not typically have access to traditional bank financing" creates an opportunity to lend very profitably. Ex. A, 2021 10-K at 7. AFC's Board Members, who signed the filing, expressly recognize and warn investors that their enterprise risks violating federal law (emphasis in the original):

> **There may be difficulty enforcing certain of our commercial agreements and contracts.** Courts will not enforce a contract deemed to involve a violation of law or public policy. Because cannabis remains illegal under U.S. federal law, parties to contracts involving the state-regulated cannabis industry have argued that the agreement was void as federally illegal or against public policy.

Ex. A at 40.

That same 10-K concludes by expressly warning: "*We cannot be assured that we will have a remedy for breach of contract,* which would have a material adverse effect on our business." *Id.* (emphasis added).

AFC's Board's warnings to the shareholder are correct. Courts, including this one, have long held that debts incurred on an agreement to violate criminal laws are unenforceable. *Fitzsimons v. Eagle Brewing Co.*, 107 F.2d 712, 713 (3d Cir. 1939); *Jackson Purchase Rural Elec. Coop. Ass'n v. Local Union 816, Int'l Broth. of Elec. Workers*, 646 F.2d 264, 267 (6th Cir. 1981) ("[O]ne who has himself participated in an illegal act cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction.").

The principle applies to financial agreements intended to facilitate cannabis activity, such as AFC's loans here, and even when mature debts are due. *Kornea v. Miller*, 797 F. Supp. 3d 295, 303 (S.D.N.Y. 2025) (cannabis financing agreement "has as its object the unlawful purchase and sale of cannabis"); *CCH Acquisitions, LLC v. J&J&D Holdings, LLC*, No. 2:23-cv-2983, 2025 WL 601249, at *5 (S.D. Ohio Feb. 25, 2025) ("It follows that the parties' Purchase Agreement is an illegal contract under the CSA. To start, the agreement obligates [Defendant] to obtain approval for medical and adult-use marijuana licenses in Michigan. Once he does so, the agreement allows [Defendant] to buy Plaintiffs' marijuana operation, including their inventory, equipment, land, and other assets."); *Next Step Advisors LLC v. True*

14

*Harvest Holdings Inc.,* 641 F. Supp. 3d 655, 658 (D. Ariz. 2022) (refusing to enforce note for debt incurred to buy a cannabis operator as it undoubtedly contemplated illegal activity); *Sensoria, LLC v. Kaweske*, 20-cv-00942-MEH, 2021 WL 103020, at *6 (D. Colo. Jan. 12, 2021) ("Plaintiffs do not explain how relief could be fashioned here that would not endorse or require illegal activity, or would be paid from an asset source independent of marijuana."); *Hammer v. Today's Health Care II,* No. CV2011-051310, 2012 WL 12874349, at *2 (Ariz. Super. Apr. 17, 2012) ("The explicitly stated purpose of these loan agreements was to finance the sale and distribution of marijuana. This was in clear violation of the laws of the United States. As such, this contract is void and unenforceable.").

Likewise, the Restatement makes clear that where the parties' contract was intended to facilitate the violation of criminal law, it cannot be enforced even though already performed by one of the parties, therefore creating a windfall for the other. Restatement (Second) of Contracts § 178 cmts b & e (1981) ("To the extent, however, [the promisee] engaged in misconduct that was serious or deliberate, his claim to protection of his expectations fails."); *id.* § 182 ("If the promisee has substantially performed, enforcement of a promise is not precluded on grounds of public policy because of some improper use that the promisor intends to make of what he obtains *unless the promisee acted for the purpose of furthering the improper use*") (emphasis added); illustration 2 (debt unenforceable

where lender know borrower intended to use loan to facilitate illegal gambling).

Thus, AFC's conspiratorial violation of the CSA is more than enough to make the debt unenforceable as a matter of public policy because courts may not enforce a contract by which the parties intended to violate criminal law, even where one side has performed. *CCH Acquisitions, LLC*, 2025 WL 601249 at *6 (refusing damages to the performing party because to "enforce any part of the Purchase Agreement, the Court would have to stamp its approval on the parties' unlawful activities"). A court is doubly-restrained from aiding a criminal lender where, as here, that lender expressly prohibited the Borrowers from earning money other than through the sale of cannabis, meaning that the lender intended to be paid with funds that could only come from illegal cannabis sales. *Bartch v. Barch*, 111 F.4th 1043, 1055 (10th Cir. 2024) (holding that even "compensatory damages" for breach of cannabis contract must "not require a losing party to violate federal law").

The same is true of any foreclosure remedy. The Borrowers are single purpose entities that only operate in cannabis. Enforcing liens necessarily involves the sale of ongoing cannabis businesses and production assets, with AFC reaping the proceeds. Selling a cannabis dispensary or cultivation would necessarily "facilitate future marijuana operations," and thus AFC's lien and security agreements are "an illegal contract under the CSA." *CCH Acquisitions* at *3-4; *see also id.* at *3 ("[W]here parties ask courts to ignore established law, accept illegal conduct, and reward

16

parties accordingly. . . by enforcing the illegal promise, courts ratify unlawful conduct and become complicit in the parties' illicit transaction.").

Perhaps for that reason, AFC has been talking out of both sides of its mouth regarding its liens. When questioned at the oral argument about why enforcing its liens would not involve CSA violations, AFC represented that it does not take a lien in any cannabis or illegal collateral, meaning assets subject to forfeiture or seizure under the CSA. Dkt. 56 at 28. This was untrue. Appellees pointed this Court by letter to AFC's contract provisions that define the term "Collateral" to include cannabis products, not to mention the facilities to produce them and the proceeds of selling them. Dkt. 57 at 1-2. AFC responded by assuring this Court that Plaintiffs had "misconstrued" the agreement. Dkt. 58 at 1.

Plaintiffs misconstrued nothing. AFC's interactions with the Borrowers confirm that AFC takes a possessory interest in all the cannabis. For example, in a very recent "Information Request" email from AFC's CEO to the Borrowers, AFC demanded that Borrowers produce the following information, almost certainly as part of its foreclosure plans, including: "Cultivation planting, harvest schedule by strain with list of phenos [phoenotypes] in facility and avg testing"; "Harvest details (yield tracker by harvest for last 6 months, AB vs. Popcorn vs. Trim[2] by harvest for the last

---

[2] "AB" refers to grades of cannabis flower as does "Popcorn" and "trim".

17

6 months)"; and "METRC inventory reports."[3]  Ex. B (May 5, 2026 email).

Thus, contrary to AFC's counsel's representations to this Court at oral argument and in subsequent filings, AFC obviously does claim liens in the cannabis plants and products, and is presently preparing to satisfy the debt by selling the Borrowers equity and their facilities for cannabis production and distribution to a new illegal cannabis operator.

AFC gets a Reply, and should speak clearly. If AFC does not claim liens or is not intending to satisfy the debt by selling (directly or indirectly) the Borrowers' equity or cannabis production/distribution facilities, then it can and should set the record straight. But if that is in fact exactly what is going on, then counsel is obliged to correct its prior representations to the Court. And if AFC fails to commit about whether it is asserting liens in the fruits and instrumentalities of the cannabis business, then it forfeits any claim the dispute is truly moot.

Were there any doubt, AFC took the opposite position in a recent Massachusetts state court where it asked to appoint a receiver to manage its borrowers' cannabis operations and maximize the value of selling their businesses to other cannabis operators. *See generally* Ex. C, *Advanced Flower Capital v. DMA Holdings (MA), LLC*, No. 2584CV175 (Ma. Sup. Ct.). In its own words, AFC said

---

[3] METRC is a comprehensive database that tracks cannabis.

there that it was trying to vindicate its contractual "rights as a creditor over some of the most valuable Collateral: cannabis licenses and inventory." Ex. C at 11.

AFC did so expressly on the grounds that it needed the state court to enforce its liens "because cannabis is a schedule 1 controlled substance under federal law." Ex. C at 12 ("With ordinary legal remedies off the table and the unavailability of a U.S. Bankruptcy court to restructure a cannabis retailer, the only viable remedy [is for the state court to designate] a Court Appointee to manage Defendants' assets"). AFC's complaint, verified by AFC's CEO, explained that it needed the court's help for a work-around to the federal illegality problem, because its collateral "include[es] cannabis licenses and other cannabis assets associated with Defendants' cannabis business." *See* Ex. D at 3.

AFC's state court maneuvering cannot be squared with its counsel's representations to this Court at oral argument that: "because it's a federal law Supremacy Clause-type issue, the state court would absolutely be prohibited from granting relief that violates the CSA." Dkt. 56 at 10.

The cannabis "inventory" that AFC described in Massachusetts as its "collateral" is the very same substance AFC's counsel told this Court did not fall within the coverage of AFC's liens. *Compare* Dkt. 58 at 5-6 ("In sum, the Borrowers' claim that AFC has a security interest in cannabis plants is unfounded and their accusation of a "misrepresentation" is meritless.". . . . AFC unequivocally

19

rejects that construction [i.e. that the term "Collateral" extends to cannabis] and stipulates that cannabis plants qualify as "Excluded Assets" under the Security Agreement and thus are not secured "Collateral," and hereby waives any argument to the contrary.").

The same is true for any other mechanism AFC will use to enforce its loan. Enforcing liens in the proceeds of cannabis sales, in the equity of cannabis businesses, and in cannabis production equipment and distribution facilities would each also constitute additional violations of the CSA under AFC's own illegality theory. These were facilitated by the state court at AFC's insistence.

In addition to contradicting AFC's prior representations about its liens, AFC's actions in Massachusetts state court also highlight its gamesmanship. AFC clearly intends to forestall adjudication of the illegality issue until it can maneuver the case to a decisionmaker less concerned about the violation of federal criminal laws.

The Court should not indulge that plan. Rather, the Court should deny the motion outright, and make clear in its opinion what was obviously lost on the Massachusetts court: contracts made with the intention to violate a federal criminal law are no more enforceable in state court than in federal -- which is not at all. *Gonzales v. Raich*, 545 U.S. 1, 26-29 (2005) (affirming application of the CSA despite California state laws legalizing local production of medically prescribed marijuana because "[t]he Supremacy Clause unambiguously provides that if there

20

is any conflict between federal and state law, federal law shall prevail."); *see also* Williston on Contracts § 19:8 (4th ed.), Effect of Violation of Law of Jurisdiction Other Than the Forum, 8 ("The result, that a court will not enforce a contract made with the intention of violating another jurisdiction's laws, may be reached either on the ground that the agreement is directly opposed to the law of the place of the contract or under the well-recognized conflict of laws principle that the law of the place of performance should be applied.").

Were AFC granted dismissal with leave to punt the illegality question to state courts, the result would undermine the policies of respect for federal criminal laws that the *Raich* Court found controlling. *Raich*, 545 U.S. at 32 ("[T]hat [] narcotics trade has thrived in the face of vigorous criminal enforcement efforts suggests that no small number of unscrupulous people will make use of the California exemptions to serve their commercial ends whenever it is feasible to do so."). That should not be permitted. Where, as here, the issue of illegality of cannabis contracts is a "common, economically significant issue," other courts (including the two states where Appellees operate) could undoubtedly use additional guidance on issues touching on federal law. *Romsted,* 566 F. App'x at 191-92.

And that assumes AFC would respect the requirement for judicial involvement. At oral argument, and again in this motion, AFC suggested that if the Borrowers want to allege illegality, the proper way to assert it is when AFC

pursues a "repayment action" to foreclose on the collateral. Dkt. 61 at 11. What AFC does not mention is that it intends to enforce its illegal contracts via self-help remedies that skirt any opportunity for an adjudication: On May 14, AFC served notice on the Borrowers that it intends to auction off their pledged Pennsylvania dispensaries by July 28. *See* Ex. E. Thus, if AFC gets its way, this non-judicial remedy could avoid the need for AFC to have *any court* pass on the legality of its liens and loans, a result that further justifies denying its request for voluntary dismissal.

## CONCLUSION

This Court should deny AFC's Motion to Dismiss.

Dated: May 18, 2026

Respectfully submitted,

/s/ Jon Loevy
Jon Loevy
LOEVY & LOEVY
311 North Aberdeen Street
3rd Floor
Chicago, IL 60607
Tel: (312) 243-5900
jon@loevy.com

*Attorneys for Plaintiffs-Appellees*

Jamie Hoxie Solano
DYNAMIS LLP
200 Connell Drive
Berkeley Heights, NJ 07922
Telephone: (973) 295-5495
JSolano@dynamisllp.com

Michael B. Homer
DYNAMIS LLP
175 Federal Street, Suite 1200
Boston, MA 02110
Tel: (617) 693-9732
MHomer@dynamisllp.com

23

# CERTIFICATIONS

I, Jamie Hoxie Solano, hereby certify as follows:

1.      Pursuant to Third Circuit L.A.R. 28.3(d), the undersigned is a member in good standing of this Court.

2.      This brief complies with the type-volume limitation of Rule 27(d)(2) of the Federal Rules of Appellate Procedure because it contains 5,200 words, excluding the portions of the brief that are exempted by Rule 32(f) and because it has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman font.

3.      On May 18, 2026, I caused a copy of the foregoing motion to be filed using the CM/ECF system on all counsel of record.

*/s/ Jon Loevy*